CARSON HARBOR VILLAGE, LTD., a limited partnership, dba Carson Harbor Village Mobilehome Park, Plaintiff,

v.

UNOCAL CORPORATION, a Delaware Corp.; Carson Harbor Village Mobile Home Park, a California general partnership; Richard G. Braley; Walker Smith, Jr.; County of Los Angeles; City of Compton; City of Carson, Defendants.

No. CV 96–3281 MMM(RCx).

United States District Court, C.D. California.

Oct. 31, 2003.

Chris M. Amantea, Michelle L. Manzo, McDermott Will & Emery, Los Angeles, CA, for plaintiff.

John P. Zaimes, Peter A. Nyquist, Weston Benshoof Rochefort, Rubalcava & MacCuish, Linda Cohen Harrel, Department of Transportation, Legal Division, Los Angeles, CA, Thomas C. Sites, Gallagher & Gallagher, Los Angeles, CA, Lisa Marie Bond, Patrick K. Bobko, and Evan J. McGinley, Richards Watson & Gershon, Los Angeles, CA, for defendants.

Lisa Marie Bond, Richards Watson & Gershon, Los Angeles, CA, Evan J. McGinley, Richards Watson & Gershon, Los Angeles, CA, Charles A. Jordan, Holley & Galen, Los Angeles, CA, for cross-claimant.

Lisa Marie Bond, Richards Watson & Gershon, Los Angeles, CA, Evan J. McGinley, Richards Watson & Gershon, Los Angeles, CA, for counter-defendant.

AMENDED ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT OF UNOCAL CORPORATION, COUNTY OF LOS ANGELES, CITY OF COMPTON, AND CITY OF CARSON; DENYING MOTION FOR SUMMARY JUDGMENT OF CARSON HARBOR VILLAGE, LTD.; AND GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT OF CARSON HARBOR VILLAGE MOBILE HOME PARK, RICHARD BRALEY AND WALKER SMITH

MORROW, District Judge.

Plaintiff Carson Harbor Village, Ltd. ("Carson Harbor") is the owner and opera-

tor of a mobile home park in Carson, California. An undeveloped, open-flow wetlands covers approximately seventeen acres of the mobile home park property. In 1993, while attempting to refinance the property, Carson Harbor discovered hazardous substances contamination. A subsequent environmental assessment revealed tar-like and slag materials in the wetlands.

In 1996, Carson Harbor sued defendants Unocal Corporation ("Unocal"), the City of Compton, the City of Carson, and the County of Los Angeles ("the Government Defendants"); Richard G. Braley, Walker Smith, Jr. and Carson Harbor Village Mobile Home Park ("the Partnership Defendants"); and the California Department of Transportation and W. Van Loben Sels ("Caltrans").[1] Its complaint alleged claims under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq., the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 et seq., and the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 et seq. It also pleaded state law claims for nuisance, trespass, injury to easement, indemnity, and negligent nondisclosure.[2] Carson Harbor alleged that Unocal, which leased and used the property for petroleum production between 1945 and 1983, had dumped the tar-like and slag materials onto the property. It asserted that the Partnership Defendants were liable for the contamination as past owners of the property, and it maintained that the Government Defendants,

which conducted operations upstream from the property, were liable for lead deposited on the property through stormwater run-off. Carson Harbor sought to recover the costs of its cleanup, which totaled approximately $285,000, as well as damages arising from its inability to refinance the property.

On November 4, 1997, Judge Kim McLane Wardlaw entered summary judgment in favor of defendants on all claims except the state law nuisance and trespass claims asserted against Unocal.[3] See *Carson Harbor Village, Ltd. v. Unocal Corp.*, 990 F.Supp. 1188 (C.D.Cal.1997). A Ninth Circuit panel reversed, in part, the entry of judgment on the CERCLA and indemnity claims. That decision was subsequently withdrawn, however, and, on October 24, 2001, the court issued an *en banc* opinion reversing the entry of summary judgment in favor of Unocal and the Government Defendants on the CERCLA claim, and in favor of the Partnership Defendants on the indemnity claim. See *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 873, 888 (9th Cir.2001), cert. denied *sub nom. Carson Harbor Village, Ltd. v. Braley*, 535 U.S. 971, 122 S.Ct. 1437, 152 L.Ed.2d 381 (2002). The case was remanded to the district court, and assigned to this court for handling.[4] Pursuant to the court's scheduling order, the Partnership Defendants, the City of Compton, the City of Carson, the County of Los Angeles, Unocal, and plaintiff conducted further discovery necessitated by

---

1. The district court subsequently entered judgment in favor of Caltrans and Sels. See Docket Entry 15, dated August 6, 1996 (dismissing all claims against the State of California and Sels in his official capacity with prejudice); Docket Entry 279, dated November 28, 1997 (entering judgment in favor of Sels and dismissing all claims against him with prejudice).

2. The parties stipulated to the dismissal of the negligent nondisclosure claim. See Docket Entry 254, dated September 24, 1997.

3. The state law claims for nuisance and trespass were remanded to state court and subsequently dismissed.

4. Carson Harbor filed a petition for writ of certiorari in the United States Supreme Court, which was denied on April 1, 2002.

the Ninth Circuit's order. Each now moves for summary judgment.[5]

## I. FACTUAL BACKGROUND

Plaintiff Carson Harbor Village, Ltd. is a limited partnership owned entirely by James Goldstein and his corporation, Goldstein Properties, Inc. Goldstein, who is the President and sole shareholder of Goldstein Properties,[6] is a highly-educated, sophisticated businessman with extensive experience in the purchase of mobile home parks.[7] Carson Harbor is the current owner of the Carson Harbor Village Mobile Home Park, located at 17701 Avalon Boulevard in Carson, California ("the property").[8]

### A. The Property

The property is a 420 space mobile home park on seventy acres in the City of Carson.[9] It includes approximately seventeen acres of marsh, which bisect the property, traversing it from northwest to southwest.[10] Plaintiff asserts that this area has been designated a protected wetlands and

5. Carson, joined by Compton, has filed a motion to strike those portions of the complaint that have been rendered irrelevant by rulings of the district court and Ninth Circuit. Plaintiff does not oppose this motion, and the court accordingly strikes plaintiff's second through sixth claims for relief under RCRA and CWA, as well as its claims for trespass, nuisance and injury to easement. The court also grants Carson's unopposed request to strike plaintiff's demand for a jury trial on its remaining CERCLA claim. See, e.g., *Hatco Corp. v. W.R. Grace & Co.-Conn.*, 59 F.3d 400, 412–14 (3d Cir.1995) (holding that the parties are not entitled to a jury trial in suits brought under 42 U.S.C. §§ 9607 and 9613); *United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 749 (8th Cir. 1986) (disagreeing with defendant's characterization of response costs as legal damages, and holding that defendant was not entitled to a jury trial "[w]hen the government seeks recovery of its response costs under CERCLA ..., [because] it is in effect seeking equitable relief in the form of restitution or reimbursement of the costs it expended in order to respond to the health and environmental danger presented by hazardous substances"); *Metal Processing Co. v. Amoco Oil Co.*, 173 F.R.D. 244, 246 (E.D.Wis.1997) (holding that parties are not entitled to a jury trial in suits brought under § 9607 because CERCLA relief is equitable in nature). Plaintiff's demand for a jury trial on the express indemnity claim is not stricken, as the Partnership Defendants have not challenged plaintiff's right to have a jury decide the claim.

6. Statement of Uncontroverted Facts and Conclusions of Law in Support of Unocal's Motion for Summary Judgment ("Unocal's Facts"), ¶ 6; Statement of Genuine Issues of Material Fact in Opposition to Unocal's Motion for Summary Judgment ("Pl.'s Unocal Issues"), ¶ 6; Statement of Uncontroverted Facts and Conclusions of Law in Support of City of Carson's Motion for Summary Judgment ("Carson's Facts"), ¶ 7; Statement of Genuine Issues of Material Fact in Opposition to City of Carson's Motion for Summary Judgment ("Pl.'s Carson Issues"), ¶ 7.

7. Unocal's Facts, ¶ 7; Pl.'s Unocal Issues, ¶ 7.

8. Unocal's Facts, ¶ 1; Pl.'s Unocal Issues, ¶ 1; Statement of Uncontroverted Facts and Conclusions of Law in Support of County of Los Angeles' Motion for Summary Judgment ("LA's Facts"), ¶ 1; Statement of Genuine Issues of Material Fact in Opposition to County of Los Angeles' Motion for Summary Judgment ("Pl.'s LA Issues"), ¶ 1; Carson's Facts, ¶ 8; Pl.'s Carson Issues, ¶ 8; Statement of Uncontroverted Facts and Conclusions of Law in Support of Compton's Motion for Summary Judgment ("Compton's Facts"), ¶ 2; Statement of Genuine Issues of Material Fact in Opposition to Compton's Motion for Summary Judgment ("Pl.'s Compton Issues"), ¶ 2.

9. Compton's Facts, ¶ 2; Pl.'s Compton Issues, ¶ 2.

10. LA's Facts, ¶ 2; Pl.'s LA Issues, ¶ 2; Pl.'s Compton Issues, ¶ 2; Plaintiff's Request for Judicial Notice in Support of Opposition to Partnership Defendants' and City of Compton's Motions for Summary Judgment ("Pl.'s Prtnshp. & Compton Judicial Notice"), Ex. 2 (Declaration of Douglas L. Carden in Opposition to Defendants' 1997 Motions for Summary Judgment) ("Carden 2nd Decl."), ¶ 2 ("[A] public notice dated July 15, 1978 ... designates the marsh on the property owned by plaintiff as a wetlands").

habitat area.[11] The property is subject to deed restrictions designed to preserve the area in its natural condition. These prohibit construction or dumping on the land, covering the land with non-natural cover, removing natural resources, fishing or trapping animal or aquatic life without the permission of the California Department of Fish and Game, removing timber, or allowing members of the public to trespass upon or use the property.[12]

Historically, the site has been used both as a dairy farm and for oil production and storage.[13] Aerial photographs show oil use dating back to 1941.[14] Unocal had an oil and gas lease at the property from 1945 to 1977, when it signed a Quitclaim Deed. It continued to hold a non-exclusive easement across the land subsequent to that time.[15] In 1977, a special use permit issued, that permitted conversion of the site to "a complete mobile home community."[16] The mobile home park currently there was built in approximately 1978.[17] Carson Harbor purchased the property from the Partnership Defendants in 1983 for

11. Statement of Uncontroverted Facts and Conclusions of Law in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Facts"), ¶ 2; Pl.'s LA Issues, ¶ 2; Pl.'s Compton Issues, ¶ 2; Carden 2nd Decl., ¶ 2 ("[A] public notice dated July 15, 1978 ... designates the marsh on the property owned by plaintiff as a wetlands"). A 1978 notice from the Army Corps of Engineers states that there is a "Phase III Wetlands ... adjacent to and south of Artesia Freeway, adjacent to and east and west of Avalon Road." (Carden 2nd Decl., ¶ 2, Ex. A (ACE Notice of Jurisdiction Over Streams and Wetlands) at 64.) Defendants assert this evidence fails to prove the marsh is a federally protected wetlands area. (Carson's Statement of Genuine Issues of Material Fact in Opposition to Plaintiff's Motion for Summary Judgment) ("Carson's Issues"), ¶ 2; Compton's Statement of Genuine Issues of Material Fact in Opposition to Plaintiff's Motion for Summary Judgment ("Compton's Issues"), ¶ 2; County of Los Angeles' Statement of Genuine Issues of Material Fact in Opposition to Plaintiff's Motion for Summary Judgment ("LA's Issues"), ¶ 2. The description in the Army Corps notice, however, appears to reference the location of the property along Avalon Road and the flow of the storm drains south from the Artesia Freeway into the marsh. (See Unocal's Facts, ¶ 1; Pl.'s Unocal Issues, ¶ 1; LA's Facts, ¶ 1; Pl.'s LA Issues, ¶ 1; Carson's Facts, ¶ 8; Pl.'s Carson Issues, ¶ 8; Pl.'s Compton Issues, ¶ 13; Request for Judicial Notice in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Judicial Notice"), Ex. 1 (Declaration of Douglas L. Carden in Support of Plaintiff's 1997 Motion for Summary Judgment ("Carden Decl."), ¶ 10, Ex. K ("1984 Report to Mayor of Carson") (stating that the storm drains flowing onto the property were built as part of the construction of the Artesia freeway))). In any event, whether the area is a federally protected wetlands is not relevant to the issues presented in these motions, and need not be decided by the court.

12. Pl.'s Facts, ¶ 2; Pl.'s Compton Issues, ¶ 2; Carden Decl., ¶ 3, Ex. B ("Corporation Grant Deed").

13. Compton's Facts, ¶ 3; Pl.'s Compton Issues, ¶ 3; Carden Decl., ¶¶ 4-5, Ex. C (1977 Special Use Permit) at 23-24; Ex. D (Draft Environmental Impact Report) at 35 (noting that the land was previously used "for marginal dairy grazing and oil well production").

14. Compton's Facts, ¶ 4; Pl.'s Compton Issues, ¶ 4.

15. Unocal's Facts, ¶ 2; Pl.'s Unocal Issues, ¶ 2; Declaration of Peter A. Nyquist in Support of Unocal Corporation's Motion for Summary Judgment ("Nyquist Decl."), Ex. E (Quitclaim Deed). The County of Los Angeles asserts that Unocal's leasehold lasted from at least 1961 to some time after 1983. (LA's Facts, ¶ 8; Pl.'s LA Issues, ¶ 8).

16. Compton's Facts, ¶ 4; Pl.'s Compton Issues, ¶ 4; 1977 Special Use Permit at 23-24.

17. Compton's Facts, ¶ 2; Pl.'s Compton Issues, ¶ 2; Pl.'s Carson Issues, ¶ 9. The City of Carson contends the park was built in 1977. (Carson's Facts, ¶ 9; Carson's Request for Judicial Notice ("Carson Judicial Notice"), Ex. V (Declaration of John Wisz, Civil Engi-

$7,980,000.[18] Plaintiff and Carlsberg Financial Corporation acquired title to the property on or about April 1, 1983.[19] Plaintiff purchased Carlsberg's interest in 1986, and became the sole owner of the property at that time.[20]

Carson Harbor's owner, Goldstein, testified that he did not recall any discussion, inquiry or investigation regarding the environmental condition of the property at the time it was purchased in 1983.[21] Dennis Olson, who conducted a due diligence inspection of the property on plaintiff's behalf, recalls that he looked at the wetlands, but did not physically enter the area to inspect its bottom.[22] Carson Harbor knew that oil operations had been conducted on the property at the time it purchased the site in 1983.[23] It did not perform tests or soil sampling on or beneath the property to determine if there was contamination prior to purchase.[24]

### B. Tar–Like And Slag Materials

In or about 1993, Goldstein wanted to refinance the property at a lower interest rate, and submitted a loan application to G.E. Capital Corporation.[25] The lender retained Law/Crandall to perform an environmental assessment of the property, which revealed "a tar-like patch in the ravine" at the site.[26] Tar-like and slag materials that contained high levels of lead[27] were discovered in the wetlands area in 1993 or 1994.[28] The tar material was visible on the surface and covered an area approximately 20 feet by 30 feet. Subsequent characterization and excavation revealed that the tar-like and slag materials covered an area approximately 170 feet long and 75 feet wide, and extended to varying depths of approximately one to five feet. The slag material varied in both size and depth, but appeared to be most concentrated near the tar-like deposit.[29]

neering Manager, City of Carson ("Wisz Decl."), ¶ 59.))

18. Statement of Uncontroverted Facts and Conclusions of Law in Support of Partnership Defendants' Motion for Summary Judgment ("Prtnshp. Defs.' Facts"), ¶ 25; Statement of Genuine Issues of Material Fact in Support of Plaintiff's Opposition to Partnership Defendants' Motion for Summary Judgment ("Pl.'s Prtnshp. Issues"), ¶ 25.

19. Unocal's Facts, ¶ 1; Pl.'s Unocal Issues, ¶ 1; Carson's Facts, ¶ 10; Pl.'s Carson Issues, ¶ 10.

20. Carson's Facts, ¶ 11; Pl.'s Carson Issues, ¶ 11.

21. Unocal's Facts, ¶ 11; Carson's Facts, ¶ 12; Declaration of Lisa Bond in Support of Carson's Motion for Summary Judgment ("Bond Decl."), Ex J (Deposition of James Goldstein ("Goldstein Depo.")) at 95:6–18.

22. Unocal's Facts, ¶ 12; Nyquist Decl., Ex. K (Deposition of Dennis Olson ("Olson Depo.")) at 43:3–10.

23. Carson's Facts, ¶ 13; Pl.'s Carson Issues, ¶ 13.

24. Carson's Facts, ¶ 14; Pl.'s Carson Issues, ¶ 14.

25. LA's Facts, ¶ 26; Pl.'s LA Issues, ¶ 26; Prtnshp. Defs.' Facts, ¶ 7; Pl.'s Prtnshp. Issues, ¶ 7.

26. Prtnshp. Defs.' Facts, ¶¶ 7–8; Pl.'s Prtnshp. Issues, ¶¶ 7–8.

27. Carson's Facts, ¶ 25; Pl.'s Carson Issues, ¶ 25; Compton's Facts, ¶¶ 5–6; Pl.'s Compton Issues, ¶¶ 5–6; Prtnshp. & Compton Judicial Notice, Ex. 1 (Declaration of James F. Goldstein in Support of Plaintiff's 1997 Motion for Summary Judgment ("Goldstein 1997 Decl."), ¶ 4).

28. Pl.'s Facts, ¶ 18; Unocal's Facts, ¶ 4; Pl.'s Unocal Issues, ¶ 4; Carson's Facts, ¶ 21; Pl.'s Carson Issues, ¶ 21.

29. Pl.'s Unocal Issues, ¶¶ 23–25; Declaration of Hassan Amini in Support of Plaintiff's 1997

### 1. Source Of The Tar And Slag

Carson Harbor alleges that Unocal generated and disposed of the tar and slag in the wetlands.[30] Unocal employee Richard Salisbury reported on March 27, 1995, that "[t]here ha[d] been numerous spills to [a] storm drain [entering the property] including at least one in the 1980s from one of our wells."[31] At his deposition, Salisbury clarified that he knew of only one spill firsthand, but that he had heard of others from past foremen in the field.[32] Salisbury stated that the tar-like material had the same consistency as material that forms at "oil and gas tank farms" when a tank or pipeline leaks and the leaks are absorbed into the soil.[33]

Plaintiff's expert, Dr. Hassan Amini, asserts that the tar material was most likely tank bottom sludge from oil production and refining operations conducted by Unocal on or around the property. Specifically, he states that the tar material contained high concentrations of petroleum hydrocarbons, lead, and certain volatile organic compounds (BTEX), all of which are characteristic of materials originating from oil production. He notes further that the slag material had volcanic-like characteristics indicative of material that originated from a high-temperature furnace process and was subjected to abrupt cooling.[34]

Amini and plaintiff's second expert, Dr. Robert Ghirelli, as well as James Ross, a senior water resource control engineer at the Regional Water Quality Control Board ("RWQCB"), all believe that the tar-like and slag materials were deposited on the property through some means other than storm drains.[35] Dr. Amini, for example, testified that he did not believe the tar and slag were brought onto the property by stormwater.[36] Carson's expert, Dr. Robert Morrison, similarly concluded that it was "highly improbable" the tar and slag washed onto the property through the stormwater system.[37]

Carson Harbor alleges on information and belief that the tar and slag were generated and deposited on the property between 1961 and 1977.[38] Dr. Amini notes that the wetlands traverse the mobile home community and that removal of the tar-like materials required 100 truckloads. He concludes that this quantity of tar and slag materials could not have been

Motion for Summary Judgment ("Amini 1997 Decl."), ¶ 6.

**30.** Carson's Facts, ¶ 118; Pl.'s Carson Issues, ¶ 118.

**31.** Pl.'s Unocal Issues, ¶¶ 25–26; Declaration of Thomas W. Casparian in Opposition to Carson, County of Los Angeles, and Unocal's Motions for Summary Judgment ("Casparian 3rd Decl."), Ex. 3 (Deposition of Richard Salisbury) ("Salisbury Depo.") at 61:1–64:1.

**32.** Pl.'s Unocal Issues, ¶ 27; Salisbury Depo. at 64:2–11.

**33.** Pl.'s Unocal Issues, ¶¶ 30–31; Salisbury Depo. at 47:19–48:25.

**34.** Pl.'s Unocal Issues, ¶¶ 35–36; Declaration of Hassan Amini in Support of Plaintiff's Opposition to Motions for Summary Judgment of Carson, LA and Unocal ("Amini Decl."), ¶ 10.

**35.** LA's Facts, ¶ 10; Carson's Facts, ¶ 22; Compton's Facts, ¶ 10; Pl.'s Compton Issues, ¶ 10; Declaration of Thomas C. Sites in Support of Compton's Motion for Summary Judgment ("Sites Decl."), Ex. C (Deposition of Hassan Amini, Ph.D. ("Amini Depo.")) at 217:2–7, 394:19–395:12; Sites Decl., Ex. B (Deposition of James Ross ("Ross Depo.")) at 137:20–138:8. See also Sites Decl., Ex. E (Deposition of Robert Ghirelli ("Ghirelli Depo.")) at 91:13–22 ("As far as how it got there, it's my impression it was dumped there or deposited there").

**36.** Carson's Facts, ¶ 24; Amini Depo. at 395:3–12.

**37.** Carson's Facts, ¶ 24; Carson's Judicial Notice, Ex. V (Declaration of Robert D. Morrison, Ph.D. ("Morrison Decl.")), ¶ 22.

**38.** Carson's Facts, ¶ 23.

deposited on the property without being noticed and reported by at least some of the mobile home community residents, and thus that the materials were most likely discharged into the wetlands before the mobile home park was constructed in 1977.[39] The evidence presented in connection with the 1997 motions for summary judgment, however, caused Judge Wardlaw to find that the tar-like and slag materials had been deposited on the property prior to 1947. See *Carson Harbor Village, supra*, 990 F.Supp. at 1194.[40]

Plaintiff concedes that Carson did not cause the tar or slag to be deposited on the property.[41] Frank Sotelo, Compton's Street Superintendent, contends that

Compton also did not participate in disposal of the tar and slag.[42]

### 2. Investigation Of The Tar And Slag

In December 1993, as part of its effort to refinance the property, Carson Harbor hired Park Environmental Corporation to investigate the contamination at the property.[43] Ed Furu supervised the collection and analysis of nineteen soil samples, and presented a summary of his findings to Carson Harbor's attorney, Richard Close, in a June 10, 1994, letter. Furu found that total lead concentrations in the samples ranged from non-detectable to 2,300 parts per million ("ppm"). He also found that WET protocol analysis of five soil samples revealed concentrations of soluble lead ranging from 15 to 86 ppm.[44]

---

**39.** Pl.'s Unocal Issues, ¶¶ 37, 41; Amini Decl., ¶ 11.

**40.** As a consequence, and as an alternative basis for granting summary judgment in favor of the Partnership Defendants, Judge Wardlaw found that they could not be potentially responsible persons ("PRPs") under CERCLA because they owned the property between 1977 and 1983, long after the tar and slag deposits were made. Judge Wardlaw rejected plaintiff's argument that the passive migration of hazardous substances during a party's ownership of property was sufficient to render that party a PRP under CERCLA. She thus declined to hold the Partnership Defendants liable on the basis that lead from the tar-like and slag materials leaked into the *surrounding soil and lead from stormwater runoff entered the property while they were the owners. Carson Harbor Village, supra,* 990 F.Supp. at 1194. The Ninth Circuit affirmed this portion of the decision. *Carson Harbor Village, supra,* 270 F.3d at 874–87. (See Compton's Facts, ¶ 7; Pl.'s Compton Issues, ¶ 7). It also noted that "... investigation revealed that the [tar-like and slag] materials were a waste or by-product of petroleum production and that they had been on the property for several decades prior to its development as a mobile home park." *Id.* at 868. Unlike the statement that the materials had been on *the property for decades prior to its development as a mobile home part,* the Ninth Circuit's observation that the waste was a by-

product of petroleum production was not necessary to any of its holdings, and does not constitute law of the case.

**41.** Carson's Facts, ¶ 119; Pl.'s Carson Issues, ¶ 119.

**42.** Compton's Facts, ¶ 11; Request for Judicial Notice in Support of Compton's Motion for Summary Judgment ("Compton's Judicial Notice"), Ex. A (Declaration of Frank Sotelo ("Sotelo Decl."), ¶ 3).

**43.** Pl.'s LA Issues, ¶ 27; Carson's Facts, ¶ 40; Pl.'s Carson Issues, ¶ 40. Park Environmental did not participate directly in the refinancing process. (County of Los Angeles' Motion for Summary Judgment ("LA's Mot."), Ex. I (Deposition of Edward Furu ("Furu Depo.")) at 15:8–25 ("Q: What was your understanding of what Park was hired to do in connection with this property? A: I believe that we were hired as consultants to evaluate environmental conditions throughout the Carson Harbor Mobile Home Park ... Q: ... Were you hired to assist with the refinancing of the property? A: Not directly.... I believe that we were to evaluate environmental conditions so that others could conduct the refinancing"); LA's Mot., Ex. K (Deposition of James Ross ("Ross Depo.")) at 69:23–70:5.)

**44.** Furu Depo. at 129:18–139:19, Ex. 19 (1994 Furu Letter).

Carson Harbor subsequently hired McLaren Hart to investigate further and to remediate the contamination.[45] The impacted area was identified through visual inspection and confirmed through follow-up sampling.[46] A test of a sample of the tar-like material revealed that it had a Total Threshold Limit Concentration ("TTLC") of lead of 1,600 ppm. A similar test of a sample of slag showed that it had a TTLC lead content of 590 ppm and a Soluble Threshold Limit Concentration ("STLC") of lead of 12 ppm.[47] McLaren Hart considered various alternatives for remediating the tar-like and slag materials in the wetlands, but concluded, "due primarily to the concentrations of lead in the tar material, the sensitive nature of the wetlands, and the surrounding residential uses of the Property, [that] leaving the material in place was not a feasible solution." [48]

Dr. Amini testified that lead was inherent in the tar-like and slag materials.[49] While he believed that lead from other sources may also have been present in the tar, he was reasonably certain that one sample collected from approximately two feet inside the tar contained only lead that was inherent to the material.[50] Based on this sample, Dr. Amini concluded that the lead inherent to the tar was sufficient to require its removal as a hazardous substance.[51] He noted that the tar had a high viscosity, such that it would eventually seal itself and prevent the sinking of any lead particulate inside the tar.[52] He also testified that the slag had a vesicular texture and porosity that made it possible for lead coming from the surface to sink into the slag as a particulate.[53]

## C. Whether Additional Lead Was Deposited Through The Storm Drain System

■ On June 10, 1994, Park Environmental completed a limited Site Assessment designed to evaluate the potential presence of lead in the soils within the natural drainage wetlands area of the property. It found there were sufficient lead concentrations to necessitate reporting to regulatory agencies.[54] In defining the impacted area, McLaren Hart had only been concerned with the tar-like and slag materials.[55] On March 23, 1995, however,

45. Pl.'s LA Issues, 28; Carson's Facts, ¶ 41; Pl.'s Carson Issues, ¶ 41.

46. Carson's Facts, ¶ 42: Amini Depo. at 222:6–224:19.

47. Amini Decl., ¶ 3. Carson objects to Amini's description of these test results as hearsay under Rule 801 of the Federal Rules of Evidence, and as not properly authenticated under Rule 901(a). Amini has personal knowledge of McLaren Hart's tests because he supervised them. Accordingly, Carson's objections are overruled.

48. Pl.'s Unocal Issues, ¶ 40; Amini Decl., ¶ 8.

49. LA's Facts, ¶¶ 7, 9; Carson's Facts, ¶ 26; Compton's Facts, ¶ 8; Pl.'s Compton Issues, ¶ 8; Amini Depo. at 389:22–390:1, 421:12–19.

50. Carson Facts, ¶ 43; Pl.'s Carson Issues, ¶ 26; Pl.'s Compton Issues, ¶ 8; Amini Depo. at 421:20–423:3.

51. LA's Facts, ¶ 9; Amini Depo. at 430:2–5, 588:2–589:13.

52. Carson's Facts, ¶ 27; Pl.'s Carson Issues, ¶ 27; Compton's Facts, ¶ 9; Pl.'s Compton Issues, ¶ 9; Amini Depo. at 428:21–25.

53. Pl.'s Carson Issues, ¶ 26; Pl.'s Compton Issues, ¶ 8; Amini Depo. at 428:10–20.

54. Pl.'s Compton Issues, ¶ 32; Carden Decl., ¶ 8, Ex. G ("Park Environmental Report").

55. Carson's Facts, ¶ 42: Amini Depo. at 222:6–224:19.

it sent the RWQCB a letter stating that Park Environmental's soil samples upstream from the tar and slag revealed lead values ranging from 11 to 220 ppm. McLaren Hart represented that Carson Harbor's immediate removal action would clear the tar-like and slag materials from the property. It cautioned, however, that "[o]ther watershed water quality measures [would have to] be taken by the appropriate authorities to improve the water quality of the surface run-off entering the Carson Harbor Village park." [56]

### 1. Ownership And Maintenance Of The Storm Drain System

The cities of Compton and Carson, and the County of Los Angeles are public entities that operate a storm drain system.[57] Storm drains serving Compton, Carson and the County join together at various points,[58] and certain of them empty onto the marsh at the northeast corner of Carson Harbor's property.[59] The drainage area upstream from the property is 2.4 square miles, and contains a mix of industrial and residential properties located in Carson, Compton and certain unincorporated County areas.[60]

---

**56.** Casparian 3d Decl., Ex. 2 (Deposition of James Ross ("Ross Depo.")), Ex. 26 (January & March McLaren Hart Letters). Compton's expert, Dr. Edward Faeder, asserts that the mean soil lead level on the property was 92.2 ppm, a level at which there was no risk of "imminent endangerment." (Compton's Facts, ¶ 36; Compton's Request for Judicial Notice ("Compton Judicial Notice"), Ex. D (Declaration of Edward Faeder in Support of 1997 Opposition to Plaintiff's Motion for Summary Judgment ("Faeder Decl."), ¶¶ 13–14)). He also notes that background lead levels in the Wilmington/Compton area at the time were in the 188 ppm range. (Compton's Facts, ¶ 37; Pl.'s Compton Issues, ¶ 37; Faeder Decl., ¶ 13.) Plaintiff effectively concedes the accuracy of Faeder's statement, as Dr. Amini notes that the threshold "action level" or "hazardous waste level" is 1,000 ppm (Carson's Facts, ¶ 50; Amini Depo. at 547:5–8), while another of plaintiff's experts, Dr. Richard Richter, states that a lead level of 15 micrograms per liter (the equivalent of 15 parts per billion) is the default value for lead concentrations in drinking water (Carson's Facts, ¶ 48; Bond Decl., Ex. R (Deposition of Richard Richter Ph.D. ("Richter Depo.")) at 144:18–145:2). RWQCB's Ross similarly states that a level lower than 220 ppm does not pose a threat to human health (Compton Facts, ¶ 74; Ross Depo. at 89:20–90:3). Plaintiff, however, argues that the level of lead contamination at the property is irrelevant in assessing defendants' CERCLA liability, and this is clearly the holding of *A & W Smelter & Refiners v. Clinton*, 146 F.3d 1107 (9th Cir.1998). There, the Ninth Circuit declined to read a minimum level requirement for lead into CERCLA, stating: "Nothing in the law suggests that quantities of a hazard-

ous substance below its reportable level render it no longer hazardous. The Second, Third and Fifth Circuits have faced this very question and all agree that CERCLA's definition of hazardous substance has no minimum level requirement. See *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 720 (2d Cir. 1993) ...; *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 260–63 (3d Cir.1992) ...; *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1199–1201 (2d Cir.1992); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 669 (5th Cir.1989). We see no basis for parting company." *A & W Smelter & Refiners, supra*, 146 F.3d at 1110.

**57.** Compton's Facts, ¶ 1; Pl.'s Compton Issues, ¶ 1. Carson was incorporated on February 20, 1968. (Carson's Facts, ¶ 108; Pl.'s Carson Issues, ¶ 108.)

**58.** Compton's Facts, ¶ 12; Pl.'s Compton Issues, ¶ 12.

**59.** Compton's Facts, ¶ 13; Pl.'s Compton Issues, ¶ 13.

**60.** LA's Facts, ¶ 4; Request for Judicial Notice in Support of LA's Motion for Summary Judgment ("LA's Judicial Notice"), Ex. F (Declaration of Gary Hildebrand) ("Hildebrand Decl."), ¶ 9. Hildebrand is a supervising civil engineer for the County. Additionally, Carl Sjoberg, who is in charge of the County's Industrial Waste Control Program, produced a map at his deposition titled "Land Use within the Carson Mobile Home Park Drainage Area." He testified that drainage always runs north to south, and labeled certain areas north of the property as within Carson, Compton and the City of Los Angeles.

There are two storm drain inlets located on the north portion of the property.[61] The storm drain system and streambed run through the marsh and connect to an outlet at the other end of the marsh, with the water running northeast to southwest.[62] There are surface water drains, concrete drainage channels, culverts and other outlets on the property that carry water from roadways and areas of the property outside the wetlands into the wetlands area.[63]

■ Defendants contend there is no evidence as to when the storm drains were built. A report submitted to Carson's

(Carden Decl., Ex. J (Deposition of Carl Sjoberg) ("Sjoberg Depo.") at 30:9–11, 33:3–12, 79:12–22, Ex. 250.)

61. LA's Facts, ¶ 5; Carson's Facts, ¶ 18; Pl.'s Carson Issues, ¶ 18.

62. Pl.'s Facts, ¶ 8; Compton's Facts, ¶ 14; Pl.'s Compton Issues, ¶ 14; Carson's Facts, ¶ 15; Sjoberg Depo. at 79:12–22 ("Q: . . . [D]oes the County drainage channel drain into the property, then come back out and continue on at the other end of the property? A: There's a drain that picks it up at the lower end and a drain above"). Prior to construction of the flood control/storm drain inlets on the northern portion of the property, and the adjoining improved flood control channels, a natural watercourse crossed the property. (LA's Facts, ¶ 3; Carson's Facts, ¶ 17; Pl.'s Carson Issues, ¶ 17.) Plaintiff objects to Carson's characterization of the drainage area as a "watercourse," asserting that it is a federally protected wetlands area instead. (Pl.'s Carson Issues, ¶ 15). No evidence has been submitted demonstrating whether the area is either a watercourse or a wetlands, and the court does not consider the characterization relevant to the issues presented by the pending motions.

63. Carson's Facts, ¶¶ 19–20; Pl.'s Carson Issues, ¶¶ 19–20.

64. Pl.'s Facts, ¶¶ 5–6; Pl.'s Compton Issues, ¶ 13; Carden Decl., ¶ 10, Ex. K ("1984 Report to Mayor of Carson"). Carson and the Coun-

Mayor on February 21, 1984, however, indicates that the drains and outlets linked to the debris traps at the northern end of the property were installed by Caltrans as part of the construction of the Artesia (91) Freeway. This project was completed in 1976.[64] The report states that Caltrans relinquished responsibility for maintenance of the drains and debris traps to Carson on May 8, 1980.[65] A December 8, 1983, letter from the Los Angeles County Flood Control District ("LACFCD") to Carson's City Engineer indicates that Carson at that point became responsible for maintaining storm drains constructed by Caltrans that were outside its right of way and within the city limits.[66]

ty object to consideration of this document on the basis that plaintiff's attorney, Douglas Carden, cannot properly authenticate it, and lacks personal knowledge of the matters set forth in it. ". . . [D]ocuments, including discovery documents, although such documents are not admissible in that form at trial, can be used in a motion for summary judgment if appropriately authenticated by affidavit or declaration." *Chevron, U.S.A. Production Co. v. O'Leary*, 958 F.Supp. 1485, 1492 (E.D.Cal. 1997) (citing *United States v. One Parcel of Real Property*, 904 F.2d 487, 491–92 (9th Cir. 1990)); *Cook v. Layman*, 263 F.Supp.2d 1234, 1237–38 (E.D.Cal.2003) (same). See also *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 776, n. 20 (9th Cir.2002) (citing *Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889, n. 12 (9th Cir.1996), for the proposition that "documents produced by a party in discovery [may be] deemed authentic when offered by the party-opponent"). Carden declares that the exhibit is a true and correct copy of a document produced by Carson during discovery. (Carden Decl., ¶ 10.) For this reason, the court finds that it has been properly authenticated for purposes of this summary judgment motion. Defendants' objections are therefore overruled.

65. 1984 Report to Mayor of Carson.

66. Pl.'s Compton Issues, ¶ 13; Carden Decl., ¶ 10, Ex. K ("1984 Report to Mayor of Carson"); ¶ 11, Ex. L ("1983 Letter to Carson City Engineer"). Carson and the County object to this letter on the basis that plaintiff's

Carson's City Engineer acknowledges that Carson had an easement over plaintiff's property from December 1984 to October 1985, when it quitclaimed its interest to the LACFCD. The interest quitclaimed included the easement to operate and maintain storm drain facilities on the property.[67] The City Engineer contends that Carson does not presently own the storm drain system in Carson or operate the storm drain inlets on the northern portion of plaintiff's property.[68] Compton does not appear to dispute that it had or has operational responsibility for certain of the storm drains entering plaintiff's property.

## 2. Whether Stormwater Is A Source Of The Lead Deposits At The Site

▮▮▮▮ According to plaintiff's expert, Dr. Richard Gersberg, there is a 99%

attorney, Douglas Carden, cannot properly authenticate it. Carden states that the letter was produced by the County during the course of discovery. (Carden Decl., ¶ 11). Accordingly, for the reasons set forth in note 64, *supra*, defendants' objections are overruled. See *Orr, supra*, 285 F.3d at 776, n. 20. Plaintiff also proffers an October 18, 1978, letter from Compton to the LACFCD in which the city accepts responsibility for "the entire length of Drain No. MTD 815." (Pl.'s Compton Issues, ¶ 13; Carden Decl., ¶ 12, Ex. M ("1978 Compton Letter")). While defendants' objections to the foundation for and authentication of the document are overruled (see *Orr, supra*, 285 F.3d at 776, n. 20), plaintiff provides no information regarding the location of the drain, and the letter thus has little or not probative value.

67. Carson's Facts, ¶ 109; Pl.'s Carson, L.A. & Unocal Judicial Notice, Ex. 5 (Supplemental Declaration of John Wisz in Support of Carson's 1997 Motion for Summary Judgment ("Supp. Wisz 1997 Decl."), ¶¶ 17–18, 20). Plaintiff asserts that Carson continues to have operational responsibility for the storm drain facilities within its jurisdictional boundaries. (Pl.'s Carson Issues, ¶ 109).

68. Carson's Facts, ¶¶ 114–115; Wisz Decl., ¶¶ 56–57.

probability that the stormwater that flowed onto the property contained lead.[69] Gersberg bases this conclusion not on site specific data, but on several general studies regarding lead contamination in urban and stormwater runoff in Los Angeles County.[70] The head of the County's Industrial Waste Control Program, Carl Sjoberg, similarly stated that he would not be surprised to hear of lead in the storm drain system because "there's been incidents throughout the system over the years where lead has been or may have been a pollutant." [71]

Dr. Gersberg states that lead is removed from water very efficiently by wetlands areas, and thus there is a high likelihood that lead that enters a wetlands is "retained within the site and will accumulate in soils, plants, and biota on the proper-

69. Pl.'s Compton Issues, ¶ 16; Declaration of Thomas W. Casparian in Support of Plaintiff's Opposition to Compton's Motion for Summary Judgment ("Casparian Compton Decl."), Ex. 1 (Deposition of Richard M. Gersberg, Ph.D. ("Gersberg Depo.")) at 68:20–69:2.

70. Carson's Facts, ¶ 34; Compton's Facts, ¶ 21; Pl.'s Compton Issues, ¶ 21; Carden Decl., ¶ 13, Ex. N (Expert Report of Dr. Richard M. Gersberg ("Gersberg Report")) at 78–79; Compton Judicial Notice, Ex. C (Expert Report of Kenneth D. Jenkins ("Jenkins Report")) at 6–7; Gersberg Depo. at 73:7–16.

71. Pl.'s Facts, ¶ 14; Sjoberg Depo. at 37:1–24. Carson objects to this testimony on the basis that the statement lacks foundation, as there is no a showing that Sjoberg has personal knowledge of this fact. Sjoberg's status as the Chief Industrial Waste Planner for the County of Los Angeles establishes a foundation for his knowledge of prior incidents involving lead in the stormwater. Carson also objects to Sjoberg's statement that lead is "ubiquitous in the environment" (*id.*) on lack of foundation and personal knowledge grounds. Given the vague and general nature of the statement, and the lack of any showing regarding Sjoberg's credentials, the court sustains this objection.

ty."[72] He concludes, based on the size of the discharge pipe at the site, that quite a bit of water could come out of the pipe if it filled up, and that the wetlands could be partially under water during a good rain.[73]

Compton's expert, Edward Faeder, states, by contrast, that "[t]he relatively low soil sample readings at the northeast end of the marsh ... support the observation that stormwater is not the source of [the] marsh lead" because, "[i]f the storm drain inlets were the source of the lead, these soil lead samples from the northeast end should have been substantially higher." Faeder notes that the average downstream lead levels were not substantially different than the upstream values, and concludes as a result that there was no runoff lead source emptying onto the site.[74] Faeder also asserts that samples taken from the storm drain mouth contained a level of lead that was well below the drinking water standard.[75] Plaintiff's expert, Dr. Amini concedes that he would expect the concentration of lead to be higher in the northeast portion of the property *"if* the inlet of the marsh where the stormwater is coming in was not a scour area but a depositional area." He does not state, however, whether the area tested was a "depositional area" or a "scour area."[76]

Faeder opines that dry deposition may account for the nominal, background levels of lead found throughout the site.[77] Gersberg acknowledges that "dry deposition" may account for some percentage of the lead found on the property, but asserts there is nonetheless a high probability that the lead at the site came from stormwater.[78] Gersberg states that both dry deposition and stormwater flowing from within the trailer park are "obviously" sources of lead in the wetlands, but are insignificant compared with upstream drainage from the storm drain.[79]

### 3. When Lead May Have Been Deposited On The Property By Stormwater

The Ninth Circuit held there was "no evidence that there was any lead-contaminated stormwater runoff to the property prior to 1994...."[80] The court considers this statement the law of the case for purposes of this summary judgment proceeding.

### 4. Adequacy Of On-Site Sampling And Testing

As noted, plaintiff's expert, Dr. Gersberg, relied on general information and studies in forming the conclusion that stormwater likely carried lead onto the property. By contrast, another of plaintiff's experts, Dr. Ghirelli, testified that

---

**72.** Pl.'s Facts, ¶ 14; Gersberg Report at 79.

**73.** Compton's Facts, ¶ 20; Pl.'s Compton Issues, ¶ 20; Gersberg Depo. at 119:15–121:14.

**74.** Carson's Facts, ¶ 31; Compton's Facts, ¶¶ 16–19; Faeder Decl., ¶ 16.

**75.** Compton's Facts, ¶ 18; Faeder Decl., ¶ 16.

**76.** Pl.'s Compton Issues, ¶¶ 16–19; Amini Depo. at 218:17–24 (emphasis added).

**77.** Faeder Decl., ¶ 16.

**78.** Compton's Facts, ¶ 23; Gersberg Depo. at 58:11–59:15.

**79.** Carson's Facts, ¶¶ 33, 36; Gersberg Depo. at 15:20 16:19.

**80.** LA's Facts, ¶ 21; *Carson Harbor Village Ltd. v. Unocal Corp.,* 270 F.3d 863, 888 (9th Cir.2001). While plaintiff's expert, Dr. Lee, asserts that "[a]t least a portion of the lead detected in the wetland soils and the slag material was deposited there from stormwater discharges that occurred prior to 1990" (see Pl.'s Facts, ¶¶ 10, 16; Lee Decl., ¶ 11), the court has excluded his opinion for the reasons stated in its separate Order re Certain Evidentiary Objections.

"some kind of sampling of the stormwater" would be appropriate,[81] while a third, Dr. Richter, testified that a party might "want to sample run-off" if it wished to determine the source of the lead.[82] Carson's expert, Dr. Robert Morrison, opines that sampling data from the site is not sufficient to permit a reasonable scientific determination that the source of the lead found there is stormwater.[83]

While plaintiff's Dr. Amini concluded that stormwater runoff was the most likely source of the lead detected in the flood control channel,[84] he stated he could not determine, based on existing samples and information, "that off-site stormwater *is* the source of any lead found at the Carson Harbor Park" because he had not "gone to exhaustive studies to eliminate other sources of possibilities of lead contamination."[85] Specifically, Amini admitted that he did not investigate whether any NPDES permits were held by industrial facilities upstream of the property.[86] He also conceded that no attempt had been

made to distinguish between naturally occurring lead and lead that was deposited at the site by an outside source.[87] He could not rule out aerial deposition as a source of the lead found in the wetlands,[88] and noted that "there [were] statistical methods that [would] give ... [a] more likely source of the material."[89]

Dr. Amini testified that surface and ground water on the site "are practically in direct communication," and that in some rare occasions the groundwater may "feed" the surface water. This would happen, he stated, because "[t]he saturated sediments in the flood control channel ... act like a sponge during the high flood water and high groundwater recharge time, and at the time of the receding of the flood water, [they could] return some of that water back to the channel."[90] For this reason, Dr. Amini conceded that he could not rule out groundwater as a source of the lead in the wetlands without testing the groundwater.[91]

Dr. Gersberg could not say with any reasonable degree of scientific certainty what percentage of lead at the site, if any, was deposited by stormwater.[92] He ac-

---

81. Compton's Facts, ¶ 35; Ghirelli Depo. at 5–15.

82. LA's Facts, ¶ 13; LA's Mot., Ex. R (Deposition of Richard Richter ("Richter Depo.")) at 266:10–24.

83. Carson's Facts, ¶ 30; Compton's Facts, ¶ 40; Compton's Judicial Notice, Ex. F (Declaration of Robert Morrison ("Morrison Decl.")), ¶¶ 2, 24.

84. Amini Depo. at 305:1–7.

85. LA's Facts, ¶ 14; Carson's Facts, ¶¶ 28, 54; Compton's Facts, ¶ 27; Amini Depo. at 420:4–18 (emphasis added).

86. Compton's Facts, ¶ 51; Amini Depo. at 399:10–17.

87. Carson's Facts, ¶ 35; Amini Depo. at 495:2–5.

88. Carson's Facts, ¶ 36; Amini Depo. at 495:14–17.

89. Compton's Facts, ¶ 39; Pl.'s Compton Issues, ¶ 39; Amini Depo. at 494:17–495:1.

90. Carson's Facts, ¶¶ 16, 52; Bond Decl., Ex. M (Deposition of Hassan Amini, Ph. D. ("Amini Depo.")) at 237:6–238:5. Plaintiff disputes Dr. Amini's suggestion that groundwater may feed the surface water, noting that no groundwater sampling was conducted at the site. (Pl.'s Carson Issues, ¶ 16). As the opinion is offered by its expert, however, plaintiff is bound.

91. Carson's Facts, ¶ 53; Amini Depo. at 343:19–344:6.

92. Carson's Facts, ¶ 60; Compton's Facts, ¶ 27; Gersberg Depo. at 58:16–23, 62:2–7. Plaintiff notes that the RWQCB did not require that it do any quantitative modeling to determine the significance of possible sources

knowledged that no soil samples had been taken near the stormwater outlets,[93] and that, while a debris sample taken near the property revealed a lead concentration of more than 100 ppm, he could not conclude on the basis of that one sample that the lead on the property had been deposited by stormwater.[94] Gersberg also acknowledged that he could not tell from the sampling data as a whole whether the entirety of the lead came from the tar or from stormwater, that he could not attribute the lead to a specific source, and that it was possible the lead found outside the tar area could have come from sources such as tar, direct deposition, paint, illicit discharges, or on-site stormwater.[95]

Neither party has proffered evidence regarding the amount of stormwater flowing onto the property.[96] No stormwater samples were collected, although four surface water samples were taken at the entrance to the property.[97] One water sample was collected from each of the two storm drain inlets on the north portion of the property.[98] These showed lead detection levels of 13 parts per billion and below detection respectively.[99] Water samples from storm drains 1A and 2A registered "non-detect" when tested for organic lead.[100] These

samples were taken from a pool of standing water in the storm drain mouth, not from a runoff event.[101]

Carson's expert, Dr. Morrison, states that 13 parts per billion of lead is not significant from a regulatory standpoint, and concludes that the results of the tests from the two storm drains are inconsistent with lead being transported via stormwater into the storm drain channel.[102] Dr. Amini concurs, stating that the results of the storm drain tests could not form the basis for a finding that the lead in the park came from the stormwater.[103] The parties agree that the surface water tests do not provide adequate information to permit the drawing of conclusions regarding the quality of the water that has historically entered the site.[104]

### 5. NPDES Permits

Carson Harbor alleges that stormwater discharge contaminated the wetlands, causing it to incur necessary response costs under CERCLA.[105] A National Pollution Discharge Elimination System ("NPDES") permit is required to discharge industrial liquids into the storm drain system and to discharge stormwa-

of lead in the wetlands. (Pl.'s Carson Issues, ¶ 60).

93. Compton's Facts, ¶ 22; Gersberg Depo. at 37:10–38:14.

94. LA's Facts, ¶ 16; Compton's Facts, ¶ 26; Gersberg Depo. at 124:8–20.

95. LA's Facts, ¶ 12; Carson's Facts, ¶¶ 29, 32; Compton's Facts, ¶ 41; Gersberg Depo. at 30:21–31:24, 253:2–15, 259:10–16.

96. Compton's Facts, ¶ 20; Pl.'s Compton Issues, ¶ 20.

97. Compton's Facts, ¶ 22; Amini Depo. at 7–24.

98. Carson's Facts, ¶ 46; Pl.'s Carson Issues, ¶ 46.

99. Carson's Facts, ¶ 47; Amini Depo. at 462:17–23.

100. Carson's Facts, ¶¶ 57–58; Pl.'s Carson Issues, ¶¶ 57–58.

101. Pl.'s Compton Issues, ¶¶ 17–19; Pl.'s Prtnshp. & Compton Judicial Notice, Ex. 1 ("Amini 1997 Decl.", ¶ 3).

102. Carson's Facts, ¶¶ 37, 55; Morrison Decl., ¶¶ 15, 19.

103. Carson's Facts, ¶ 56; Amini Depo. at 548:4–16.

104. Compton's Facts, ¶ 24; Pl.'s Compton Issues, ¶ 24.

105. LA's Facts, ¶ 11; Pl.'s LA Issues, ¶ 11; Pl.'s Compton Issues, ¶ 15.

ter.[106] Prior to 1990, there were no NPDES permits regulating stormwater runoff on the property [107] because NPDES permits were not required for municipal stormwater and urban runoff prior to that date.[108] In 1990, NPDES Permit No. CA0061654 ("the 1990 permit") was issued to the County of Los Angeles and certain identified co-permitees, including the cities of Compton and Carson.[109] On July 15, 1996, NPDES Permit CAS 614001 ("the 1996 permit") was issued, superceding the 1990 permit.[110] The northeast corner storm drain pipe system, the streambed, and the southwest corner storm drain pipe system are all part of, and operated pursuant to, the NPDES permits.[111]

## (a) City Of Carson

Carson's start date for compliance with the 1990 permit was July 1, 1993.[112] At the time plaintiff filed suit on May 7, 1996, the 1990 Permit was the only NPDES permit under which Carson was operating.[113] John Wisz, Carson's Civil Engineering manager, states that the city has been in compliance with the 1990 permit at all relevant times, and that it has implemented all Best Management Practices ("BMPs") required by the permit.[114] Plaintiff did not identify during discovery any BMPs that Carson had failed to implement, asserting only that it did not know of any plan the city had implemented to comply with the permit.[115] Plaintiff's ex-

106. LA's Facts, ¶ 20; Compton's Facts, ¶¶ 42–43; Pl.'s Compton Issues, ¶¶ 42–43; *Carson Harbor Village*, 270 F.3d at 888 ("Here, the Water Quality Board issued NPDES permits to the Government Defendants in 1990 and 1996. Those permits authorized the discharge of stormwater containing pollutants . . ."). Compton's superintendent has proffered a declaration stating that NPDES permits typically require pretreatment of the liquids discharged into the storm drain system. (Compton Judicial Notice, Ex. A (Declaration of Frank Soleto in Support of Compton's 1997 Opposition to Plaintiff's Motion for Summary Judgment ("Soleto Decl.")), ¶ 8.) Plaintiff contends this statement is without basis, and is irrelevant because it pertains to industrial permits rather than permits for stormwater discharges from urban runoff. (Pl.'s Compton Issues, ¶ 42).

107. Pl.'s Facts, ¶ 17; Carson's Issues, ¶ 17; Compton's Issues, ¶ 17; LA's Issues, ¶ 17; Carson's Facts, ¶ 75; Pl.'s Carson Issues, ¶ 75; Pl.'s Compton Issues, ¶ 52; Points and Authorities in Support of Compton's Motion for Summary Judgment ("Compton Mot.") at 9:10, 11:14 ("[t]he first permit was issued in 1990").

108. LA's Facts, ¶ 23; Pl.'s LA Issues, ¶ 23.

109. Pl.'s Facts, ¶ 17; Carson's Issues, ¶ 17; Compton's Issues, ¶ 17; LA's Issues, ¶ 17; Carson's Facts, ¶ 74; Pl.'s Carson Issues,

¶ 74; Compton's Facts, ¶¶ 45–46; Pl.'s Compton Issues, ¶¶ 45–46.

110. Pl.'s Facts, ¶ 17; Carson's Issues, ¶ 17; Compton's Issues, ¶ 17; LA's Issues, ¶ 17; Carson's Facts, ¶ 81; Pl.'s Carson Issues, ¶ 81; Compton's Facts, ¶ 44; Pl.'s Compton Issues, ¶ 44.

111. Compton's Facts, ¶ 47; Pl.'s Compton Issues, ¶ 47.

112. Carson's Facts, ¶¶ 76, 94; Pl.'s Carson Issues, ¶ 76; Ghirelli Depo. at 38:5–11.

113. Carson's Facts, ¶ 80; Pl.'s Carson Issues, ¶ 80.

114. Carson's Facts, ¶ 77; Wisz Decl., ¶¶ 17–18, 22. Plaintiff objects that evidence regarding defendants' compliance with the NPDES permits and implementation of best management practices is irrelevant given the Ninth Circuit's holding that defendants did not violate the permits. See *Carson Harbor Village, supra*, 270 F.3d at 870. The court overrules this objection, as it finds that evidence of permit compliance and best management practices is relevant to whether the Government Defendants should be held liable as "arrangers" under 42 U.S.C. § 9607(a).

115. Carson's Facts, ¶ 78; Bond Decl., Ex. B (Plaintiff's Supplemental Response to Carson's First Set of Interrogatories, No. 8).

pert, Dr. Ghirelli, opined that Carson had, in fact, complied with the 1990 permit.[116]

Ghirelli observed that the Water Board knew about the contamination on Carson Harbor's property at the time it drafted the 1996 permit, and did not single out the property in the permit for special protection.[117] Rather, the responsibilities the 1996 permit imposed on Carson concern compliance with the Stormwater Management Plan and a County Plan to be developed under the permit.[118] The 1996 permit, moreover, expressly recognizes that Carson is not responsible for discharges it cannot control.[119] Wisz asserts that Carson has been in compliance with the 1996 permit at all relevant times, and that it has implemented each of the required BMPs called for by the permit.[120] Neither Wisz nor Dr. Amini is aware of any RWQCB order stating that Carson has failed to comply with its NPDES permits.[121]

Wisz maintains that neither the 1990 nor the 1996 permits required Carson to treat stormwater or prevent stormwater from entering plaintiff's property.[122] Plaintiff

does not dispute that Carson's NPDES permits do not contain effluent limitations for stormwater discharges.[123] Wisz also asserts that Carson is not required to monitor stormwater under either of the permits, and that it is not responsible for runoff from state facilities such as the I–91 Freeway.[124] Carson Harbor, however, cites a 1983 letter from the LACFCD to Carson's City Engineer stating that the city is responsible for maintaining storm drains located outside Caltrans property and within the city limits.[125]

### (b) City Of Compton

Compton's Street Superintendent, Frank Sotelo, contends that the city has implemented BMPs that include: (1) a maintenance program for the storm drain system in the City streets; (2) stenciling warning signs on City streets that pouring hazardous substances into the storm drain system is prohibited; (3) conducting classes under the supervision of CalOSHA on storm drain safety and procedures; (4) regularly sweeping all City streets; (5)

Plaintiff's objection to this evidence is overruled for the reasons stated in note 116, *supra*.

116. Carson's Facts, ¶ 79; Bond Decl., Ex. L (Deposition of Robert P. Ghirelli, D.Env. ("Ghirelli Depo.")) at 23:11–18. Plaintiff's objection to this evidence is overruled for the reasons stated in note 116, *supra*.

117. Carson's Facts, ¶ 97; Ghirelli Depo. at 80:18–81:5. Plaintiff notes that certain provisions of the 1996 permit are designed to minimize pollutants and contaminants entering receiving waters from Carson's operation of storm drain facilities, and that Carson has adopted ordinances that are designed to protect receiving waters.

118. Carson's Facts, ¶ 82; Pl.'s Carson Issues, ¶ 82.

119. Carson's Facts, ¶ 85; Pl.'s Carson Issues, ¶ 85.

120. Carson's Facts, ¶¶ 86–87; Wisz Decl., ¶¶ 20 22. Plaintiff's objection to this evidence is overruled for the reasons stated in note 116, *supra*.

121. Carson's Facts, ¶ 89; Amini Depo. at 408:12–16; Wisz Decl., ¶ 19.

122. Carson's Facts, ¶¶ 84, 91; Wisz Decl., ¶ 45.

123. Carson's Facts, ¶¶ 95–96; Pl.'s Carson Issues, ¶ 84.

124. Carson's Facts, ¶¶ 92–93; Wisz Decl., ¶¶ 46–47. Plaintiff argues that the NPDES permit and Stormwater Pollution Prevention Program impose an obligation on Carson and the County of Los Angeles to monitor stormwater discharges. (Pl.'s Carson Issues, ¶ 92).

125. Pl.'s Carson Issues, ¶ 93; Plaintiff's Request for Judicial Notice in Opposition to Carson, County of Los Angeles, and Unocal's Motions for Summary Judgment ("Pl.'s Car-

maintaining staff who respond to citizen requests; (6) promptly and regularly cleaning the storm drains; (7) promptly responding to citizen requests for drain repairs or maintenance; (8) providing a twenty-four hour stand-by crew to respond to emergencies; (9) sending employees to various water workshops; (10) retaining a professional consultant to advise and assist the City regarding storm drain and storm-water issues; (11) attending monthly permittee meetings; (12) participating in the executive Advisory Committee; (13) attending Los Angeles River Watershed Permittee meetings; (14) subscribing to publications providing educational and practical assistance in this area; (15) promoting recycling; and (16) participating in the county-wide Hazardous Waste Management Program.[126]

There is no evidence that Compton has violated its NPDES stormwater permits, and plaintiff's expert, Dr. Ghirelli, acknowledged that Compton was in compliance with the 1990 NPDES permit.[127] As of 1997, Sotelo had been employed by Compton for twenty-one years. He testified that throughout his employment, the city had had an ordinance that prohibited the disposal of pollutants, including lead, in the storm drain system.[128] He also asserted that, at all times prior to 1990 when he

was employed, Compton had procedures in place to prevent pollutants from entering the storm drain system. In addition to the ordinance, these included regular street sweeping, public trash receptacles, maintenance of the storm drain lines and system, and sand bagging around catch basins in the event of a spill.[129]

### (c) County Of Los Angeles

Gary Hildebrand, a Supervising Civil Engineer for the County of Los Angeles, states that the County developed and implemented BMPs as required by the 1990 permit, with each permittee city responsible for its own BMPs.[130] He also states that the County has complied with BMPs and monitoring requirements under the 1996 permit.[131]

### (d) All Defendants

Plaintiff's expert, Dr. Ghirelli, asserts that the permits require the County, rather than Compton or Carson, to monitor the site.[132] He also notes that the Water Board does not consider individual cities responsible for runoff from state facilities such as Caltrans.[133]

In granting the Government Defendants' motions for summary judgment on Carson Harbor's CWA claims, Judge Wardlaw

son, L.A., & Unocal Judicial Notice"), Ex. L (1983 Letter to Carson City Engineer).

126. Compton's Facts, ¶ 48; Sotelo Decl., ¶ 6. Plaintiff's objection to this evidence is overruled for the reasons stated in note 116, *supra*.

127. Compton's Facts, ¶¶ 11, 52; Pl.'s Compton Issues, ¶ 52; Sites Decl., Ex. E (Ghirelli Depo.) at 207:15–18.

128. Compton's Facts, ¶ 49; Sotelo Decl., ¶ 7. Plaintiff's objection to this evidence is overruled for the reasons stated in note 116, *supra*.

129. Compton's Facts, ¶ 50; Sotelo Decl., ¶ 8. Plaintiff's objection to this evidence is over-

ruled for the reasons stated in note 116, *supra*.

130. LA's Facts, ¶ 18; Hildebrand Decl., ¶¶ 4–7.

131. LA's Facts, ¶¶ 18, 242; Hildebrand Decl., ¶¶ 8 11, 17; *Carson Harbor Village, supra*, 270 F.3d at 888 ("[T]here is no evidence that there was … a violation of the permits"). Plaintiff argues that this statement is irrelevant to the County's discharges prior to 1990.

132. Carson's Facts, ¶ 92; Ghirelli Depo. at 213:16–23.

133. Carson's Facts, ¶ 93; Ghirelli Depo. at 215:11–15.

held that Carson Harbor's evidence fell "considerably short of meeting its burden on summary judgment that the Government Defendants violated either the 1990 or 1996 permits." [134] She also found that "[Carson Harbor's expert] ... acknowledged that all of the Government Defendants were in compliance with the 1990 permit and expressed no opinion with regard to the 1996 permit." [135] Judge Wardlaw granted Carson's motion for summary judgment on the state law claims—a judgment that was later affirmed by the Ninth Circuit—"[b]ecause plaintiff ha[d] not shown that the Government Defendants failed to comply with the [1990 and 1996] permits [and] any pollutants discharged into the stormwater were [thus] allowed pursuant to the authority of the state." [136] *Carson Harbor Village, supra,* 990 F.Supp. at 1197. Carson Harbor does not dispute that the Ninth Circuit ultimately held there was insufficient evidence to conclude that the Government Defendants had violated the terms of their NPDES permits. [137]

**134.** Carson's Facts, ¶ 98; Pl.'s Carson Issues, ¶ 98.

**135.** Carson's Facts, ¶ 99; Pl.'s Carson Issues, ¶ 99.

**136.** Carson's Facts, ¶ 100; Pl.'s Carson Issues, ¶ 100.

**137.** LA's Facts, ¶ 22; Pl.'s Carson Issues, ¶ 102

**138.** Carson's Facts, ¶ 67; Pl.'s Carson Issues, ¶ 67.

**139.** Compton's Facts, ¶ 70; Ross Depo. at 132:22–133:4.

**140.** Compton's Facts, ¶ 71; Ross Depo. at 61:19–61:2.

**141.** Carson's Facts, ¶¶ 65, 68–70; Ross Depo. at 70:2–13. Plaintiff cites an August 1994 McLaren Hart memorandum to Ross, which states that the RWQCB's John Lewis had discussed the lead detected in the soil with

## D. Remediation Of The Property

### 1. Cleanup Of The Tar–Like And Slag Material

The RWQCB for the Los Angeles Region supervised Carson Harbor's remediation of the property. [138] James Ross of the RWQCB never found that the tar and slag constituted "an imminent and substantial threat" to human health or the environment. [139] Rather, he concluded that there was a "low potential for a health threat on the site," and that the preponderance of the data fell below health risk guidelines. [140] Ross testified that he did not direct Carson Harbor to remove substances from the wetlands, but that it volunteered to remove the tar-like and slag materials. [141] Unocal's Richard Salisbury, however, prepared a memorandum on May 1, 1995, stating that Ross had confirmed in a meeting that "he want[ed] the 'slag-like' and 'tar-like' material removed from the creek bed .... [and] that his objective was to remove it as cheaply and non-disruptively as possible." [142] Ross, moreover, told

McLaren Hart, and directed that it submit a proposed course of action to Ross. (Pl.'s Carson Issues, ¶ 65; Casparian 3rd Decl., Ex. 14 (August 1994 Memo Proposing Remedial Action)). Defendants object that the document is not properly authenticated. For the reasons set forth in note 160, *infra,* defendants' objection is sustained.

**142.** Salisbury Depo. at 75:12–80:8, Ex. 232 (May 1, 1995 Memo). While Salisbury testified to out of court statements made by Ross, the Ninth Circuit held that the testimony fell "within the 'basic rule of evidence ... that prior inconsistent statements may be used to impeach the credibility of a witness.'" *Carson Harbor, supra,* 270 F.3d at 873 (holding that Salisbury's memo could be used to impeach Ross' assertion that he did not require plaintiff to remove the tar and slag materials). The Ninth Circuit also held that Dr. Amini's testimony that "the Water Quality Board ordered the cleanup" should have been admitted and considered. *Id.* No evidence has been submitted in connection with the pres-

McLaren Hart in a February 1995 letter—captioned "Remediation Workplan Approval"—that its proposed remedial action had been "approved" by the RWQCB, subject to certain modifications, which included classification of the slag material as hazardous waste and removal of all residual soil contamination except that registering below certain measurement criteria.[143]

Dr. Amini testified that Carson Harbor's remediation effort focused on removal of the tar-like and slag material from the stream channel.[144] All of the tar-like and slag materials were removed, with the exception of some material that was within the root zone of a protected willow tree.[145] McLaren/Hart issued a Closure Report on September 13, 1995, which discussed removal of the tar-like and slag materials from the marsh, as well as verification sampling of lead concentration levels in the excavated area.[146] The report noted that approximately 1,043 tons of tar-like and slag materials had been removed from an approximately 9,000 square foot area that had an average depth of two feet.[147] Following removal of the tar-like and slag materials, McLaren/Hart collected twenty verification samples.[148] These revealed TTLC lead concentrations below 1,000 ppm. Only four samples had a total lead concentration above 50 ppm. Follow-up analysis of these four samples indicated soluble lead concentrations that marginally exceeded the Soluble Threshold Limit Concentration of 5 ppm.[149] McLaren Hart submitted its Closure Report to the RWQCB on October 11, 1995, stating that it had "achieved all the goals of [its] remedial action plan" and therefore "submitted [the] clean closure report in request for closure of the case." [150]

The RWQCB reviewed McLaren Hart's clean closure report, and conducted independent inspection and testing at the property.[151] On October 18, 1995, the RWQCB sent Carson Harbor a letter captioned "Closure Approval," which stated:

"We have reviewed your October 11, 1995, report for the subject site which request[s] closure of the project. In addition, staff inspected the site on October 17, 1995, to verify the extent of the removal actions completed. Staff has also taken verification samples from the bottom of the excavated areas, on July 26, 1995, and have determined that the removal is complete to the extent required by this Board. On the basis of the above, we have concluded that all of the requirements established by this Board in our RAP approval letter dated February 27, 1995, have been complied with. In addition, the contamination has been successfully removed[, and] the remaining soil in the bottom of the water-

ent motions that Dr. Amini made such a statement.

143. Pl.'s Compton Issues, ¶ 71; Amini 1997 Decl., ¶ 6, Ex. H (Letter Approving Remedial Action Plan). Plaintiff notes additionally that Ross read a handwritten note during his deposition that appeared to indicate removal of the tar and slag was "required." (Ross Depo. at 90:6–17).

144. Compton's Facts, ¶ 64; Amini Depo. at 266:2–14.

145. Compton's Facts, ¶ 54; Pl.'s Compton Issues, ¶ 54; Pl.'s Compton Issues, ¶ 5; Sites Decl., ¶ 9, Ex. H ("McLaren/Hart Clean Closure Report") at 152.

146. LA's Facts, ¶ 29; Pl.'s LA Issues, ¶ 29; Compton's Facts, ¶ 31; Pl.'s Compton Issues, ¶ 31; McLaren/Hart Clean Closure Report.

147. McLaren/Hart Clean Closure Report at 152.

148. Compton's Facts, ¶ 56; Pl.'s Compton Issues, ¶ 56; McLaren/Hart Clean Closure Report at 150.

149. Compton's Facts, ¶ 53; McLaren/Hart Clean Closure Report at 152.

150. LA's Facts, ¶ 30; Pl.'s LA Issues, ¶ 30.

151. LA's Facts, ¶ 31; Pl.'s LA Issues, ¶ 31.

course poses no further threat to surface waters of the State. We, therefore, conclude that no further action is required at this site." [152]

Ross testified that he would not have sent this letter if he believed that the tar-like and slag material on the property was a continuing threat to surface water.[153]

## 2. Compliance With The National Contingency Plan

Dr. Amini testified that McLaren Hart considered the National Contingency Plan, 40 C.F.R. Part 300, in undertaking its remediation effort, but did not strictly follow the plan. Amini considered the project a removal action rather than "a full-blown remedial action under CERCLA," and therefore did not feel "it was necessary to pursue [the] very cumbersome and elaborate procedure prescribed in [the] N.C.P." [154] He stated that the project "did not require, necessarily, [a] full blown feasibility study, risk assessment, public in-

volvement, and many other requirements...." [155]

Dr. Amini was not aware of any health risk assessments conducted at the site during remediation. Although he recommended that an assessment be conducted, attorney Richard Close decided to defer performing such an evaluation.[156] Dr. Amini did not know of any reports that documented Carson Harbor's consideration of remediation alternatives.[157] He also did not know of anyone who solicited public comment regarding the remedial action plan on plaintiff's behalf.[158] Carson Harbor's Goldstein similarly did not know of anyone acting on the partnership's behalf who held public meetings or gave public notice concerning the remedial action plan.[159]

■ Carson Harbor cites a number of letters as evidence that its response action fully complied with the National Contingency Plan.[160] Specifically, it contends it

**152.** Carson's Facts, ¶ 71; Pl.'s Carson Issues, ¶ 71; Prtnshp. Defs.' Facts, ¶ 19; Pl.'s Prtnshp. Issues, ¶ 19; Declaration of Walter J. Lipsman in Support of Partnership Defendants' Motion for Summary Judgment ("Lipsman Decl."), ¶ 11, Ex. J (Oct. 18 RWQCB Letter); Compton's Facts, ¶ 55; Pl.'s Compton Issues, ¶ 55.

**153.** Lipsman Decl., ¶ 12, Ex. K (Deposition of James Ross ("Ross Depo.")) at 132:1–21.

**154.** Carson's Facts, ¶ 123; Amini Depo. at 803:19–804:6.

**155.** Carson's Facts, ¶ 126; Amini Depo. at 804:11–23.

**156.** Unocal's Facts, ¶ 9; Carson's Facts, ¶ 124; Amini Depo. at 290:8–291:18.

**157.** Carson's Facts, ¶ 127; Amini Depo. at 568:1–4.

**158.** Carson's Facts, ¶ 125; Amini Depo. at 567:2–19.

**159.** Unocal's Facts, ¶ 8; Nyquist Decl., Ex. H (Deposition of James Goldstein ("Goldstein Depo.")) at 137:9–18.

**160.** Pl.'s Carson Issues, ¶ 123; Casparian 3rd Decl., Ex. 2 (Ross Depo.), Ex. 38 (RWQCB Closure Approval Letter); Casparian 3rd Decl., Exs. 5–44. Carson and the County object to Exhibits 5–44 to the Casparian declaration, asserting that Casparian cannot authenticate the documents, that he lacks personal knowledge concerning the events discussed in them, and that the documents are inadmissible hearsay. The exhibits in question are a series of letters between and among such parties as Carson Harbor's former attorneys, Carson Harbor's agent Ken James, representatives of the Brea Canon Oil Co., the Los Angeles Public Works Department, the County of Los Angeles Board of Supervisors, the Los Angeles County Flood Control District, McLaren Hart, the Regional Water Quality Control Board, the U.S. Army Corp of Engineers, the California Department of Transportation, Union Oil Co., Unocal Oil Co., the City of Carson, the California Department of Fish and Game, the City of Compton, the County of Los Angeles, and Senator Ralph Dills. Casparian was not a party to any of the communications, and offers no explanation as to why he has personal knowledge of the documents or could au-

complied with the requirement that it conduct a health risk assessment because it met the cleanup levels prescribed by the RWQCB, and these were designed to protect public health and the environment.[161] Similarly, it contends it complied with the public comment requirement. The admissible evidence plaintiff proffers in support of this assertion indicates that it made State Senator Ralph Dills aware of the problem, leading his representatives to participate in a number of meetings and discussions regarding the situation; and that it held meetings with the interested parties prior to implementation of the remedial action plan.[162] Carson Harbor notes there was sufficient public awareness of the problem that an article was published in a local newspaper regarding contamination at the wetlands.[163] Additionally, it

thenticate them. None of this information is provided by Casparian's supplemental declaration, filed on June 19, 2003. It states only that he has been rent control counsel for Carson Harbor for the past five years, and does not demonstrate that he is able to authenticate the correspondence or testify to the matters that it concerns.

A document that is not properly authenticated cannot be considered in ruling on motions for summary judgment. See *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1551 (9th Cir.1989) ("A document which lacks a proper foundation to authenticate it cannot be used to support a motion for summary judgment"). As Casparian has not properly authenticated Exhibits 4–55, the court sustains defendants' objection to their admission. See *Kortan v. State of California*, 5 F.Supp.2d 843, 849 (C.D.Cal.1998) ("In an effort to substantiate her claim of psychological injury, Kortan has attached to her declaration a letter from a clinical psychiatrist.... The letter is addressed solely to Kortan's counsel, and the plaintiff herself cannot attest to its authenticity. The fact that Exhibit E was produced from the plaintiff's own files does not insulate her from the authentication requirement. Clearly, the proper approach would have been for counsel or the treating physician to have submitted a declaration authenticating the letter. This was not done," citing *Flaherty v. Coughlin*, 713 F.2d 10, 14 (2d Cir.1983) ("Since verification can easily be provided and does establish evidentiary links essential to the motion, we see little reason not to require it as a prerequisite to a grant of summary judgment")). The one exception is the newspaper article attached as Exhibit 28. Newspaper articles are self-authenticating, and are not hearsay so long as they are not offered for the truth of the matter asserted. Fed.R.Evid. 902(6); *Price v. Rochford*, 947 F.2d 829, 833 (7th Cir.1991) ("Newspaper articles are generally self-authenticating, Fed.R.Evid. 902(6), and there is

no hearsay problem since Price did not offer the articles to prove that he was in bankruptcy, only that he was reported to have been in bankruptcy"); *Orloff v. Cleland*, 708 F.2d 372, 378, n. 6 (9th Cir.1983) ("We reject the VA's argument that we may not consider the newspaper articles because they are not properly authenticated. Newspaper articles are self-authenticating. Fed.R.Evid. 902(6)").

Plaintiff received a copy of the court's tentative ruling the day prior to argument, and attempted to lodge supplemental declarations of Dr. Amini and Richard Close on the day of the hearing to authenticate the documents that had been tentatively excluded. Defendants objected to consideration of these new declarations. It is axiomatic that evidence must be admissible to support or defeat a motion for summary judgment. It is also a basic rule of evidence that documents must be properly authenticated to be admitted. It should thus have been clear to plaintiff that the documents attached to the Casparian declaration had to be properly authenticated before they could be considered by the court. See *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir.2002) ("Authentication is a 'condition precedent to admissibility.' ... [U]nauthenticated documents cannot be considered in a motion for summary judgment"). This matter has been pending for some seven years. Plaintiff should be able, at this stage of the case, to present its evidence in admissible form. Accordingly, the court declines to consider the late-submitted declarations.

161. Pl.'s Carson Issues, ¶ 124; Ross Depo., Exs. 26, 45.

162. Pl.'s Carson Issues, ¶ 125; Ross Depo. at 40:10–20, 111, Exs. 32, 35; Salisbury Depo. at 33:1–15, 34:4–37:12, 42:4–10, 84:12–95:15.

163. Casparian 3rd Decl., Ex. 28.

contends it conducted a feasibility study as required by the National Contingency Plan, considering both a "no action" alternative and removal of the tar-like and slag materials.[164] More specifically, Carson Harbor asserts that: (1) the Park Environmental Report and remedial action plan are the functional equivalent of the remedial investigation/feasibility study and remedial design/remedial action plan required by federal law; (2) the RWQCB considered whether the tar and slag needed to be removed, and required their removal; and (3) Dr. Amini testified that "the only feasible alternative was to excavate the tar and slag material and dispose of it offsite." [165]

The purpose of the remedial action was "to outline the procedures for the removal of a 'tar-like' and 'slag' waste material ... in accordance with the standards of solid waste handling and disposal (California Code of Regulations, Title 14)." [166] The plan discussed the results of the sampling conducted by Park Environmental and McLaren Hart; noting that "the highest concentrations of metals and petroleum hydrocarbons [were] associated with the 'tar-like' and 'slag' waste material," it recommended that those materials be re-

moved, and that no action be taken outside their immediate area.[167] Removal was the only remedial alternative identified in the plan.

### 3. Remediation Of Lead Outside Of The Tar And Slag Area

Dr. Amini testified that removal of the tar and slag from the site was the appropriate remedial action, and was the work performed by McLaren Hart.[168] He did not recommend further remediation. Although he knew that lead was present on the property outside the area of the tar and slag, Dr. Amini did not believe the lead posed a danger to aquatic organisms.[169] He also did not know of any existing groundwater quality issues following removal of the tar and slag, and thus did not feel he needed to recommend remediation of other sources.[170] Nonetheless, he remained concerned about possible risk to the groundwater through sources that were not addressed by the removal of the tar and slag.[171]

RWQCB's Ross concluded that the level of contaminants outside the tar and slag area was not unusual or unexpected, and did not pose a significant threat to the environment or the residents of the mobile

**164.** Pl.'s Unocal Issues, ¶ 8; Pl.'s Carson Issues, ¶ 126.

**165.** Pl.'s Unocal Issues, ¶ 9; Pl.'s Carson Issues, ¶¶ 126–127; Casparian 3rd Decl., Exs. 12, 14, 20; Amini Decl., ¶ 8.

**166.** LA's Mot., Ex. E (Remedial Action Plan) at 115.

**167.** Remedial Action Plan at 120–21.

**168.** Carson's Facts, ¶ 66; Compton's Facts, ¶ 58; Pl's Compton Issues, ¶ 58; Amini Depo. at 248:19–249:11, 266:9–14. A portion of the wetlands in the vicinity of the tar and slag was "excavated by hand" and "loaded into roll-off bins." (Pl's Carson Issues, ¶ 66; Nyquist Decl., Ex. J (Remedial Action Plan) at U0415–U0416.)

**169.** Carson's Facts, ¶ 64; Compton's Facts, ¶¶ 59, 63; Amini Depo. at 268:6–17. Plaintiff objects that this conclusion is irrelevant in determining whether it is entitled to recover response costs. The evidence goes to the extent of the remediation, and to whether lead carried through the storm drain system maintained by the Government Defendants "caused" Carson Harbor's response costs. The objection is, accordingly, overruled.

**170.** Compton's Facts, ¶ 59; Lipsman Decl., ¶ 13, Ex. L (Deposition of Dr. Hassan Amini ("Amini Depo.")) at 272:23–273:25.

**171.** Amini Depo. at 273:5–12.

home park.[172] As a consequence, he did not require that Carson Harbor conduct groundwater testing because "it didn't appear warranted." In its letter approving Carson Harbor's proposed remedial plan, however, the RWQCB noted that the soil remaining after excavation of the tar and slag needed to be below 50 ppm TTLC and 5 ppm STLC.[173]

■ Compton's expert, Dr. Jenkins, concluded from the existing soil data that, with the exclusion of samples identified as tar or slag, the concentration of lead in the soil samples ranged from 4 to 370 mg/kg, with an average concentration of 63 mg/kg. He stated that these numbers fell well within the ranges of lead reported for soils and wetland sediments.[174] Although Jenkins concluded that the concentrations of lead in the soils should not pose a risk to soil invertebrates or microbes, he found that they exceeded the soil benchmark for plants.[175] Dr. Faeder concluded that the aggregate data was below the average background for the geographic area, despite the existence of "one deviant point." [176]

Goldstein is not aware that any governmental agency required further cleanup or remedial work in the marsh where the tar-like and slag materials were removed, and no subsequent cleanup has been done.[177] Judge Wardlaw previously entered summary judgment in defendants' favor on Carson Harbor's RCRA claim, stating that it had failed to establish there was imminent danger to human health or the environment.[178] Plaintiff did not appeal this ruling, and admits that the property poses no imminent or substantial danger to health or the environment.[179]

### E. Continued Attempts To Refinance The Property

Mark Hansen of Hansen–Davies Financial Group was Goldstein's primary contact regarding the 1993 G.E. Capital loan application.[180] Hansen testified that he had discussions with the lender's environmental consultant, Law/Crandall, regarding the loan throughout September and November 1993, after the tar-like materials had been discovered, and that he continued

---

172. Compton's Facts, ¶ 69; Ross Depo. at 153:8–21.

173. Pl's Carson Issues, ¶ 64; Amini 1997 Decl., ¶ 6, Ex. H (Remedial Workplan Approval). Plaintiff also proffers an August 1994 letter from McLaren Hart to the RWQCB stating that Ross had indicated the RWQCB would require additional documentation demonstrating that the lead in the wetlands did not pose a significant threat to human health or the environment. (Pl's Carson Issues, ¶ 64; Casparian 3rd Decl., Ex. 12). As noted *supra* in note 160, *supra*, this letter is not properly authenticated and cannot be considered.

174. Compton's Facts, ¶ 57; Compton Judicial Notice, Ex. C (Jenkins Report) at 25.

175. Compton's Facts, ¶ 61; Jenkins Report at 25–26. Plaintiff objects that Dr. Jenkins' conclusions are irrelevant in determining whether it is entitled to recover response costs. While the level of hazard posed by the pres-

ence of lead at the site is not relevant in assessing defendants' liability for a release under CERCLA (see *A & W Smelter, supra,* 146 F.3d at 1110), the report is relevant in determining whether plaintiff may assert that the lead constitutes a "permanent nuisance," and recover indemnity damages on that basis from the Partnership Defendants. Accordingly, the court overrules the objection.

176. Compton's Facts, ¶ 61; Faeder Decl., ¶¶ 17–18.

177. Lipsman Decl., ¶ 6, Ex. E (Deposition of James Goldstein ("Goldstein Depo.")) at 289:1–290:1.

178. LA's Facts, ¶ 34; Pl.'s LA Issues, ¶ 34.

179. Compton's Facts, ¶ 68; Pl.'s Compton Issues, ¶ 68.

180. Goldstein Depo. at 40:1–19, 48:24–49:5.

to believe during this period that the loan would ultimately close.[181]

After the tar-like materials were found, Law/Crandall requested permission to conduct an underground water test at the property.[182] Goldstein had hired Park Environmental to "assist with obtaining refinancing for the park," and it advised Goldstein not to allow groundwater testing.[183] Goldstein told Hansen there was no reason to test the groundwater because there was no evidence that it might contain hazardous substances.[184] Goldstein ultimately refused to permit Law/Crandall to conduct the test. While he states he was willing to perform substitute tests demonstrating that the property did not pose a threat,[185] Goldstein acknowledges that loan negotiations terminated because the parties were unable to reach agreement on the underground water test.[186] G.E. representative Brian Mills states the loan did not close because the recommendations in Law/Crandall's Phase I report were not followed.[187] He also states he told Carson Harbor that G.E. would not go forward with the loan if a "Phase II report" was not prepared.[188]

Hansen did not understand that G.E. was prepared to fund the loan if a groundwater test was conducted. Rather, it was "prepared to move forward with the loan if the[ ] environmental consultants concluded that the site didn't pose an environmental threat."[189]

After the negotiations with G.E. terminated, Goldstein decided there was "no sense in going immediately to seek other lenders with the known environmental problems" on the site.[190] Carson Harbor did have discussions with other lenders at a later point, however, and no lender refused to refinance the property for environmental reasons or requested that plaintiff test the groundwater.[191] Union Bank told Goldstein it did not have the funds necessary to make the loan; Goldstein does not know whether this was the actual reason Union Bank terminated loan discussions.[192] He terminated discussions with other lenders because the loan terms offered were not satisfactory.[193]

Bank of America ultimately refinanced the property in September 1997. Carson Harbor obtained $15,895,000 from the refinance.[194] A new Phase I environmental study was conducted, and Bank of America

---

181. Lipsman Decl., ¶ 8, Ex. G (Deposition of Mark Hansen ("Hansen Depo.")) at 121:14–17, 138:1–7.

182. Hansen Depo. at 151:8–11.

183. Prtnshp. Defs.' Facts, ¶ 12; Pl.'s Prtnshp. Issues, ¶ 12.

184. Pl.'s Prtnshp. Issues, ¶ 31; Casparian Prtnshp. Decl., ¶ 7; Ex. 2 (Deposition of James Hansen ("Hansen Depo.")) at 153:5–23.

185. Hansen Depo. at 154:14–155:25; Goldstein Depo. at 68:3–69:22.

186. Goldstein Depo. at 73:23–74:3 ("I felt it was unreasonable to be required to do an underwater test, and they had felt differently, and we didn't reach a meeting of the minds

on that issue and [the loan negotiation process] was terminated . . .").

187. Lipsman Decl., ¶ 9, Ex. H (Deposition of Brian Mills ("Mills Depo.")) at 210:6–20.

188. Mills Depo. at 127:21–24.

189. Hansen Depo. at 155:17–25.

190. Prtnshp. Defs.' Facts, ¶ 15; Pl.'s Prtnshp. Issues, ¶ 15; Goldstein Depo. at 100:21–24.

191. Goldstein Depo. at 97:1–4, 233:22–25.

192. Goldstein Depo. at 236:1–237:1.

193. Goldstein Depo. at 237:5–24.

194. Prtnshp. Defs.' Facts, ¶¶ 17, 24; Pl.'s Prtnshp. Issues, ¶¶ 17, 24.

concluded "there were no environmental issues that would preclude them from lending on the property."[195]

## F. Rent Increase Granted To Plaintiff

█ On or about January 22, 1997, the Carson Mobile Home Park Rental Review Board granted plaintiff a monthly increase of $58.70 for 407 of the mobile home park's rent-controlled spaces.[196] The Board found that rent increases of 12.86% to 14.01% per unit would generate an additional $286,690.80 in annual rental income and allow Carson Harbor to maintain a profit level similar to that it had enjoyed following the 1994 rent increase hearing and prior to a rise in operating expenses.[197]

The Board's resolution identified the increased operating expenses that justified the rent hike as (1) the costs incurred in determining how to clean up contamination at the property, obtaining approval of a

remediation plan, and implementing necessary remediation, and (2) the payment of disputed property tax assessments following resolution of a tax appeal.[198] It stated that part of the cleanup work had been financed by a $300,000 loan, and that that cost had therefore been allocated by the board over the 28–month life of the loan.[199] While noting that some claims for legal services related to the remediation were not allowed as operating expenses because they involved the preparation and filing of this action,[200] "[t]he Board did ... allocate some attorneys' fees related to the wetlands remediation as a 1995 operating expense." *Carson Harbor Village, Ltd. v. City of Carson Mobilehome Park Rental Review Board,* 70 Cal.App.4th 281, 294, 82 Cal.Rptr.2d 569 (1999) (*"Carson Harbor v. Rental Review Board"*).[201] It also provided that "if any of the costs of preparing, obtaining approval of and implementing a remediation plan and cleaning up contami-

**195.** Prtnshp. Defs.' Facts, ¶ 23; Pl.'s Prtnshp. Issues, ¶ 23; Hansen Depo. at 197:2–12, 199:8–12.

**196.** LA's Facts, ¶¶ 40–41; Prtnshp. Defs.' Facts, ¶ 2; Pl.'s Prtnshp. Issues, ¶ 2; Lipsman Decl., ¶ 3, Ex. B ("Resolution No. 97–185") at 5–6. Plaintiff notes that the rent increase did not take effect for ninety days after notice thereof was given. (Pl.'s Prtnshp. Issues, ¶ 2; Resolution No. 97–185 at 6).

**197.** LA's Facts, ¶ 43; Carson's Facts, ¶¶ 129, 133; Prtnshp. Defs.' Facts, ¶ 4; Resolution No. 97–185 at 5. Plaintiff's attorney states that the City of Carson rent control board does not adjust target profits by the Consumer Price Index ("CPI"), taking into account the rate of inflation, but rather by 75% of the CPI. (Casparian Prtnshp. Decl., ¶ 3). The Partnership Defendants object that Casparian has not demonstrated personal knowledge of this fact. See Fed.R.Civ.Proc. 56(e) (requiring that affidavits in opposition of a summary judgment motion "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testi-

fy to the matters stated therein"). Casparian's supplemental declaration indicates that he has served as Carson Harbor's rent control counsel for five years. It states specifically that he has participated in drafting plaintiff's rent increase applications, that he has presented those applications to the City of Carson Mobile Home Rental Review Board, and that he has litigated the Board's decisions when they have been unfavorable to Carson Harbor. Based on these activities, he asserts he has personal knowledge of the recent history of Carson Harbor's applications and of the application of Carson's rent control scheme to the property. (Supp. Casparian Decl., ¶ 2.) This adequately states the basis for Casparian's knowledge of the fact, and defendants' objection is overruled.

**198.** LA's Facts, ¶ 42; Prtnshp. Defs.' Facts, ¶ 4; Resolution No. 97–185 at 2.

**199.** Resolution No. 97–185 at 2–3.

**200.** Resolution No. 97–185 at 3.

**201.** Carson's Facts, ¶ 130.

nation in the marsh which were allowed as operating expenses by the Board are recovered in the Applicant's litigation seeking recovery of those costs, ... the Park will be required to include that recovery, excluding any legal fees recovered, as income in the first rent increase application which follows that recovery and the recovery shall be counted in the income data for the last year for which financial data is submitted with that application." [202]

The board observed that many of the costs Carson Harbor had incurred were unusual rather than normal and recurring expenses, while the rent increase was to continue indefinitely.[203] This is borne out by the fact that tenants have continued to pay the higher rent since 1997. *Carson Harbor v. Rental Review Board, supra,* 70 Cal.App.4th at 294, 82 Cal.Rptr.2d 569.[204] Carson Harbor's rent control attorney, Casparian, states that property owners who are granted a rent increase because of decreased profits cannot receive another until their income drops or their expenses exceed the level considered in granting the increase.[205] Carson Harbor, in fact, received no additional rent increases until 2001.[206]

## G. Damages Sought By Plaintiff

Carson Harbor filed suit on May 7, 1996, after it had completed its remediation of the tar-like and slag materials.[207] It seeks to recover its incurred response, remedial and removal costs, i.e., (1) $231,797 for engineering and construction costs associated with site remediation; (2) a $52,744 hazardous waste generator fee levied by the State Board of Equalization; and (3) attorneys' fees of $245,722 incurred in connection with the remediation.[208] Carson Harbor has not produced statements or a detailed accounting of the attorneys' fees it seeks, so the court cannot determine whether they are "closely related" to its cleanup of the contamination.[209]

Carson Harbor also seeks to recover the purported loss in value of the property due to contamination,[210] and the increased interest expense it incurred because it allegedly could not refinance the property due to the presence of hazardous materials.[211] As respects the diminution in value of the property, Goldstein asserts that any present buyer would seek a 20–25% reduction in the purchase price because of the environmental risk.[212] He admits he has not tried to sell the property and has no immediate plans to sell it.[213]

---

**202.** Resolution No. 97–185 at 3.

**203.** Carson's Facts, ¶ 131; Prtnshp. Defs.' Facts, ¶ 4; Resolution No. 97–185 at 2.

**204.** Carson's Facts, ¶ 132.

**205.** Casparian Prtnshp. Decl., ¶ 2.

**206.** Casparian Prtnshp. Decl., ¶¶ 4–5. The Partnership Defendants object that Casparian has failed to demonstrate that he has personal knowledge of the facts stated. For the reasons stated in note 197, *supra,* the court overrules the objection.

**207.** LA's Facts, ¶ 15; Carson's Facts, ¶ 72; Pl.'s Carson Issues, ¶ 72.

**208.** LA's Facts, ¶ 44; Pl.'s LA Issues, ¶ 44; Prtnshp. Defs.' Facts, ¶ 1; Pl.'s Prtnshp. Is-

sues, ¶ 1. Plaintiff notes that it has not limited its claims to these amounts.

**209.** Unocal's Facts, ¶ 5; Pl.'s Unocal Issues, ¶ 5.

**210.** Prtnshp. Defs.' Facts, ¶ 18; Pl.'s Prtnshp. Issues, ¶ 18.

**211.** Prtnshp. Defs.' Facts, ¶ 6; Pl.'s Prtnshp. Issues, ¶ 6.

**212.** Prtnshp. Defs.' Facts, ¶ 26; Pl.'s Prtnshp. Issues, ¶ 26.

**213.** Prtnshp. Defs.' Facts, ¶ 28; Pl.'s Prtnshp. Issues, ¶ 28; Goldstein Depo. at 290:11–19, 300:24–301:9, 303:3–7.

Finally, plaintiff seeks to recover attorneys' fees and costs from the Partnership Defendants pursuant to an indemnity clause in the 1983 purchase agreement between the parties.[214]

## II. DISCUSSION

### A. Standard Governing Motions For Summary Judgment

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses which demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof at trial, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must then set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); FED.R.CIV.PROC. 56(e).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The evidence presented by the parties must be admissible. FED.R.CIV.PROC. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir.1985); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979).

### B. CERCLA Claims

#### 1. Legal Standard Governing CERCLA Claims

 Congress enacted the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 et seq., "to provide for liability, compensation, cleanup, and emergency response for hazardous substances release into the environment and the cleanup of inactive hazardous waste disposal sites." *3550 Stevens Creek Associates v. Barclays Bank*, 915 F.2d 1355, 1357 (9th Cir.1990) (citing PUB.L. No. 96–510, 94 Stat. 2767 (1980)). To further this purpose, Congress created a private right of action for the recovery of certain response costs against "various types of persons who contributed to the dumping of hazardous waste at a site." *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152 (9th Cir.1989); 42 U.S.C. § 9607(a). To establish a *prima facie* right to recovery under § 9607(a), a plaintiff must demonstrate that: (1) the site on which the hazardous substances are contained is a

---

**214.** Prtnshp. Defs.' Facts, ¶ 30; Pl.'s Prtnshp. Issues, ¶ 30.

"facility" as defined in CERCLA; (2) a "release" or "threatened release" of a "hazardous substance" from the facility has occurred; (3) the "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan;" and (4) defendants are within one of four classes of persons subject to liability under § 9607(a). See *Carson Harbor Village, supra*, 270 F.3d at 872; *3550 Stevens Creek, supra*, 915 F.2d at 1358. See also *Long Beach Unified School District v. Dorothy B. Godwin California Living Trust*, 32 F.3d 1364, 1366–67 (9th Cir. 1994).

### 2. CERCLA Claims Against Unocal

#### a. Compliance With The National Contingency Plan

A private party may not recover response costs under CERCLA unless the remedial actions generating those costs are consistent with the National Contingency Plan ("NCP"). 42 U.S.C. § 9607(a)(4)(B).[215] See also *Washington State Dep't. of Transp. v. Washington Natural Gas Co.*, 59 F.3d 793, 800 (9th Cir. 1995) ("[A]ny '[non-government] person' seeking response costs under § 9607(a)(4)(B) must prove that its actions are consistent with the NCP"). The NCP is a plan promulgated by the EPA that delineates specific steps private parties must take in selecting a remedial action plan and cleaning up hazardous waste. See 40 C.F.R. Part 300. It is "designed to make the party seeking response costs choose a cost-effective course of action to protect public health and the environ-

ment." *Washington State Dep't. of Transp., supra*, 59 F.3d at 802.

Under EPA regulations, private response action is "consistent with the NCP" if the action, evaluated as a whole, is in "substantial compliance" with certain procedural requirements, and results in a "CERCLA-quality cleanup." See 40 C.F.R. § 300.700(c)(3)(i). See also 40 C.F.R. § 300.700(c)(4) ("immaterial or insubstantial deviations" will not render a response action inconsistent with the NCP). The NCP's procedural requirements include, *inter alia*, that the party seeking response costs conduct a remedial site investigation (40 C.F.R. § 300.700(c)(5)(vii)), prepare a remedial investigation and feasibility study ("RI/FS") (40 C.F.R. § 300.700(c)(5)(viii)), and provide an opportunity for public comment (40 C.F.R. § 300.700(c)(6)). Unocal argues that Carson Harbor failed substantially to comply with the public comment and RI/FS requirements, and that summary judgment must be granted in its favor on plaintiff's CERCLA claim as a result.

#### (1) Whether Compliance Is An Element Of Liability

 Several courts have held that a plaintiff must make a *prima facie* showing of NCP compliance to survive the entry of summary judgment on a CERCLA claim. See *County Line Inv. Co. v. Tinney*, 933 F.2d 1508, 1517–18 (10th Cir.1991) ("... we affirm the district court's holding that consistency with the NCP is an element of a CERCLA contribution claim, as well as its determination that the New Owners failed, on a fully developed record, to carry their burden of making a *prima facie*

---

**215.** In contrast, the United States, a state or an Indian tribe may recover the cost of any remedial action that is "not inconsistent with" the National Contingency Plan. 42 U.S.C. § 9607(a)(4)(B). This difference in wording has been interpreted to mean that a government entity's costs are presumed to be consistent with the NCP, while private parties must plead and prove consistency with the NCP.

showing of this element on summary judgment"); *Public Service Co. of Colorado v. Gates Rubber Co.*, 22 F.Supp.2d 1180, 1187, n. 4 (D.Colo.1997) ("To survive summary judgment, a plaintiff must therefore make a *prima facie* showing of [consistency with the NCP]"), aff'd., 175 F.3d 1177 (10th Cir.1999); *Channel Master Satellite, Systems, Inc. v. JFD Electronics Corp.*, 748 F.Supp. 373, 381 (E.D.N.C.1990) ("[I]n a cost recovery action such as this, the plaintiff bears the burden of proof to establish, as an essential element of discovery that, *inter alia*, the response costs for which it seeks compensation are 'consistent' with the NCP"). See generally *City of Oakland v. Nestle USA, Inc.*, No. C–98–3963 SC, 2000 WL 1130066, * 3 (N.D.Cal. Aug.8, 2000) ("To establish a *prima facie* case under CERCLA §§ 107 and 113, a plaintiff must demonstrate that ... a 'release' ... caused the plaintiff to incur response costs that are 'consistent with the national contingency plan' "). See also *NutraSweet Co. v. X–L Engineering Co.*, 227 F.3d 776, 791 (7th Cir.2000) (holding that defendant should have challenged plaintiff's NCP compliance at summary judgment to preserve the issue for appeal); *Sherwin–Williams Co. v. City of Hamtramck*, 840 F.Supp. 470, 479 (E.D.Mich. 1993) (granting summary judgment on a CERCLA claim for declaratory relief because plaintiff "will be unable to meet its burden of showing that its actions were consistent with the NCP").[216]

One court in this circuit has concluded, however, that failure to comply with the NCP "is not a defense to liability, but goes only to the issue of damages," and that "inconsistency [with the NCP] is [therefore] not a basis for granting summary judgment on the liability question." *Mid Valley Bank v. North Valley Bank*, 764 F.Supp. 1377, 1389–90 (E.D.Cal.1991). The *Mid Valley* court found such a holding dictated by the Ninth Circuit's decision in *Cadillac Fairview/California, Inc. v. Dow Chemical Co.*, 840 F.2d 691 (9th Cir.1988). See *Mid Valley, supra*, 764 F.Supp. at 1390. In *Cadillac Fairview*, the court stated that "whether a response action is necessary and consistent with the criteria set forth in the contingency plan is a factual one to be determined at the damages stage of a section 107(a) action, rather than by the mechanism of prior governmental approval." *Cadillac Fairview, supra*, 840 F.2d at 695.

The court cannot agree with the conclusion in *Mid Valley* that compliance with the NCP is not an element of a *prima facie* case under CERCLA. The Ninth Circuit has consistently stated that incurring response costs that are necessary *and* consistent with the NCP is an essential element of a private CERCLA action. See, e.g., *Carson Harbor, supra*, 270 F.3d at 870–71; *3550 Stevens Creek Assocs., supra*, 915 F.2d at 1358; *Ascon Properties Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152–53 (9th Cir.1989); *Cose v. Getty Oil Co.*, 4

---

**216.** Some courts hold that summary judgment may be entered on the basis that plaintiff has not demonstrated compliance with the NCP only if the factual record on the issue *is* sufficiently developed at the time the motion is filed. See *County Line, supra*, 933 F.2d at 1513 ("[T]here are some circumstances in which a CERCLA plaintiff may be entitled to a declaration of the defendant's liability even though the plaintiff has not yet established that all of its claimed response costs were incurred consistent with the NCP. These include cases ... in which the factual record

does not permit a determination of consistency with the NCP at the time the motion for summary judgment is filed"); *Public Service Co., supra*, 22 F.Supp.2d at 1187, n. 4 ("Here, the factual record is sufficiently developed to make an NCP consistency determination. As such, 'there is nothing to be gained by delaying this determination until trial' "). Plaintiff does not contend that it has not had a full and fair opportunity to develop the factual record on this issue, and the court thus finds this doctrine inapplicable in the instant case.

F.3d 700, 703–04 (9th Cir.1993).[217] But see *Washington State Dep't. of Transp., supra,* 59 F.3d at 798 ("The district court granted WSDOT's motion as to the liability of WNG et al. under CERCLA on the ground that each defendant was a responsible 'person' under 42 U.S.C. § 9607. The court stated that the defendants challenged liability only on the basis that WSDOT failed to comply with the NCP. However, failure to comply with the NCP is not a defense to liability, but rather a factual issue affecting damages").

*Cadillac Fairview,* moreover, is not to the contrary. There, the district court dismissed a private party's CERCLA claim because it did not await governmental action respecting a site before commencing cleanup. The court held that "in order for a private response action to be 'consistent with the national contingency plan,' it must be 'initiated and coordinated by a governmental entity, and not by a private individual acting alone.'" *Cadillac Fairview, supra,* 840 F.2d at 693–94 (quoting the district court's order). The circuit court rejected this reasoning. *Id.* at 694–95. In response to the defendant's argument that dispensing with a requirement of preliminary government action might result in a defendant paying for cleanup actions that were "inadequate or ill-conceived," the court observed that the statute did "not allow recovery of any and all costs of response," but only those that were "necessary" and "consistent with the national contingency plan." It noted that whether response action is necessary and consistent with the national contingency plan is a fact question "to be determined at the damages stage of a section 107(a) action, rather than by the mechanism of prior governmental approval," and observed that defendants would "have ample opportunity at trial to express their concern that the costs incurred by Cadillac Fairview in this case were unnecessary or inconsistent with the national contingency plan." *Id.* at 695.

■ As can be seen, *Cadillac Fairview* stands merely for the proposition that consistency with the NCP is an issue to be determined in the context of a § 9607(a) action for reimbursement, not one to be decided by obtaining governmental agency approval before commencing remediation. While compliance with the NCP is a fact question, it can, like any other fact question, be resolved on summary judgment where the evidence is undisputed. Cf. *Carson Harbor Village, supra,* 270 F.3d at 872 (citing *Cadillac Fairview* for the proposition that the necessity of responses costs is a fact question, and that prior governmental approval is not required to render costs necessary). Accordingly, the question is whether the evidence presently in the record raises triable issues of fact regarding Carson Harbor's compliance with the NCP.[218]

217. Compare *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 668 (5th Cir.1989) ("To establish a *prima facie* case of liability in a CERCLA cost recovery action, a plaintiff must prove: (1) that the site in question is a 'facility' as defined in § 9601(9); (2) that the defendant is a responsible person under § 9607(a); (3) that a release or a threatened release of a hazardous substance has occurred; and (4) that the release or threatened release has caused the plaintiff to incur response costs. If the plaintiff establishes each of these elements and the defendant is unable to establish the applicability of one of the defenses listed in § 9607(b), the plaintiff is entitled to summary judgment on the liability issue.... A plaintiff may recover those response costs that are necessary and consistent with the National Contingency Plan ('NCP')" (citations omitted)).

218. It is appropriate to require a CERCLA plaintiff to prove compliance with the NCP in order to survive a motion for summary judgment because damages are a fundamental component of a private party CERCLA claim, and if the recovery of damages is foreclosed because the plaintiff has failed to comply with

### (2) "Remedial" v. "Removal" Actions

■■■■ A private party may recover response costs under § 9607(a) for expenses incurred in connection with a "remedial action" or a "removal." Removal actions are "short-term action[s] taken to halt the immediate risks posed by hazardous wastes" (*Advanced Micro Devices, Inc. v. National Semiconductor Corp.*, 38 F.Supp.2d 802, 810 (N.D.Cal.1999)),[219] while remedial actions are designed to achieve a permanent remedy.[220] See *Exxon Corp. v. Hunt*, 475 U.S. 355, 360, 106 S.Ct. 1103, 89 L.Ed.2d 364 (1986) ("Governmental response consists of 'removal,' or short-term cleanup, § 9601(23), and 'remedial action,' or measures to achieve a 'permanent remedy' to a particular hazardous waste problem, § 9601(24)"); *Channel Master, supra,* 748 F.Supp. at 385 ("The courts have consistently found that the removal category was to be used in that limited set of circumstances involving a need for rapid action, while non-urgent situations are to be addressed as remedial actions"); *Amland Properties Corp. v. Alcoa*, 711 F.Supp. 784, 794 (D.N.J.1989) ("Removal actions are to be taken in response to an immediate threat to the public welfare or to the environment.... Remedial actions, on the other hand, 'are generally considered long-term or permanent remedies' ").

Because of the exigency inherent in removal actions, the statutory requirements for NCP compliance relative to such actions are somewhat relaxed. See *Morrison Enterprises v. McShares, Inc.*, 302 F.3d 1127, 1136 (10th Cir.2002) ("The NCP is a long and detailed list of procedures that must be carried out by federal and state governments when they are responding to hazardous waste releases. The NCP specifies requirements for the two types of response actions at CERCLA sites: 'removal,' which is generally characterized as a short-term response to reduce the immediate threat from the release to human health and the environment, and 'remediation,' which is generally characterized as a response action intended to permanently reduce or eliminate the threat from the release.... Both types of actions have substantial requirements, but the requirements for remedial actions are much more detailed and onerous. Most of the requirements for both removal and remedial actions have been made applicable to private parties that seek to perform their own cleanup actions at CERCLA sites ..."); *Channel Master, supra,* 748 F.Supp. at 385–86 (" '[T]he distinction between [removal and remedial] actions is of no small importance, for whereas removal actions need only comply with ... relatively simple NCP requirements ... remedial actions must comport with the "more de-

---

the NCP, there is no need to try issues of liability. The court notes, in this context, that Carson Harbor makes no argument that certain of its costs were consistent with the NCP, even if others were not.

**219.** "Removal" is defined by 42 U.S.C. § 9601(23) as "the cleanup or removal of released hazardous substances from the environment, such actions as may be necessar[ily] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such

other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release...."

**220.** "Remedial actions" are defined by 42 U.S.C. § 9601(24) as "those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment."

tailed procedural and substantive provisions of the NCP."...' The division of responses into the two categories of removal and remedial actions is designed to provide an opportunity for immediate action—a removal—without detailed review, where there is no time to safely conduct such a review due to the exigencies of the situation," quoting *Amland, supra,* 711 F.Supp. at 795); *Versatile Metals v. Union Corp.,* 693 F.Supp. 1563, 1577 (E.D.Pa. 1988) ("Removal actions are not subject to the lengthy procedural requirements of the NCP since they are taken in response to an immediate threat"). See also *Public Service Co. of Colorado v. Gates Rubber Co.,* 175 F.3d 1177, 1182 (10th Cir.1999) ("NCP requirements vary depending on whether the response action is characterized as a removal or a remedial action. Generally, a removal action costs less, takes less time, and is geared to address an immediate release or threat of release.... In broad contrast, a remedial action seeks to effect a permanent remedy to the release of hazardous substances when there is no immediate threat to the public health. Remedial actions usually cost more and take longer"); *Norfolk Southern Railway Co. v. Gee Co.,* No. 98 C 1619, 2002 WL 31163777, * 31, n. 27 (N.D.Ill. Sept.30, 2002) ("The parties in this case have spent a significant amount of time attempting to define Norfolk Southern's response action as either a 'removal,' ... or a 'remedial action'.... In general terms, a removal action is more emergent and usually involves a short term remedy to protect the health of a community or the environment, ... while a remedial action is one that is longer term, more permanent in nature, and may be 'taken instead of or in addition to removal actions ...'. The apparent significance of this dispute is the parties' understanding that the court's interpretation of the NCP in the case of a removal action would be more lenient than in the case of a long term remedial action. Indeed, in a recent decision the Tenth Circuit has stated that both removal actions and remedial actions have substantial requirements, but the requirements for a remedial action are much more extensive").

The NCP requires that a party undertaking a removal action conduct a removal site evaluation and review current site conditions. See 40 C.F.R. § 300.415(a). It directs that the propriety of the contemplated removal action then be evaluated, considering several factors, including the actual or potential exposure of nearby human populations; actual or potential contamination of drinking water supplies; threat of fire or explosion; and other circumstances that may pose a threat to public health. See 40 C.F.R. § 300.415(b). Finally, a party conducting a removal action must satisfy certain community relations requirements, including notification of affected citizens and providing a period for public comment. See 40 C.F.R. § 300.415(n).

In contrast, a party initiating a remedial action is expected, *inter alia,* to conduct a remedial site evaluation (40 C.F.R. § 300.420) and complete an RI/FS before selecting the appropriate remedy (40 C.F.R. § 300.430). It must also satisfy certain community relations requirements, which include conducting interviews with various interested parties, preparing a community relations plan, publishing the proposed remediation plan in a local newspaper, providing a reasonable opportunity for oral comment on the plan, and ensuring that there is a public meeting during the public comment period. 40 C.F.R. § 300.430(c), (f)(3). See also *Cytec Industries, Inc. v. B.F. Goodrich Co.,* 232 F.Supp.2d 821, 834 (S.D.Ohio 2002) ("In determining the appropriateness of a removal action, the NCP requires consideration of eight specific factors.... These factors illustrate the immediate nature of

removal activities, in that they include such factors as: actual or potential exposure to nearby human populations; actual or potential contamination of drinking water supplies; threat of fire or explosion; and other factors or situations that may pose threats to the public health.... In contrast, the NCP provisions regarding remedial actions reflect an overall goal 'to select remedies that are protective of human health and the environment, that maintain protection over time, and that minimize untreated waste.' ... See also [40 C.F.R.] § 300.430(e)(9)(iii) (requiring that any analysis of alternatives for a remedial action give consideration to such criteria as overall protection of human health and the environment, in both the short term and long term; as well as long-term effectiveness and permanence of the alternative)").

 Whether a party's response is a removal action or a remedial action is a question of law that can be decided on summary judgment. See *Cytec Industries, supra,* 232 F.Supp.2d at 832; *Ad-*

*vanced Micro Devices, supra,* 38 F.Supp.2d at 809. Here, the undisputed evidence demonstrates that Carson Harbor's response was a remedial action as defined in the statute. The presence of the tar-like and slag materials on the property was first noted in 1993. Carson Harbor engaged two separate consultants thereafter to examine the extent of the contamination and determine an appropriate approach to remediation. The tar-like and slag materials were ultimately removed in 1995.

There is no evidence in the record that the materials posed the type of threat to human health and welfare that required immediate action. To the contrary, there is evidence that RWQCB's Ross never considered the tar and slag an imminent and substantial threat to human health or the environment.[221] Citing the absence of such evidence, Judge Wardlaw entered summary judgment in defendants' favor on Carson Harbor's RCRA claim, stating that plaintiff had failed to establish the contamination posed an imminent danger to human health or the environment.[222] See

---

**221.** Compton's Facts, ¶ 70; Ross Depo. at 132:22–133:4. Carson Harbor admits that the lead does not presently pose an imminent and substantial danger to human health or the environment. (See Compton's Facts, ¶ 68; Pl.'s Compton Issues, ¶ 68.) This admission, however, is not relevant to the situation that obtained prior to the removal of the tar-like and slag materials from the site.

**222.** LA's Facts, ¶ 34; Pl.'s LA Issues, ¶ 34. This ruling is now law of the case. See *Walker v. Mortham,* 158 F.3d 1177, 1185, n. 13 (11th Cir.1998) ("Under the law of the case doctrine, we are bound by the factual findings and legal conclusions of that decision"); *United States v. Robinson,* 690 F.2d 869, 872 (11th Cir.1982) ("Under the law of the case doctrine, both the district court and the court of appeals generally are bound by findings of fact and conclusions of law made by the court of appeals in a prior appeal of the same case"). See also *United States v. Maybusher,* 735 F.2d 366, 370 (9th Cir.1984)

("The doctrine typically applies to the same case when the parties in the subsequent proceeding were also the parties to the former appellate decision"). Cf. *In re Foxmeyer Corp.,* 286 B.R. 546, 556 (Bankr.D.Del.2002) ("[I]f a court, within its ruling that disposes of a prior summary judgment motion, fails entirely to address a legal theory which might provide a basis presently for the grant of summary judgment, then such prior ruling would not, by virtue of the law of the case doctrine, preclude that court from entertaining such legal theory within the context of a subsequent summary judgment motion *unless* such legal theory would necessarily depend for its success on (a) the existence of material facts that the court has previously found to be subject to a genuine dispute, and/or (b) the outcome of legal issues that the court has previously determined it cannot yet resolve" (emphasis added)). Judge Wardlaw's ruling, and the court's ruling here is, moreover, distinct from the Ninth Circuit's holding that genuine issues of material fact remained as to

*Metropolitan Serv. Dist. v. Oregon Metal Finishers, Inc.*, 32 Env't. Rep. Cas. (BNA) 1102, 1990 WL 134537, * 2–3 (D.Or. Sept.11, 1990) (concluding that the response measures taken by the plaintiff were remedial rather than removal actions because there was no evidence that contamination at the site posed an immediate threat to public health or the environment); *Sherwin–Williams, supra,* 840 F.Supp. at 475–76 ("The City has demonstrated no imminent threat to health or safety, and the extended and protracted nature of the cleanup indicate that the City has engaged in a remedial action"); *Channel Master, supra,* 748 F.Supp. at 386–87 ("[Plaintiff] asserts that a removal is appropriate 'if a threat to public health or welfare or the environment exists due to an actual or potential release.' However, the presence of an actual or potential release is the threshold predicate for *all* actions under CERCLA, and thus [this] conclusion transforms *all* cleanups into removals, a result which is inconsistent with CERCLA and the NCP").

Moreover, the RWQCB's issuance of a clean closure report and the fact that plaintiff undertook no further remedial action indicate that removal of the tar-like and slag materials was intended to be a permanent remedy. While this alone is not determinative, it is a factor to be taken into consideration in determining the proper characterization of the action. See *Raytheon Constructors, Inc. v. ASARCO Inc.*, No. Civ.A 96 N 2072, 2000 WL 1635482, *13 (D.Colo. Mar.31, 2000) (stating the "a removal action is not converted into a remedial action merely because it achieves a permanent remedy," but that the fact a permanent solution is achieved "tends to favor a finding that an action was remedial in nature," citing *General Elec. Co. v. Litton Indus. Automation Sys., Inc.*, 920 F.2d 1415, 1419 & n. 4 (8th Cir.1990), abrogated on other grounds in *Key Tronic Corp. v. United States*, 511 U.S. 809, 114 S.Ct. 1960, 128 L.Ed.2d 797(1994)); *Reynolds Metals Co. v. Arkansas Power & Light Co.*, No. LR–C–95–281, 1997 WL 580361, * 5–6 (E.D.Ark. Jul.29, 1997) (accepting "that a permanent and total cleanup can, in certain circumstances, . . . be characterized as a removal action," but concluding that an excavation was a remedial action because "the uncontroverted evidence indicates that the cleanup was a 'permanent solution' designed to permit the pursuit of another venture at the Site").

Carson Harbor clearly considered its remediation of the tar-like and slag materials a "final" and "permanent" solution to environmental contamination at the site. The closure report McLaren Hart submitted to the RWQCB stated that "all the goals of [the] remedial action plan" had been achieved.[223] The RWQCB concluded that no further action at the site was required.[224] Carson Harbor's owner, Goldstein, stated that he knew of no additional remedial work that needed to be done, that

---

whether the contamination posed "an actual and real threat to human health or the environment" such that the responses costs Carson Harbor expended were necessary. Compare *Carson Harbor Village, supra,* 270 F.3d at 871–84 (discussing the "actual and real threat to human health or the environment" standard in the context of necessity) with *id.* at 870 (noting Judge Wardlaw's finding that "the 'evidence shows that there was no *imminent* danger' to human health or the environment—a requirement element of a RCRA claim" (emphasis original)).

**223.** LA's Facts, ¶ 30; Pl's LA Issues, ¶ 30.

**224.** Carson's Facts, ¶ 71; Pl's Carson Issues, ¶ 71; Pshp. Defs' Facts, ¶ 19; Pl's Pshp. Issues ¶ 19; Declaration of Walter J. Lipsman in Support of Partnership Defendants' Motion for Summary Judgment ("Lipsman Decl."), ¶ 11, Ex. J (Oct. 18 RWQCB Letter); Compton's Facts, ¶ 55; Pl's Compton Issues, ¶ 55.

no government agencies had ordered a further cleanup of the property, and that no further remediation activities had been undertaken.[225] The permanence of the remedy, therefore, weighs in favor of a finding that Carson Harbor's response was a remedial, rather than a removal action. Also supporting such a conclusion is the fact that Carson Harbor undertook the remediation to remove an impediment to its ability to refinance the property, not to respond to an emergent health or environmental threat. See *Reynolds Metals Co., supra*, 1997 WL 580361 at * 8 (stating that one relevant factor is the "motivation for the action").

Particularly given the lack of any immediate threat to public health or the environment, the court finds that the action Carson Harbor took was remedial and subject to the NCP requirements for such actions. See *Cytec Industries, supra*, 232 F.Supp.2d at 838–39 ("The cleanup of Ponds 1 and 2 was not the result of an immediate release or threat of release of hazardous substances, but instead was the option chosen by Cytec when it had to either close the ponds or fit them with liners to comply with environmental regulations. That the cleanup of the ponds was not the result of any environmental emergency is further evidenced by Cytec's decision to ship the contents of Pond 2 to cement manufacturers for reuse.... The court notes further that Cytec took the time to bring in a larger press when the original press did not remove the water from the sludge of Pond 2 to the satisfaction of the cement kilns. Thus, it appears that Cytec was not primarily concerned with the immediate removal of the hazardous waste, but instead was more concerned about accommodating the cement kilns who were reusing the wastes. In addition,

Nau testified that the cleanup of Ponds 1 and 2 was to effectuate a long-term closure for those ponds"); *Public Service Co. of Colorado, supra*, 22 F.Supp.2d at 1189–90 ("In this case, PSCO admits that it sought to remedy its environmental problems permanently.... The extent of PSCO's ability to plan its actions—both its initial PCB cleanup and the negotiated Consent Order—matches the policy behind the more complex, carefully planned remedial actions. In sum, I find that PSCO's response was, as a matter of law, a remedial action. As such, it will be subject to the NCP standards for remedial actions referred to in 40 C.F.R. § 300.700(c)(5)-(6)").

### (3) Compliance With The NCP In General

As noted, the NCP provides that a private cleanup effort will be deemed consistent with the NCP if "when evaluated as a whole, [it] is in substantial compliance with the applicable requirements [of the NCP] and results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i). See 40 C.F.R. § 300.700(c)(4) (a party that "substantially complies" with the requirements of the NCP may pursue a cost-recovery action); *Waste Management of Alameda County, Inc. v. East Bay Regional Park District*, 135 F.Supp.2d 1071, 1100 (N.D.Cal.2001) (stating that the EPA shifted to this flexible "case-by-case" standard "to avoid discouraging private parties from cleaning up hazardous wastes for fear that recovery of their costs would later be precluded by less than perfect compliance with the NCP," citing 55 Fed.Reg. 8792–94). See also *Louisiana–Pacific Corp. v. ASARCO, Inc.*, 24 F.3d 1565, 1576 (9th Cir.1994) (holding that "strict compliance" is not required). Actions are not consid-

**225.** Lipsman Decl., ¶ 6, Ex. E (Deposition of James Goldstein ("Goldstein Depo.")), at pp.

289:1–290:1.

ered inconsistent with the NCP simply because they deviate in "immaterial or insubstantial" respects from its requirements. 40 C.F.R. § 300.700(c)(4).

Substantial compliance is "evaluated [by examining the party's activities] as a whole." This focus on the entirety of the cleanup, rather than on a checklist of required actions, responds to "concerns that rigid adherence to a detailed set of procedures should not be required in order to recover costs under CERCLA for private party cleanups." 55 Fed.Reg. 8793. The EPA, in fact, specifically rejected a checklist approach because "a list of rigid requirements [might] serve to defeat cost recovery for meritorious cleanup actions based on a mere technical failure by the private party." *Id.*

In addition to showing that it substantially complied with the NCP requirements, a private party must also show that its actions resulted in "a CERCLA-quality cleanup." A CERCLA-quality cleanup is one in which (1) the remedy is "protective of human health and the environment"; (2) it utilizes "permanent solutions and alternative treatment technologies or resource recovery technologies"; (3) it is cost-effective, and (4) it is selected after "meaningful public participation." *Id.* See also *Waste Management, supra,* 135 F.Supp.2d at 1100.

### (4) Compliance With The Public Comment Requirement

■■■ The public comment/community relations requirements for remedial actions include interviewing interested parties, including local officials and community residents, developing a community relations plan, publishing a brief analysis of the remediation plan in a major local newspaper, and offering a public comment period following publication of the planned remediation that includes the opportunity for a public meeting. See 40 C.F.R. § 300.430(c), (f)(3).[226] The EPA has stated that it "does not believe ... the failure of a private party to pro-

---

**226.** The regulation requires that a party

"(i) Conduct[] interviews with local officials, community residents, public interest groups, or other interested or affected parties, as appropriate, to solicit their concerns and information needs, and to learn how and when citizens would like to be involved in the Superfund process.

(ii) Prepar[e] a formal community relations plan (CRP), based on the community interviews and other relevant information, specifying the community relations activities that [it] expects to undertake during the remedial response. The purpose of the CRP is to:

(A) Ensure the public appropriate opportunities for involvement in a wide variety of site-related decisions, including site analysis and characterization, alternatives analysis, and selection of remedy;

(B) Determine, based on community interviews, appropriate activities to ensure such public involvement, and

(C) Provide appropriate opportunities for the community to learn about the site.

(iii) Establish[] at least one local information repository at or near the location of the response action. Each information repository should contain a copy of items made available to the public, including information that describes the technical assistance grants application process. The [party] shall inform interested parties of the establishment of the information repository." 40 C.F.R. § 300.430(c).

Once a plan has been selected, the regulation requires that a party

"(A) Publish a notice of availability and brief analysis of the proposed plan in a major local newspaper of general circulation; ...

(C) Provide a reasonable opportunity, not less than 30 calendar days, for submission of written and oral comments on the proposed plan and the supporting analysis and information located in the information repository, including the RI/FS....

(D) Provide the opportunity for a public meeting to be held during the public comment period at or near the site at issue regarding the proposed plan and the supporting analysis and information...." 40 C.F.R. § 300.430(f)(3).

vide a public hearing should serve to defeat a cost recovery action if the public was afforded an ample opportunity for comment." 55 Fed.Reg. 8795. It has also stated, however, that the NCP's community relations provisions define the minimum level of public involvement necessary to ensure a CERCLA-quality cleanup. 55 Fed.Reg. 8766.

There is little evidence in the record demonstrating that Carson Harbor complied with the public comment/community relations requirement.[227] Unocal's Richard Salisbury testified that he attended two meetings with Carson Harbor representatives on May 4 and 8, 1995. Other parties were present, including RWQCB's Ross, representatives of McLaren Hart, Park Environmental, CET Environmental, and a staff person for State Senator Ralph Dills, whose office had processed some citizen complaints regarding the site. The participants discussed whether the tar-like and slag materials should be removed; Ross ultimately stated, however, that the decision had been made to pursue removal, and instructed McLaren Hart to proceed with the removal operation.[228] Other evidence indicates that Ross visited the site on two or three additional occasions; one of these meetings appears to have been attended by a representative from Senator Dill's office, a representative of the state Department of Toxic Substance Control, and a representative of the City of Carson.[229]

■ There is no evidence, however, that a community relations plan was prepared, that the public was given notice of the remediation action, that a public meeting was held, or that other opportunity for public comment was provided. Indeed, Dr. Amini admits that McLaren Hart did not pursue the "very cumbersome and elaborate procedure[s] prescribed in the N.C.P." because it considered the response a removal action.[230] Dr. Amini knows of no effort to solicit public comment on the remedial action plan. And Carson Harbor's owner, Goldstein, is not aware that anyone acting on Carson Harbor's behalf held public meetings or published notice of the remedial action plan that had been selected.

While the evidence is sufficient to raise a triable issue of fact regarding the fact that Carson Harbor notified and interviewed local officials and other interested and/or affected parties, it does not demonstrate compliance with the remaining NCP public comment requirements, or even raise triable issues of fact in that regard. There is, as noted, no evidence that Carson Harbor developed a community relations plan, that the remediation plan was published or otherwise made available to the public, that any public meetings were held, or that public comment was solicited. The meetings among plaintiff's environmental consultants, Unocal, the RWQCB, and Senator Dills' staff simply did not afford the general public "an ample opportunity for comment." 55 Fed.Reg. 8793. See *City of Oakland, supra,* 2000 WL 1130066 at * 5 ("After the discovery of the lead contamination, the only measures taken to ensure public participation with regard to the measures to be taken in connection with the rocky fill were a press release and

**227.** Plaintiff has proffered a series of letters and other documents as evidence that it complied with NCP. Many of these have been excluded, however, because they are not properly authenticated. See note 160, *supra.*

**228.** Salisbury Depo. at 33:1–15, 34:18–21, 35:4–37:12, 42:4–10, 84:12–95:15.

**229.** Ross Depo. at 38:19–40:20, Ex. 32.

**230.** Amini Depo. at 290:8–291:18. As noted earlier, whether a response constitutes a removal action or a remedial action is a question of law. It is therefore not a proper subject of expert testimony. See *Channel Master, supra,* 748 F.Supp. at 386.

discussions of the matter at meetings of the Board of Port Commissioners that are open to the public. The Court concludes that these measures were not substantially compliant with the NCP. The press release . . . was issued only one day before excavation began. Moreover, the release itself says only that there is a 'potential' of hazardous waste at the site, and that if such waste were to be found, the Port would ensure that it received approval from the appropriate regulatory agencies before conducting any excavation. . . . [I]t appears that the meetings that took place over the next few months dealt primarily with the approval of charges for work that had already been completed. . . . Moreover, the Port's project manager . . . knew of no meetings open to the public at which the options for dealing with the lead contaminated fill were discussed. . . . No evidence has been submitted to show that the public was able to comment upon the options that were available and/or considered after the time that the lead contamination was discovered. Given the tenor of the press release, and the subject of the meetings held, the Court must conclude that the public did not participate in the selection of the response action").

 Carson Harbor argues that it substantially complied with the public comment provisions because the direct involvement of a public agency like the RWQCB is equivalent to involving members of the public at large. Some courts have held that participation by a public agency is sufficient to demonstrate compliance with the NCP public comment requirement. See *Bedford Affiliates v. Sills*, 156 F.3d 416, 428 (2d Cir.1998) ("Sills urges that Bedford's failure to provide any opportunity for public comment prior to initiating cleanup at the Site should preclude recovery of response costs. . . . The district court found the DEC has been actively involved in the cleanup of this Site since 1993 when Bedford negotiated its first consent order. . . . Such extensive involvement of a government agency charged with the protection of the public environmental interest is an effective substitute for public comment. Where a state agency responsible for overseeing remediation of hazardous wastes gives comprehensive input, and the private parties involved act pursuant to those instructions, the state participation may fulfill the public participation requirement"); *Norfolk Southern Railway Co. v. Gee Co.*, 158 F.Supp.2d 878, 883 (N.D.Ill. 2001) ("The Seventh Circuit has not yet decided the issue explicitly, but its *Nutra-Sweet* decision suggests strongly that government agency involvement, similar to that of the IEPA in this case, can provide an adequate substitute for public notice and comment"); [231] *Sherwin–Williams Co.*

---

**231.** In *NutraSweet, supra,* 227 F.3d 776, defendant argued that the plaintiff had violated the NCP because it had not effectively cleaned up its property. The Seventh Circuit rejected this assertion, stating: "The Illinois EPA approved NutraSweet's clean-up plan, and the agency monitored the progress of the remediation. NutraSweet remediated its property until the Illinois EPA advised it that it could stop because NutraSweet's efforts had succeeded to the maximum extent possible. In light of this evidence, we are satisfied that NutraSweet met th[e NCP] requirement for a CERCLA recovery." *Id.* at 791. The *Norfolk Southern Railway* court interpreted this statement to mean that agency involvement could serve as a substitute for compliance with the public comment requirements of the NCP. See *Norfolk Southern Railway, supra,* 158 F.Supp.2d at 882 ("Defendants, in this case, believe that this court interpreted *NutraSweet* too broadly because that case 'involved the issue whether the clean-up was sufficient to eradicate the contamination, not whether IEPA approval was sufficient to satisfy the community relations requirement.' . . . The court disagrees. The factual section of the *NutraSweet* opinion did not mention any public notice or comment efforts on the part of the plaintiff, yet the Seventh Circuit did not qualify its conclusion that the IEPA's approval and involvement satisfied the NCP").

*v. Artra Group, Inc.,* 125 F.Supp.2d 739, 752 (D.Md.2001) ("At least one circuit has concluded that evidence of a state environmental agency's involvement with approving cleanup plans and monitoring remediation progress was sufficient to satisfy the requirement of consistency with the NCP as a whole, and not merely with respect to the public participation requirements," citing *NutraSweet, supra,* 227 F.3d at 791); *American Color & Chemical Corp. v. Tenneco Polymers, Inc.,* 918 F.Supp. 945, 957 (D.S.C.1995) ("This court ... recognizes that governmental agencies charged with protection of the public interest may serve as substitutes for participation by individual members of the public, at least where the agency is actively involved in all aspects of the investigation, planning, and remediation of a release of a hazardous substance ..."); *General Elec. Co. v. Litton Business Systems, Inc.,* 715 F.Supp. 949, 961 (W.D.Mo.1989) ("Public hearings are not mandated in the NCP when compliance with legally applicable or relevant and appropriate state requirements provides a substantially equivalent opportunity for public involvement.... It is clear to the Court that no public hearing was required due to the fact that GE was complying with legally applicable or relevant and appropriate state requirements that the waste be removed. Furthermore, if notice to the public is a requirement, the input of the Missouri Department of Natural Resources serves as a substitute for public comment"), aff'd. on other grounds, 920 F.2d 1415 (8th Cir.1990), cert. denied, 499 U.S. 937, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991). See also *Morrison Enterprises, supra,* 302 F.3d at 1137–38 (holding, as a fact-specific matter, that plaintiff was entitled to a "rebuttable presumption" of compliance with the NCP because it undertook a cleanup pursuant to a consent order with a state environmental agency that was part of the EPA's program of deferring the placement of properties on the national priorities list to afford an opportunity for state governments to effect remediation).

Other courts have held that the involvement of a public agency other than the EPA *does not substitute for compliance with the public notice/comment requirements of the NCP.* See *Public Service Co. of Colorado, supra,* 175 F.3d at 1185 & n. 13 (after noting that a private party's consent decree with a state environmental agency "was silent on any requirement to inform the public about the Site and its cleanup," the court stated that "[t]his absence cannot be filled by PSCO's invoking the doctrine of *parens patriae,* equating the State's involvement with substantial compliance with the NCP. Although the 1990 NCP suggests that 'significant state involvement serves the identical purpose that the public notice provision seeks to effectuate,' *Bedford Affiliates v. Sills,* 156 F.3d 416, 428 (2d Cir.1998), the facts before us do not permit us to equate CDH's executing the Consent Order as the equivalent of active state involvement. In *Bedford,* the New York Department of Environmental Conservation, state officials were actively involved in the cleanup, 'present to investigate the implementation of the preliminary site assessment and the interim remedial measure, and generally to oversee the progress of the cleanup' "); *County Line Investment Co., supra,* 933 F.2d at 1512 (plaintiff's failure to provide an opportunity for public comment on a remedial action barred its recovery under CERCLA despite the fact that its cleanup plan was approved by the Oklahoma State Department of Health); *Waste Management, supra,* 135 F.Supp.2d at 1102 ("While some courts have found that interaction with government agencies can substitute for public comment, the NCP is quite clear that its public participation standards are directed at participation by members of the general public and the

surrounding community, not government bodies. Notably, even where the government *itself* is conducting the clean-up, the NCP requires participation by the public" (citations omitted)); *Sherwin–Williams, supra,* 840 F.Supp. at 477 ("The regulations clearly contemplate participation by the general public ... Using state regulators as a substitute ... is contrary to the letter and the spirit of the regulations"). See also *Channel Master, supra,* 748 F.Supp. at 392 ("The court notes that there is no statutory language in the CERCLA statute which supports such an argument").

Certain of the courts that have held governmental agency involvement can satisfy the NCP's public comment requirement appear to have relied on the fact that the agency's process itself involved opportunities for public input and involvement. See *Estes v. Scotsman Group, Inc.,* 16 F.Supp.2d 983, 991 (C.D.Ill.1998) ("Cases allowing public agency involvement to be substituted for public comment have only allowed such a substitution if the public is provided an ample opportunity for comment and there is substantial involvement throughout the cleanup by a state agency"); *Amcast Industrial Corp. v. Detrex Corp.,* 779 F.Supp. 1519, 1537 (N.D.Ind. 1991) (holding that the NCP public participation requirement was fulfilled because the Indiana Department of Environmental Management gave public notice and received public comments before issuing an NPDES permit for the cleanup, even if it did not hold a public hearing), rev'd. in part on other grounds, 2 F.3d 746 (7th Cir.1993); *Channel Master, supra,* 748 F.Supp. at 390 ("In *General Electric,* for example, the cleanup site in question was discussed in at least three *public meetings* of the [the state environmental agency], of which *prior public notice* was given" (emphasis original)). Compare *Waste Management, supra,* 135 F.Supp.2d at 1102 ("[E]ven assuming that government involvement could fulfill the public participation requirements in some circumstances, it would not be appropriate to do so here. The governmental involvement in this case was not unusually extensive; nor did it lead to comparable opportunities for public input.... [W]hile some of the governmental interactions involved meetings open to the public ..., no one public meeting presented WMAC's proposal as a whole or presented an opportunity for meaningful public input into WMAC's consideration of remedial alternatives"); *Bethlehem Iron Works, Inc. v. Lewis Indus., Inc.,* No. CIV.A. 94–0752, 1996 WL 557592, * 60 (E.D.Pa. Oct.1, 1996) ("... Plaintiffs presented no evidence as to whether comments on the NPDES Permit [issued by a state agency] were received and whether Plaintiffs or [the Department of Environmental Resources] responded to them. In addition, the Notice does not state that a public meeting on the NPDES Permit was scheduled and Plaintiffs presented no evidence that a public hearing regarding the NPDES Permit was held").[232]

---

**232.** In other cases approving the concept that the involvement of a state environmental agency can fulfill the NCP's public participation requirement, it appears there was substantial public input irrespective of the state agency's participation. See *Sherwin–Williams, supra,* 125 F.Supp.2d at 753 ("[A]s to the remedial actions taken ... it appears that [plaintiff], with the continuous involvement of [the state agency], assessed and investigated these areas, proposed alternative remedies, and provided opportunities for public comment through notices published in the *Baltimore Sun* (a local general circulation newspaper) prior to the initiation of the remedial actions"); *American Color & Chemical, supra,* 918 F.Supp. at 953–54 (holding that there was a reasonable opportunity for meaningful public comment where the state agency involved issued a press release, the remediation effort was reported in several articles, plaintiff spoke informally to at least fifty residents concerning the initial investigation and report, the remedial alternatives under consideration, and the proposed remediation,

Certain other courts adopting the rule appear to have focused on the degree of similarity between the environmental requirements being administered by the state agency and the requirements of the NCP. See *Public Service Co. of Colorado, supra*, 175 F.3d at 1184 (rejecting defendant's argument that a state-mandated cleanup should be deemed consistent with the NCP because of the state's "intensive involvement and comprehensive oversight in the cleanup," since "[t]he record establishes although [the agency] disapproved of some of the techniques [the plaintiff] was using to neutralize contaminated soils and required [it] to ship its contaminated substances to a different facility, [the agency] was never involved in assessing the Site, proposing alternative remedies, overseeing the remedy, or involving the surrounding community.... [The agency] was not [plaintiff's] alter ego in the cleanup. Rather, the record discloses [that it] was concerned with compliance with state requirements which do not fully mirror those of the NCP"); *Washington State Dep't. of Transp., supra*, 59 F.3d at 793 (concluding that a state agency's cleanup was not consistent with the NCP because, although "an environmental cleanup could conceivably follow a standard procedure consistent with the NCP, even if the NCP is not actually referenced," the agency showed a "high degree of inconsistency" with the NCP, in that it "failed to determine the nature or extent of the threat posed by the tar-like material," its remedies failed to account for all hazardous substances and testing results, and it "failed to provide an opportunity for public review and comment of the alternative remedial measure it was considering"); *American Color & Chemical Corp., supra*, 918 F.Supp. at 957 ("The court agrees ... that the public was pro-

vided with an opportunity for meaningful public comment concerning selection of a response action.... Additionally, the requirements of the ... Consent Orders were substantially equivalent to those found in the 1990 NCP"); *Greene v. Product Mfg. Corp.*, 842 F.Supp. 1321, 1326 (D.Kan.1993) ("The court is persuaded that the provisions of the consent decree providing for a community relations program through the KDHE are sufficient to satisfy the requirements of the NCP"); *General Electric Co., supra*, 715 F.Supp. at 952, 961 (holding that "if notice to the public [was] a requirement, the input of the Missouri Department of Natural Resources ["MDNR"] serve[d] as a substitute for public comment" because the consent decree between plaintiff and MDNR "required all remedial action for the site to be 'consistent with the National Contingency Plan'" and "required MDNR approval of all remedial action").

Still other courts have simply examined the level and extent of governmental involvement, without evaluating whether opportunities for public input were provided, or whether the state agency was administering an environmental law and regulations that paralleled the NCP. See *Bedford Affiliates, supra*, 156 F.3d at 428 (concluding that "extensive" state agency involvement was an adequate substitute for public comment because state officials were actively involved in the cleanup, had been "periodically present to investigate the implementation of the preliminary site assessment and the interim remedial measure, and generally to oversee the progress of the cleanup," and had given "comprehensive input" that the private parties had followed); *Norfolk Southern Railway Co., supra*, 158 F.Supp.2d at 881–83 (find-

and residents' removal preferences were taken into consideration in selecting the remedi-

ation method).

ing that, although plaintiff conducted a "lackluster" community relations effort and did not follow the state agency's recommendations respecting public relations, it complied with the NCP "because the [state agency] was involved in both the approval of Norfolk Southern's remediation plans and the execution of the remediation itself, and then supplied the final stamp of approval by way of two separate No Further Remediation (NFR) Letters," citing *Bedford Affiliates, supra,* 156 F.3d 416 and *NutraSweet, supra,* 227 F.3d 776); *Estes, supra,* 16 F.Supp.2d at 991 ("Cases allowing public agency involvement to be substituted for public comment have only allowed such a substitution if the public is provided an ample opportunity for comment and there is substantial involvement throughout the cleanup by a state agency"); *VME Americas, Inc. v. Hein–Werner Corp.,* 946 F.Supp. 683, 692 (E.D.Wis. 1996) ("... some courts have found state regulatory involvement to be an effective substitute for public comment ... but only where the state agency 'is actively involved in all aspects of the investigation, planning, and remediation of a release of a hazardous substance ...,'" quoting *American Color & Chemical, supra,* 918 F.Supp. at 956–57).[233] Compare *City of Oakland, supra,* 2000 WL 1130066 at * 5 ("... the notification of the regulatory authorities about the cleanup was not enough to obviate the need for public comment because the evidence presented does not show these agencies' input to be 'comprehensive'").

**233.** The Eighth Circuit recently addressed *Bedford Affiliates,* and held that the substitution of state agency involvement for public participation should be limited to situations in which defendants do not dispute the quality or cost of the cleanup effort. See *Union Pacific Railroad Co. v. Reilly Industries, Inc.,* 215 F.3d 830, 838–39 (8th Cir.2000) (while "not quarrel[ing] with *Bedford Affiliates'* observation that, '[w]here a state agency responsible for overseeing remediation of hazardous wastes gives comprehensive input, and the private parties involved act pursuant to those instructions, the state participation may fulfill the public participation requirement,'" the court noted that "'none of the parties [there] ... dispute[d] the quality or cost of [the plaintiff's] cleanup efforts,'" and held that public agency involvement could not substitute for public comment where defendant challenged the necessity and effectiveness of the response action, because a period of public comment would have afforded defendant an opportunity to participate in the selection and execution of the remedy); *Norfolk Southern Railway Co., supra,* 158 F.Supp.2d at 883 ("Here, Defendants did not at any time dispute the quality or cost of Norfolk Southern's actual clean-up efforts.... Where, as here, the defendant does not, at summary judgment, contest the costs incurred by the plaintiff, the case for substitution becomes even stronger"). Unocal did not argue, in the context of the present motions, that Carson Harbor had available a more effective or less expensive remedial alternative. Its counsel, however, argued at the hearing that neither the effectiveness nor the economy of the remediation method selected can truly be known because Carson Harbor did not adequately study whether alternative methodologies would have addressed the problem. (See June 25, 2003 RT at 56:2–57:22.) Moreover, Unocal's representative, Salisbury, testified that Unocal questioned the necessity of removing the tar-like and slag materials at the time the decision was made. (See Salisbury Depo. at 36:17–37:9) ("Q. Was there any discussion at this meeting as to whether or not this material should be removed? A. Yes. Q. What did you say in that regard, if anything? A. I wasn't sure it was necessary.... There was no evidence that I could see that the slag-like material was in any way whatsoever hazardous and the lead concentrations were only slightly above the threshold limits. Q. Did you make that position known to the others at the meeting? A. I discussed it with Mr. Ross. Q. What did Mr. Ross say? A. That the decision had been made to remove it"). Indeed, Unocal has challenged whether the response costs Carson Harbor incurred were necessary. Accordingly, the *Union Pacific Railroad* rule argues against a finding that agency involvement substituted for meaningful public participation in this case.

The court agrees with the holding in *Bedford Affiliates* that extensive government involvement in a private cleanup effort can, under appropriate circumstances, fulfill the public participation requirement of the NCP. As the *Bedford Affiliates* court noted, the EPA has adopted a flexible approach to NCP compliance to ensure that the plan's requirements do not present an insurmountable obstacle to private cleanup efforts. *Bedford Affiliates, supra,* 156 F.3d at 428. Moreover, the public comment provisions of the NCP are stated in precatory, rather than mandatory, language. *Id.* (". . . the public comment provision functions as an important concern, but not an inflexible requirement. See [55 Fed.Reg. 8793] (explaining that [the] provisions set forth in §§ 300.700(c)(5)-(7) are provided as 'guidance to private parties on those requirements that may be pertinent to a particular site.') . . . Even the plain language of the National Plan does not mandate public participation; it simply states that private parties 'should' seek public comment. See 40 C.F.R. § 300.700(c)(6)"). Finally, the 1990 revisions to the NCP indicate that the public comment provisions were added because the EPA was "troubled by private cleanups lacking significant governmental involvement," and thus "significant state involvement serves the identical purpose that the public notice provision seeks to effectuate." *Id.* ("The EPA added the public notice provision because '[t]he public—both [potentially responsible persons] and concerned citizens—have a strong interest in participating in cleanup decisions that may affect them, and their involvement helps to ensure that these cleanups—which are performed without governmental supervision—are carried out in an environmentally sound manner. Thus, EPA has decided that providing public participation opportunities should be a condition for cost recovery under CERCLA,'" quoting 55 Fed.Reg. 8793).

The court also believes it is appropriate, however, to allow for such a substitution only when the record reveals "extensive" or "comprehensive" agency involvement in the cleanup, some evidence that the agency was applying standards that were identical to or consistent with the NCP, and some evidence that the agency's procedures allowed for public comment or involvement. See *Public Service Co. of Colorado, supra,* 175 F.3d at 1184 (rejecting plaintiff's argument that a state agency functioned as *parens patriae* and that its involvement satisfied the public comment requirement because "CDH was never involved in assessing the Site, proposing alternative remedies, overseeing the remedy, or involving the surrounding community," and because "the record discloses CDH was concerned with compliance with state requirements which do not fully mirror those of the NCP"). See also *Union Pacific Railroad Co., supra,* 215 F.3d at 839 ("extensive state involvement is not a *per se* substitute for substantial compliance with the public participation and comment requirements of the NCP").

Such a rule is consistent with EPA regulations stating that response actions taken under non-EPA authority must be evaluated on a "case-by-case" basis. See 55 Fed. Reg. 8796–97 ("[T]he decision to defer a site from listing on the NPL for attention by another authority does not represent a determination that the response action to be taken will presumptively be consistent with the NCP. . . . Each response action taken under another authority (e.g., RCRA) for which cost recovery is sought under section 107(a)(4)(B) must be justified on a case-by-case basis"). Cf. *Morrison Enterprises, supra,* 302 F.3d at 1138 ("Given the specifics of the EPA pilot program in this case, we conclude that Morri-

son was entitled to a rebuttable presumption of compliance with the NCP based on the fact that its action were undertaken pursuant to a consent order with the KDHE.... [L]anguage in the Cooperative Agreement and the EPA's later correspondence with the KDHE ... specifically indicates that the EPA has determined that sites within the deferral program were being handled in a manner consistent with the NCP").

It also makes practical sense. If *any* level of government involvement were sufficient to extinguish a party's obligation to comply with the NCP public comment requirements, minimal contact with state officials would permit a party to avoid involving the public in the selection of the appropriate remedial action and in evaluating whether it had effectively addressed the environmental problem.

Similarly, if a state agency's consideration of remedial alternatives is governed by a statute that does not contain provisions similar to the NCP, this undercuts any argument that its involvement should substitute for the public participation contemplated by the EPA. Cf. *Washington State Dep't. of Transp.*, 59 F.3d at 802–05 (although stating it was "questionable" whether a state agency complied with the NCP because it did not "refer to the NCP for guidance on how to handle the contaminants on the site," its representative "was not even aware that the NCP existed," and its project manager "had never implemented the NCP in a remedial action," the court noted that "an environmental cleanup could conceivably follow a standard procedure consistent with the NCP, even if the NCP is not actually referenced"; it nonetheless concluded that the agency's cleanup was not NCP-compliant because it "failed to assess accurately both the nature and the extent of the threat posed by the presence of PAHs in the soil, failed to evaluate alternatives in the matter pre-

scribed in the NCP, and failed to provide opportunity for public comment").

Finally, if a state agency does not itself solicit input from the public in some manner, it is difficult to see how its involvement in a cleanup can fulfill the purpose of the NCP's community relations requirement. While one part of this purpose is to ensure that cleanups performed without government oversight are completed in an environmentally sound manner (see 55 Fed.Reg. 8795; *Bedford Affiliates, supra,* 156 F.3d at 428), another is to ensure that those responsible for the cleanup receive citizens' input regarding environmental conditions in the community. This citizen perspective is distinctly different from the regulatory view of the state agency that scrutinizes cleanups. See *Sherwin–Williams, supra,* 840 F.Supp. at 477 ("The regulations clearly contemplate participation by the general public in decisions that could affect the environmental conditions of their neighborhood.... [E]ven where a cleanup is conducted by the EPA or a state agency, a public comment period is required").

Accordingly, before it will fulfill the community relations requirement of the NCP, a state agency's participation in a cleanup must be extensive or comprehensive, must involve the application of standards identical to or consistent with the NCP, and must afford the public some opportunity for comment or involvement. This standard was not met in the present case.

First, it does not appear that RWQCB's participation in Carson Harbor's cleanup was as extensive or comprehensive as the involvement of the state agencies in *Bedford Affiliates* and *Norfolk Southern Railway Co.* In both cases, the state agency was involved in the execution or implementation of the remediation plan. Here, there is no evidence that RWQCB partici-

pated in, oversaw, or monitored the remediation work in the same manner as the agencies involved in those cases.

In *Bedford Affiliates,* the plaintiff entered into a consent decree with the New York State Department of Environmental Conservation ("DEC"), pursuant to which it agreed to submit and implement a Preliminary Site Assessment work plan ("PSA"). *Bedford Affiliates, supra,* 156 F.3d at 421. The DEC approved the PSA, and after reviewing the assessment results, entered into a second consent decree with plaintiff that obligated plaintiff to submit and implement an interim remedial measure work plan ("IRM"). *Id.* The DEC approved the IRM, which proposed the installation of a soil vapor extraction system to treat the contaminated soil and eliminate the source of further groundwater contamination. Once the system was installed, DEC oversaw its operation. *Id.* at 422.

Regarding the level of DEC's involvement, the court stated:

"The district court found the DEC has been actively involved in the cleanup of this Site since 1993 when Bedford negotiated its first consent order. DEC officials periodically have been present to investigate the implementation of the preliminary site assessment and the interim remedial measure, and generally to oversee the progress of the cleanup and the soil vapor evacuation system. Such extensive involvement of a government agency charged with the protection of the public environmental interest is an effective substitute for public comment. Where a state agency responsible for overseeing remediation of hazardous wastes gives comprehensive

input, and the private parties involved act pursuant to those instructions, the state participation may fulfill the public participation requirement." *Id.* at 428. See also *Norfolk Southern Railway Co., supra,* 158 F.Supp.2d at 882 ("... the court concluded in its June 25 Order that Norfolk Southern substantially complied with the NCP because the IEPA was involved in both the approval of Norfolk Southern's remediation plans *and the execution of the remediation itself,* and then supplied its final stamp of approval by way of two separate No Further Remediation (NFR) Letters" (emphasis added)).

Here, the undisputed evidence shows that Carson Harbor submitted a remedial action plan to the RWQCB. The agency reviewed the plan, requested certain modifications to it, and thereafter approved it.[234] While there is a conflict in the evidence as to whether the RWQCB ultimately ordered Carson Harbor to proceed with removal of the tar-like and slag materials, the court must assume, for purposes of defendants' summary judgment motions, that, after reviewing and approving the remedial action plan, the RWQCB required Carson Harbor to proceed with remediation. Once Carson Harbor's remediation efforts were complete, the RWQCB conducted independent inspection and testing at the property,[235] and issued a letter stating that "removal [was] complete to the extent required by th[e] Board," and that "no further action [was] required at this site." [236] There is no evidence, however, that the RWQCB assessed the site and evaluated alternate remedial responses, that it participated in implementing the remediation work, or that it oversaw or

**234.** Pl.'s Compton Issues, ¶ 71; Amini Decl., ¶ 6, Ex. H (Letter Approving Remedial Action Plan); Ross Depo. at 90:6–17.

**235.** LA's Facts, ¶ 31; Pl.'s LA Issues, ¶ 31.

**236.** Carson's Facts, ¶ 71; Pl.'s Carson Issues, ¶ 71; Prtnshp. Defs.' Facts, ¶ 19; Pl.'s Prtnshp. Issues, ¶ 19; Lipsman Decl., ¶ 11, Ex. J (Oct. 18 RWQCB Letter); Compton's Facts, ¶ 55; Pl.'s Compton Issues, ¶ 55.

monitored that work in any way.[237] It was thus not as active a participant as the state agencies involved in *Bedford Affiliates* and *Norfolk Southern Railway Co.*

Plaintiff asserts that the RWQCB did not need to be as involved as the agency in *Bedford Affiliates* because there was only one effective remedial alternative available, and that alternative did not require ongoing monitoring of the remediation in the manner that the soil vapor extraction system employed in *Bedford Affiliates* did. The court acknowledges the force of this argument, and believes it is appropriate to

evaluate the level of agency involvement in light of the nature of the contamination and the available remedial alternatives. Even if it concluded, however, based on these factors, that the RWQCB's involvement was "extensive," the court would still conclude that the agency's involvement did not fulfill the public participation requirement of the NCP.

First, it is not clear on the present record what state regulations the RWQCB applied in evaluating Carson Harbor's remediation proposals, or whether those regulations were consistent with the NCP. [238] Consequently, the court cannot con-

---

237. Plaintiff's counsel argued at the hearing that two of the excluded exhibits show that Carson Harbor originally proposed to leave the tar-like and slag materials on the property, but that RWQCB's Ross vetoed this suggestion, and required their removal. The first exhibit is an August 1, 1994, letter from McLaren Hart's Dennis Dineen to RWQCB's John Lewis. Dineen states that McLaren Hart submitted reports describing the soluble lead levels on the property to Ross, and that Ross requested that additional documentation demonstrating the lead did not pose a significant hazard to human health or the environment be presented to Lewis. (Casparian Ptrnshp. Decl., Ex. 12). The second exhibit is an August 30, 1994, memorandum from Dineen to Ross describing Dineen's meeting with Lewis. Dineen asserts that Lewis told him his role was "waste classification and removal," and that McLaren Hart should propose a future course of action to Ross "[s]ince it is clear that the entire wetlands cannot be excavated." (*Id.*, Ex. 14). While these exhibits demonstrate that the RWQCB had some discussions with Carson Harbor regarding the proper remedial action to be taken, they do not support plaintiff's claim that the RWQCB vetoed a proposed plan submitted to it. Nor do they demonstrate that the agency had before it a range of remedial options, which it evaluated and among which it chose. Even were the court to countenance plaintiff's belated attempt to authenticate the documents, therefore, they would have no bearing on the outcome.

238. Carson Harbor cites four documents that it contends identify the standards applied by the RWQCB in evaluating the remediation:

(1) the remedial action plan McLaren/Hart submitted to the RWQCB; (2) the RWQCB's February 27, 1995 letter approving implementation of the plan; (3) the clean closure report McLaren/Hart sent to the RWQCB on October 11, 1995; and (4) the RWQCB's October 18, 1995, closure approval letter. These documents do not clearly identify the standards used by the RWQCB in reviewing and approving plaintiff's remediation plan. The RWQCB's letters do not cite any specific state or federal statutes or regulations that it used to evaluate the remedial action plan or the clean closure report. (See Pl.'s Carson, L.A., & Unocal Judicial Notice, Exs. H I.) The remedial action plan itself refers generally to Titles 14 and 22 of the California Code of Regulations, but does not identify any specific provisions as relevant. The titles cited, moreover, appear to relate to the disposal of waste removed from the property, rather than standards governing the remediation itself. (See Remedial Action Plan at 115 ("[t]he handling and disposal of the excavated waste will be in accordance with the standards of solid waste handling and disposal) (California Code of Regulations, Title 14). If hazardous waste is encountered during the clean closure process, it will be handled in accordance with the standards for management of hazardous and extremely hazardous wastes (California Code of Regulations, Title 22)"). The clean closure report invokes Titles 14 and 22 in a similar fashion. (See McLaren/Hart Clean Closure Report at 310 ("[t]he handling and disposal of the excavated waste was conducted in a manner in accordance with the standards of solid waste handling and disposal) (California Code of Regulations, Title 14). Non RCRA hazardous waste was encountered during the clean

clude that the environmental requirements that were being administered by the RWQCB were similar to the requirements imposed by the NCP. See *Public Service Co. of Colorado, supra,* 175 F.3d at 1184; *Washington State Dep't. of Transp., supra,* 59 F.3d at 793.

Even assuming the standards the RWQCB utilized were consistent with the NCP, there is no evidence that the agency in any manner solicited or provided opportunities for public comment. Specifically, there is no evidence that the RWQCB sought public comment concerning Carson Harbor's remediation proposal in any of

the ways envisioned by the NCP before it approved the plan, i.e., by publishing an analysis of the remediation plan in a major local newspaper, offering a public comment period following publication of the remediation plan, or holding a public meeting.[239] Indeed, the record is devoid of any evidence that the public was notified of, or invited to comment on, the proposed remediation plan prior to its implementation.

The RWQCB's failure to solicit input from the public before approving Carson Harbor's plan, to offer the public an opportunity to review and critique the plan, and

closure process. It was handled in accordance with the standards for management of hazardous and extremely hazardous wastes (California Code of Regulations, Title 22)").

Under Title 14 of the California Code of Regulations, which provides, *inter alia,* minimum standards for solid waste handling and disposal, RWQCB is defined as an "approval agency." See 14 CAL.CODE REGS. § 17225.4 ("'Approval agency' includes any agency with regulatory powers regarding solid waste generation, collection, transportation, processing or disposal and includes, but is not limited to the Board, the Department, [and] California Regional Water Quality Control Boards ...."). Title 14, however, does not mandate that approval agencies act in accordance with the NCP. See 14 CAL.CODE REGS. § 17202. Nor does it require that solid waste handling or disposal actions be the subject of public comment or participation. See generally 14 CAL CODE REGS. §§ 17200 et seq. The invocation of Title 14, therefore, does not establish that the RWQCB employed standards similar to the NCP's public comment and participation requirements in reviewing and approving plaintiff's remediation plan.

Title 22 of the California Code of Regulations governs, *inter alia,* the management of hazardous waste. The regulations specify that corrective action taken with respect to toxic substances "shall, to the maximum extent possible, be consistent with the priorities, guidelines, criteria and regulations contained in the national contingency plan." See 22 CAL.CODE REGS. § 68400.2. The corrective action requirements appear, however, to relate primarily, if not exclusively, to action taken

by the Department of Toxic Substances Control. See 22 CAL CODE REGS. § 168400.2. Based on the information before the court, it is unclear whether the RWQCB has authority under Title 22 to supervise a private party's corrective action respecting hazardous waste. Assuming the RWQCB does have such authority, the public participation requirement set forth in Title 22 was repealed effective March 19, 1999. See 22 CAL.CODE REGS. § 68500.4 (repealed). Additionally, to the extent it was bound to comply with the public participation requirements of the NCP pursuant to § 68400.2, there is no evidence that the RWQCB did so.

239. A newspaper article that appeared in the Daily Breeze regarding the contamination problem and remediation efforts does not demonstrate that such input was sought. (See Casparian 3rd Decl., Ex. 28 (Daily Breeze Article).) The public notice contemplated by the federal regulations requires that a party make the proposed remediation plan available for public review and thereafter publish "a notice of availability and brief analysis of the proposed [remediation] plan." 40 C.F.R. § 300.430(f)(3). The Daily Breeze article cannot be characterized as a public notice of the remediation plan. Indeed, the only reference in the article to the plan is the comment that "... the park owners have hired a firm to clean out the leaded soil and the firm's plan has been approved." No details of the plan are provided, and no member of the public who had wished to do so could have commented on the plan based on·the information provided in the article.

to afford a mechanism for the public to suggest alternatives is inconsistent with the NCP. The NCP imposes an obligation not just on private parties, but on governmental agencies involved in cleanups to solicit input from members of the general public. The inclusion of this provision demonstrates that the public participation requirement is designed not simply to substitute for lack of government oversight, but to ensure an adequate opportunity for affected individuals to be heard before remediation efforts are undertaken. Because the RWQCB did not solicit *any* public input, its participation was not an effective substitute for the community relations activities that the NCP contemplated Carson Harbor would undertake in this case. See *Waste Management, supra*, 135 F.Supp.2d at 1103 ("The governmental involvement in this case was not unusually extensive; nor did it lead to comparable opportunities for public input").

Accordingly, the court concludes that the RWQCB's involvement in the remediation effort did not satisfy the NCP's public participation requirement. As the evidence on this issue is undisputed, or has been construed in the light most favorable to the plaintiff, the court concludes there are no triable issues of fact regarding Carson Harbor's failure to satisfy the public participation requirement of the NCP.[240]

Failure to provide a meaningful opportunity for public participation is "more than a technical or *de minimis* deviation from the NCP," and has been found to be a sufficient basis upon which to find that a plaintiff's response costs are not recoverable under CERCLA. See *id.* at 1103; *City of Oakland, supra*, 2000 WL 1130066 at * 5 ("Failure to comply with the public participation requirement alone is enough to conclude that the Port did not substantially comply with the NCP. Therefore, the Court does not reach the issue of whether the Port fulfilled the requirements of an RI/FS").

**(5) Compliance With RI/FS Requirement**

■ The remedial investigation and feasibility study ("RI/FS") requirement of the NCP (see 40 C.F.R. §§ 300.5, 300.430) "is intended to determine the extent of contamination and possible remedies." See *Franklin County Convention Facilities Authority v. American Premier Underwriters, Inc.*, 240 F.3d 534, 544 (6th Cir.2001). Remedial investigation involves data collection and site characterization, while the feasibility study uses the data

---

**240.** Even if the court were to consider the exhibits to the Casparian declaration that have been excluded, its conclusion would not change. The excluded exhibits reveal that Carson Harbor corresponded with local political representatives and other public agencies, who deferred to the RQWCB, and that Carson Harbor offered other PRPs an opportunity to remediate the contamination themselves. None of the evidence supports a finding that Carson Harbor sought public comment on the remediation effort. There is evidence that Carson Harbor notified residents of the mobile home park that lead had been found on the property in June 1994, and advised them the contamination would be remediated. This notification apparently caused some of the residents to contact their local political representatives and ask them to intervene in the ongoing discussions regarding remediation. (Casparian 3rd Decl., Ex. 28 (Daily Breeze Article)). Merely notifying residents that there are hazardous substances on the property is not sufficient to fulfill the community relations requirements of the NCP. First, the notice was given only to a limited portion of the public—i.e., residents of the mobile home park. Second, no provision was made to permit the residents to submit comments, and no mechanism was established to ensure consideration of such comments. The fact that residents were forced to lodge complaints with Senator Dill in an effort to have their views on remediation represented indicates that adequate opportunity for public comment and involvement was not afforded.

collected to define the objectives of the response action and develop remedial alternatives. *Id.* (citing 40 C.F.R. § 300.5).

Remedial investigation requires assessment of the threats to human health or the environment taking into consideration the physical characteristics of the site and the hazardous waste, the extent to which the source of the waste can be identified, potential pathways for exposure to the waste, and other factors that may be relevant to the analysis of remedial measures. See 40 C.F.R. § 300.430(d)(1)-(4).

A feasibility study is then prepared to ensure that potential remedial alternatives are "developed and evaluated," and "an appropriate remedy [can be] selected." 40 C.F.R. § 300.430(e)(1). In developing remedial alternatives, both the objective of the remedial action and potential methods for achieving that objective must be considered. See 40 C.F.R. § 300.430(e)(2)-(6). Alternatives must be assessed for effectiveness, implementability, and cost. See 40 C.F.R. § 300.430(e)(7). The feasibility study must include "a detailed analysis ... on the limited number of alternatives that represent viable approaches to remedial action after evaluation in the screening stage." 40 C.F.R. § 300.430(e)(9).

Dr. Amini testified he did not believe the project required a "full blown feasibility study, risk assessment, public involvement, [or] many other [NCP] requirements."[241] While he apparently participated in preparing Carson Harbor's remedial action plan, Amini did not know of any reports that documented Carson Harbor's consideration of remediation alternatives.[242] He concedes he suggested that a health risk assessment be conducted, but states that

plaintiff's attorney chose not to authorize such an assessment.[243]

Undisputed evidence in the record indicates that removal of the tar-like and slag materials was an appropriate remedial measure. Dr. Amini believed there was sufficient lead inherent in the tar to require its removal as a hazardous substance,[244] and McLaren Hart proposed removal of the material as the appropriate response in the remedial action plan it submitted to the RWQCB. The remedial action plan discussed the history of the site, and outlined the results of subsurface soil investigations performed by McLaren Hart and Park Environmental. It also addressed the contaminant levels present at the property and compared them to the STLC and TTLC levels deemed toxic in title 22, section 66261.24 of the California Code of Regulations. The plan then recommended cleanup parameters or criteria, i.e., the concentration levels to which the contaminants should be reduced, and identified a single remedial alternative: removal of the tar-like and slag materials. Finally, the report detailed the procedures that would be followed during removal, including preparation of a health and safety plan, site preparation, excavation and verification sampling.[245] The RWQCB approved the removal plan with certain modifications.

While Carson Harbor asserts it raised with the RWQCB the option of leaving the tar-like and slag materials in place, there is no evidence that the agency considered this or any other remediation alternative before approving the plan. Similarly, while there is evidence that concerned parties (including the RWQCB and Unocal)

241. Amini Depo. at 804:11–23.

242. Amini Depo. at 568:1–4.

243. Amini Depo. at 290:8–291:18.

244. LA's Facts, ¶ 9; Amini Depo. at 430:2–5, 588:2–589:13.

245. Remedial Action Plan at 115, 120–21, 132–33, 136–39.

discussed remediation after the plan was prepared, and that the RWQCB ultimately directed Carson Harbor to remove the tar-like and slag materials, there is no evidence that specific remediation alternatives were evaluated at these sessions.

■ As noted, a remedial investigation requires assessment of the threat to human health or the environment posed by the contamination. The physical characteristics of the site, the contaminants, their source, and pathways for exposure must be assessed. Here, it is undisputed that Carson Harbor did not assess the threat the contamination posed to health or the environment, as it declined to follow the recommendation of its consultant that such a study be undertaken. Carson Harbor contends it satisfied this requirement nonetheless because it met the cleanup levels prescribed by the RWQCB, and these were designed to protect public health and the environment.[246] As noted earlier, in *NutraSweet,* the Seventh Circuit held that a state environmental agency's approval of a remedial plan and monitoring of a remediation effort was sufficient to demonstrate compliance with the NCP. See *NutraSweet, supra,* 227 F.3d at 791 ("the district court did not clearly err in concluding that NutraSweet had satisfied the NCP. The Illinois EPA approved NutraSweet's clean-up plan, and the agency monitored the progress of the remediation.

NutraSweet remediated its property until the Illinois EPA advised it that it could stop because NutraSweet's efforts had succeeded to the maximum extent possible. In light of this evidence, we are satisfied that NutraSweet met this requirement for a CERCLA recovery"). The Tenth Circuit has held, by contrast, that whether compliance with state agency directives can be deemed compliance with the NCP is a case-specific question that turns on whether, factually, "compliance with the state orders, and acceptance of state oversight ... establish[es] compliance with the NCP." *Morrison Enterprises, supra,* 302 F.3d at 1138. The court concludes that the Tenth Circuit's approach is the appropriate one.

There is no specific evidence in the record that the RWQCB assessed the threat the contaminants posed to health and the environment in reviewing and approving Carson Harbor's proposed remedial action. Nor is there any evidence of the standards it employed if it did so. Because there are disputed issues of fact in this regard, however,[247] the court will presume for purposes of this proceeding that the RWQCB did engage in such an assessment, and that its analysis was an adequate substitute for Carson Harbor's failure to do so. Carson Harbor appears substantially to have complied with the remaining remedial investigation requirements, as both Park Envi-

---

**246.** Pl.'s Carson Issues, ¶ 124; Ross Depo., Exs. 26, 45.

**247.** It may seem implicit that such an assessment took place as part of the RWQCB's review and approval process, in the sense that a state environmental agency is presumably charged with assessing the threat to health or the environment posed by the presence of particular contaminants at a site before it takes action to approve or require remediation there. The record presently before the court with respect to Carson Harbor's property, however, is susceptible of more than one inference on this score, since

there is a dispute as to whether the RWQCB even required that a remediation effort be undertaken. This leaves open the possibility that the agency concluded remediation was not required because the contaminants did not pose a sufficiently severe threat to health or the environment. As noted earlier, however, for purposes of deciding defendants' summary judgment motions, this dispute must be resolved in plaintiff's favor. Accordingly, the court will assume that the RWQCB in fact assessed the threat to health and the environment posed by the tar-like and slag materials, and concluded that remediation was required.

ronmental and McLaren Hart analyzed the physical characteristics of the site, contaminant levels at the property, and to some extent, their source.

The more troublesome question is whether the McLaren Hart remedial action plan constitutes an acceptable feasibility study. The essence of a such a study is the development and evaluation of potential remediation alternatives whose relative effectiveness, implementability, and cost can be compared before a remedial action is selected. The EPA requires that the feasibility study include "a detailed analysis ... on the limited number of alternatives that represent viable approaches to remedial action...." 40 C.F.R. § 300.430(e)(9). There is no evidence in the record that either Carson Harbor or the RWQCB considered the effectiveness, implementability or cost of remedial alternatives before deciding to proceed with removal of the tar and slag. In fact, the only evidence concerning Carson Harbor's consideration of alternatives is Dr. Amini's conclusory statement that McLaren Hart thought about various remedial alternatives.[248]

Carson Harbor contends that the remedial action plan constitutes an adequate feasibility study, because only "feasible" options need be studied, and there was only one such alternative available in this case. Where no other feasible options exist, Carson Harbor asserts, there is no need to address alternative approaches in the feasibility study. This argument appears to have been squarely rejected by the Ninth Circuit in *Washington State Dep't. of Transp.* See 59 F.3d at 804–05 (after noting that the NCP requires an initial screening of alternatives, examining cost, implementability, and effectiveness, to narrow the list of options, and then detailed analysis of the remaining alternatives, using similar criteria, the court con-

cluded that the agency had not satisfied the RI/FS requirement of the NCP, stating: "WSDOT failed to satisfy these requirements. In the first investigation, ... the interagency team informally considered several alternatives.... The record does not indicate that WSDOT subjected these alternatives to the kind of thorough analysis that the NCP requires. Hart Crowser's report to WSDOT does not contain a discussion of any of these alternatives. WSDOE's summary analysis states that disposal of the tar at Arlington is the only 'feasible option' and does not indicate that other alternatives were even considered").

The same is true of McLaren Hart's remedial action plan in this case. Carson Harbor asserts that a no-action option was informally discussed with the RWQCB. There is no mention of such an option in the plan, however, and no indication why it was rejected in favor of removal. See *Sealy Connecticut, Inc. v. Litton Industries, Inc.,* 93 F.Supp.2d 177, 184 (D.Conn.2000) ("While Sealy's failure to produce a formal document identified as a feasibility study might be overlooked if there were evidence that Sealy otherwise identified and considered other remedial options under the criteria established by the NCP, such is not the case.... [W]hile the April 1996 RAP identifies two remedial alternatives and at least superficially addresses some of the criteria set forth in the NCP, it does not reflect how or why the 'no action' alternative was ultimately rejected and the Winchester Building was demolished"). Similarly, there is no mention of any other alternative, or even cursory discussion as to why such options were not feasible. Finally, there is no assessment of the removal option in terms of effectiveness, cost, and ease of implementation. The remedial action

---

248. Amini Decl., ¶ 8.

plan, therefore, does not demonstrate that Carson Harbor considered remedial alternatives, or subjected them to the kind of thorough analysis that is required by the NCP. Indeed, it does not even demonstrate that Carson Harbor evaluated its chosen option—removal—in terms of the criteria set forth in the NCP. See *Raytheon Constructors, supra,* 2000 WL 1635482 at * 26–27 ("ASARCO contends that the Initial Work Plan and subsequent documents are functionally equivalent to an RI/FS.... The Initial Work Plan does not evaluate alternative remedies 'at length' based upon these criteria.... [T]here are only two short paragraphs comparing the costs in very general terms.... In addition, the Initial Work Plan devotes just over one page of double-spaced text to the comparison and selection of alternatives, which is hardly the type of detailed evaluation which the NCP contemplates.... Finally, after the alternative screening process, the Initial Work plan did not evaluate the alternatives and select a remedy based upon the nine evaluative criteria set forth in section 40 C.F.R. § 300.430(e)(9)(iii)"); *Union Pacific Railroad Co. v. Reilly Industries, Inc.,* 981 F.Supp. 1229, 1238 (D.Minn.1997) ("Although Union Pacific submits notes and internal memoranda in support of its position that it satisfied the RI/FS requirement, the notes and memoranda are not a substitute for the detailed provisions of the federal regulations"), vacated in part on other grounds, 1998 WL 1768404 (D.Minn. Jan.12, 1998), aff'd., 215 F.3d 830 (8th Cir.2000); *Sherwin–Williams, supra,* 840 F.Supp. at 478 ("The 1989 treatability proposal and the 1990 work plans submitted to the MDNR by the City do not substantially comply with the NCP requirements. The City has not demonstrated that it developed, in any detail, alternatives to the methods it chose. The work plan merely established *the* method to be used. Simple variations or adjustments to the same remedial procedure, as reflected in the amendments to the work plan, do not amount to alternatives").[249]

There is similarly no evidence that the RWQCB conducted a study of alternatives, or evaluated possible options in terms of effectiveness, cost or ease of implementation. Accordingly, its involvement cannot cure the deficiencies in the remedial action plan that the court has noted, and a finding that Carson Harbor did not substantially comply with the RI/FS requirement of the NCP is warranted.

---

**249.** Compare *Franklin County, supra,* 240 F.3d at 544 ("Here, CFA initially hired an environmental consultant to investigate the site. The Ohio EPA also conducted an assessment of the site. CFA considered numerous options for the remediation, as presented by its environmental consultant, and developed a remediation plan that ultimately was approved by the Ohio EPA. Finally, each step of the remediation process was well documented by CFA. Under these circumstances, we conclude that CFA substantially complied with the NCP's RI/FS/ROD/RD requirements"); *Alliedsignal, Inc. v. Amcast International Corp.,* 177 F.Supp.2d 713, 745 (S.D.Ohio 2001) ("Mundell's testimony to the contrary notwithstanding, the Plaintiff did consider each of these alternative remedies.... The EPA directed the Plaintiff to delete [one] possible remedy from consideration.... [Another possible remedy] is discussed and rejected in the final draft of the Feasibility Study, as is [another].... In sum, the Court concludes that the Plaintiff has incurred response costs in a manner that is consistent with the NCP"); *Waste Management, supra,* 135 F.Supp.2d at 1104 ("In this case, RUST undertook an extensive feasibility study in 1996. The Court acknowledges that the Park District has raised some legitimate concerns regarding the evaluation of costs.... It concludes, however, that overall, the feasibility study, while certainly not in perfect compliance, did 'substantially' comply with the applicable requirements set forth in the NCP").

## (6) Conclusion Regarding Compliance With The National Contingency Plan

■ To determine if it is compliant with the NCP, a private party's response action must be "evaluated as a whole." See 40 C.F.R. § 300.700(c)(3)(i). See also *Washington State Dep't. of Transport., supra*, 59 F.3d at 805 ("looking at the situation as a whole," and concluding there had been a failure to comply with the NCP). Here, based on undisputed evidence in the record, the court has concluded that Carson Harbor failed to satisfy two of the primary requirements of the NCP—ensuring public participation and preparing an adequate feasibility study. Particularly

given evidence indicating Carson Harbor affirmatively elected to forego compliance with the NCP, the fact that the RWQCB was involved in the cleanup does not cure these failures. Moreover, given the importance of these elements of the plan, the court concludes that Carson Harbor's action "as a whole" did not substantially comply with the NCP.

Because Carson Harbor has failed to raise a triable issue of fact regarding its substantial compliance with the public comment and RI/FS requirements of the NCP, Unocal's motion for summary judgment must be granted.[250] Carson also sought summary judgment on the basis that Carson Harbor had failed to comply

**250.** The court is mindful that denying Carson Harbor the opportunity to recover response costs from Unocal because of failure to comply with the requirements of the NCP may appear harsh, since Unocal's responsibility for the initial deposit of the tar-like and slag materials remains in dispute. As numerous courts have noted, however, this outcome "amply demonstrates the difference between an action for response costs under CERCLA and an action for damages in tort.... Congress did not intend for CERCLA, a narrowly drawn federal remedy, to make injured parties whole or to be a general vehicle for toxic tort actions. [Accordingly, u]nless Congress sees fit to provide such a remedy, full compensation for hazardous waste harms will in most instances remain the province of state law." *Artesian Water Co. v. Government of New Castle County*, 659 F.Supp. 1269, 1299–1300 (D.Del.1987) (quoted with approval in *Channel Master, supra*, 748 F.Supp. at 394; *Amland Properties Corp., supra*, 711 F.Supp. at 801, and *Versatile Metals, supra*, 693 F.Supp. at 1582–83). Here, plaintiff asserted state law claims against Unocal, which were remanded to state court in 1997, and ultimately settled.

The court cannot accept plaintiff's contention—asserted vigorously at oral argument—that the only real issue in evaluating NCP compliance is whether the remediation effort resulted in an environmentally sound cleanup. First, as noted earlier, one of the hallmarks of a "CERCLA-quality cleanup" is "meaningful public participation." 55 Fed. Reg. 8793. The undisputed record demonstrates there was none here. Second, as oth-

er courts have observed, consistency with the NCP should not be "reducible to an inquiry ... whether the cleanup was cost-efficient or environmentally sound." See *VME Americas, supra*, 946 F.Supp. at 692 (citing *Channel Master, supra*, 748 F.Supp. at 384 (quoting *Amland Properties Corp., supra*, 711 F.Supp. at 796)). The inclusion of the "meaningful public participation" criterion in the EPA's definition of a "CERCLA-quality cleanup" demonstrates that the process by which an environmentally sound cleanup is achieved is important, and cannot be ignored on the basis of "end justifies the means" analysis. While it is true that CERCLA has broad remedial goals designed to encourage private parties to conduct cleanup operations, and that parties responsible for contamination should not be allowed to invoke the NCP requirements to escape liability, it is also true that CERCLA's goal of protecting human health and the environment is best effectuated by citizen involvement. See *PMC, Inc. v. Sherwin–Williams Co.*, No. 93–C–1379, 1997 WL 223060, * 8 (N.D.Ill. Apr.29, 1997), aff'd., 89 F.3d 835 (6th Cir.1996). Allowing a private party conducting a cleanup to ignore the NCP's requirements almost completely does not effectuate the statutory purpose any more than demanding rigid compliance with those requirements does. See *A.S.I., Inc. v. Sanders*, No. 92–1209 PFK, 1996 WL 91626, * 4 (D.Kan. Feb.9, 1996) (finding that a plaintiff's remedial activities thwarted one of the NCP's fundamental purposes, i.e., including the public in proposed hazardous waste cleanups). Ultimately, therefore, to give effect to the statute and regulations as enacted, enforcement

with the NCP, and Compton joined in Unocal's motion. The response costs Carson Harbor seeks to recover from each of these defendants are identical, and involve identical remedial actions. Accordingly, in addition to the grounds discussed in section B.3., *infra*, Carson Harbor's failure to comply with the NCP provides an alternate basis for entering summary judgment in favor of Carson and Compton as well.

### b. Whether Plaintiff Is A Potentially Responsible Party Limited To Seeking Contribution Costs Under § 9613(f)

Like most circuit courts that have considered the question, the Ninth Circuit has held that a potentially responsible party ("PRP") may not seek indemnification for cleanup costs under § 9607(a). Rather, "[b]ecause all PRPs are liable under the statute, a claim by one PRP against another PRP necessarily is for contribution. A PRP's contribution liability will correspond to that party's equitable share of the total liability and will not be joint and several." *Pinal Creek Group v. Newmont Mining Corp.*, 118 F.3d 1298, 1301 (9th Cir.1997). See also *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 947 (9th Cir.2002) (same); *Carson Harbor Village, supra*, 270 F.3d at 871 (" 'A PRP's contribution liability will correspond to that party's equitable share of the total liability and will not be joint and several' ").[251] As the current owner of the property, Carson Harbor is a presumptive PRP. 42 U.S.C. § 9607(a)(1); *Kaufman &*

*Broad–South Bay v. Unisys Corp.*, 868 F.Supp. 1212, 1216 (N.D.Cal.1994).

There is an exception to this general rule, however, where the PRP seeking to recover cleanup costs is an "innocent landowner." See *Bedford Affiliates, supra*, 156 F.3d at 425 ("... we hold that a potentially responsible person under § 107(a) that is not entitled to any of the defenses enumerated under § 107(b) ... cannot maintain a § 107(a) action against another potentially responsible person"); *New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116, 1124 (3d Cir.1997) ("... a potentially responsible person under section 107(a), who is not entitled to any of the defenses enumerated under section 107(b), may not bring a section 107 action against another potentially responsible person"); *Keystone Coke Co. v. Pasquale*, No. CIV. A. 97–6074, 1999 WL 126917, * 2 (E.D.Pa. Mar.9, 1999) (holding that a party who cannot satisfy the requirements of the "innocent landowner" defense set forth in § 9607(b) cannot maintain a § 9607(a) claim against another PRP even if "they are ... ' "innocent" in the common sense meaning of that word' "); *Boyce v. Bumb*, 944 F.Supp. 807, 812 (N.D.Cal.1996) ("Plaintiffs may maintain a § 9607(a) claim for full cost recovery to the extent that they can prove themselves to be 'innocent landowners' within the meaning of § 9601(35) and § 9607(b)"); *M & M Realty Co. v. Eberton Terminal Corp.*, 977 F.Supp. 683, 686 (M.D.Pa.1997) ("We conclude that, under the circum-

---

of the NCP requirements can be neither too rigid nor too loose.

**251.** CERCLA did not originally recognize a claim for contribution among responsible parties, but was amended "in 1986 to clarify and confirm that CERCLA did incorporate such a claim." *Pinal Creek Group, supra*, 118 F.3d at 1300 (citing *Key Tronic Corp., supra*, 511 U.S. at 814–18, 114 S.Ct. 1960 (recognizing that "numerous cases" previously interpreted

§ 107 "to impliedly authorize such a cause of action")). Under the section added— § 9613(f)—PRP contribution claims are subject to the same statutory requirements as § 9607(a) claims. See 42 U.S.C. § 9613(f); *Pinal Creek Group, supra*, 118 F.3d at 1302 ("[W]hile § 107 created the right of contribution, the 'machinery' of § 113 governs and regulates such actions, providing the details and explicit recognition that were missing from the text of § 107").

stances alleged in this case, if M & M can establish that it is an innocent landowner under Section 107(b)(3), it will be entitled to bring a cost recovery action"); *Kaufman & Broad–South Bay v. Unisys Corp.*, 868 F.Supp. 1212, 1216 (N.D.Cal.1994) ("Another example [of a private party that can sue under § 9607(a) ] is that of a PRP who can successfully assert one of the affirmative defenses enumerated in § 9607(b)").

To prove that it is an innocent landowner under § 9607(b)(3), a party must demonstrate (1) that another party was the "sole cause" of the release of hazardous substances and the damages caused thereby; (2) that the other, responsible party did not cause the release in connection with a contractual, employment, or agency relationship with the defendant;[252] and (3) that the defendant exercised due care with respect to the hazardous substance, and took reasonable precautions against the foreseeable acts of the responsible party and the foreseeable consequences of those acts. See 42 U.S.C. § 9607(b)(3); *Westfarm Associates Ltd. Partnership v. Washington Suburban Sanitary Comm'n.*, 66 F.3d 669, 682 (4th Cir.1995). See also *Reardon v. United States*, 947 F.2d 1509, 1513 (1st Cir.1991) ("To decide, for example, the Reardons' claim that they are innocent landowners, a court must determine whether the contamination pre-dated their ownership; whether they had any knowledge or reason to know of the contamination; whether they had exercised

due care with respect to the hazardous substances; and whether they took precautions to prevent releases by foreseeable acts of third parties").

Unocal asserts that because Carson Harbor is a PRP, it cannot seek to impose joint and several liability on defendants for the response costs it incurred, but is limited to recovering from each a *pro rata* share of costs under § 9613(f). Plaintiff responds that it is an "innocent landowner," or that, at a minimum, questions of fact regarding its status as such preclude the entry of summary judgment on this basis.

Any argument that Carson Harbor is not entitled to innocent landowner status because of its contractual relationship with the Partnership Defendants is barred by the Ninth Circuit's holding in *Carson Harbor Village* that the Partnership Defendants are not PRPs because there was no disposal of contaminants at the property during their ownership of it. See *Carson Harbor Village, supra*, 270 F.3d at 874, 887. Because the Partnership Defendants are not PRPs, it cannot be said that the release of hazardous materials was caused by a party with whom Carson Harbor had a contractual relationship.

Beyond this, there is either no evidence in the present record or triable issues of fact regarding the elements of Carson Harbor's claimed innocent landowner status, i.e., whether a party that was not an employee or agent of Carson Harbor was the

---

**252.** Contractual relationships include "land contracts, deeds or other instruments transferring title or possession, unless the real property on which the facility concerned is located was acquired ... after the disposal or placement of the hazardous substance on, in, or at the facility." 42 U.S.C. § 9601(35)(A). If the release was caused by a party with whom the plaintiff had a contractual relationship, the plaintiff must demonstrate that "[a]t the time [it] acquired the facility [it] did not know and had no reason to know that any

hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility...." *Id.* "To establish that [plaintiff] had no reason to know [of the hazardous substance, however] ..., [plaintiff] must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice in an effort to minimize liability." 42 U.S.C. § 9601(35)(B).

sole cause of the release of hazardous substances, and whether Carson Harbor exercised due care regarding the contaminants, and took precautions against the foreseeable acts of the responsible party and their reasonably foreseeable consequences. First, there is no specific evidence in the summary judgment record as to who caused the release of contaminants at the property. Second, while there is evidence that Carson Harbor acted to remediate the contamination, there is no specific evidence as to whether Carson Harbor's activities at the site prior to remediation exacerbated the contamination in any way.[253] See *Kerr–McGee Chemical Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 325 (7th Cir.1994) (denying a property owner innocent landowner status because it did not take adequate steps to remove contaminants from the site or to reduce their threat after it purchased the site); *Shapiro v. Alexanderson*, 741 F.Supp. 472, 478 (S.D.N.Y.1990) (§ 9607(b)(3) could not invoked by owners who concededly did not respond to contamination problem for five

years after they learned of it); *Washington v. Time Oil Co.*, 687 F.Supp. 529, 533 (W.D.Wash.1988) ("... Time Oil fails to carry its burden of bringing out specific facts to show that some third party was solely responsible for the release"). Accordingly, the matter cannot be resolved on the present record. If Unocal were not entitled to summary judgment because of Carson Harbor's failure to comply with the NCP, therefore, its motion for summary judgment challenging plaintiff's status as an innocent landowner would have to be denied.[254]

### c. Mootness

Unocal next asserts that Carson Harbor's action is moot because it has fully recovered its response costs as contemplated in § 9607(a).

### (1) Article III Confers Jurisdiction To Adjudicate Only Cases Or Controversies

Under Article III, section 2 of the United States Constitution, federal courts have

---

**253.** This inquiry potentially involves examination of Carson Harbor's due diligence in discovering the contamination. While this is not a "contractual relationship" case, arguably whether Carson Harbor acted diligently in discovering the contamination and taking steps to remedy it is relevant in assessing whether it exercised due care with respect to the hazardous substances on the property. To the extent this is so, there are triable issues of fact as to whether Carson Harbor should have known there were contaminants at the site when it purchased the property from the Partnership Defendants. The Ninth Circuit has held that the tar-like and slag materials were on the property prior to Carson Harbor's acquisition of it in 1983. See *Carson Harbor Village, supra*, 270 F.3d at 868 ("Subsequent investigation revealed that the materials ... had been on the property for several decades prior to its development as a mobile home park"). While Carson Harbor hired Dennis Olson to conduct a due diligence inspection of the property prior to purchase, Unocal contends Olson did not investigate the

environmental condition of the property, test the soil, or enter and examine the wetlands. The present record contains little evidence that there was a thorough site investigation prior to the 1983 purchase. Nor does it reveal whether Carson Harbor knew that the property had previously been used for oil production and storage. See *Acme Printing Ink Co. v. Menard, Inc.*, 870 F.Supp. 1465, 1480–81 (E.D.Wis.1994) ("The simple fact that the site was used as a dump by Fadrowski should have put Menard on notice that hazardous substances might be present there"). Whether Olson's inspection fell below the standard of care, however, cannot be determined, as there is no evidence of that standard, and the record is not sufficiently developed regarding the investigation that was conducted.

**254.** Carson moved to strike Carson Harbor's claim for "joint and several liability." Because triable issues of fact remain regarding plaintiff's status as an innocent landowner, Carson's motion to strike is denied.

jurisdiction to adjudicate only actual "Cases" or "Controversies." U.S. Const., art. III, § 2, cl. 1. " '[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.' " *Seven Words LLC v. Network Solutions,* 260 F.3d 1089, 1095 (9th Cir. 2001) (quoting *Arizonans for Official English v. Arizona,* 520 U.S. 43, 67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997)). See also *Cook Inlet Treaty Tribes v. Shalala,* 166 F.3d 986, 989 (9th Cir.1999) ("The twin pillars of standing and 'case or controversy' go to the heart of Article III jurisdiction. The corollary to these principles is that federal courts have no jurisdiction to hear a case that is moot, that is, where no actual or live controversy exists"); *Rosetti v. Shalala,* 12 F.3d 1216, 1223 (3rd Cir. 1993) ("Article III does not permit federal courts to decide moot cases").

### (2) Whether Plaintiff Fully Recovered Its Costs Through The 1997 Rent Increase

█ CERCLA provides that "[a]ny person who receives compensation for removal costs or damages or claims pursuant to any other Federal or State law shall be precluded from receiving compensation for the same removal costs or damages or claims as provided in this chapter." 42 U.S.C. § 9614(b). See also *Stanton Road Associates v. Lohrey Enterprises,* 984 F.2d 1015, 1021–22 (9th Cir.1993) ("CERCLA precludes a plaintiff from recovering cost of repair damages under both CERCLA and state law"). It provides more generally that "[n]othing in this chapter shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous

substances or other pollutants or contaminants." 42 U.S.C. § 9652(d).

Unocal asserts that Carson Harbor has received approximately $1.7 million in increased rental income since the Carson Mobilehome Park Rental Review Board ("Rental Board") approved its rent increase application in January 1997. Unocal argues that this income has more than compensated Carson Harbor for its alleged damages of $530,263. The undisputed evidence shows, however, that the Rental Board's decision was not designed solely to compensate Carson Harbor for its expenditures in remediating the property. Rather, the board compared plaintiff's annual income and expenses, including the costs it incurred in the ordinary course of business, the cost of remediating the contamination,[255] and the cost of paying disputed property tax assessments. The evidence does not indicate what portion of the rent increase the board approved was attributable to each of these categories of expense.

The fact that the Rental Board granted a rent increase based in part on plaintiff's remediation expenses does not mean that the increased rent is a state law award of response costs. The rent increase was designed to "increase the Park's income to offset the increase in expenses and allow the Park to maintain a profit level similar to its gross profit level prior to the large increase in operating expenses which occurred since the hearing on the Park's 1994 rent increase application."[256] Although the amount of the rent increase might have been reduced or its authorization might have been delayed had Carson Harbor not incurred remediation expenses, it did not, and could not, result in a wind-

---

**255.** Because Carson Harbor obtained a $300,000 loan to cover certain of its remediation costs, the Rental Board took into account only that portion of loan that was to be paid during time period covered by the increase.

**256.** Resolution No. 97–185 at 5.

fall because the rent levels set in 1997 simply set a higher bar for the granting of future rent increases.[257] The fact that the rent increase was not designed to compensate for the incurring of response costs is further evidenced by the Rental Board's statement that any recovery by Carson Harbor in this suit had to be reflected as income in its next rent increase application.[258]

Because the 1997 rent increase did not constitute "compensation for removal costs ... pursuant to ... State law," Carson Harbor is not precluded from seeking recovery under CERCLA.[259] Compare *Price v. United States Navy*, 818 F.Supp. 1326, 1332–33 (S.D.Cal.1992) ("Here, plaintiffs received a $25,000.00 reimbursement from the State of California for the cleanup and associated costs. In addition, plaintiffs received a $30,000.00 settlement for the private cleanup and associated costs. The Court finds that these payments were made pursuant to state and/or federal law. Thus, a setoff and credit for these payments from other sources reduces the total amount of damages to which plaintiffs are entitled"), aff'd. in part, rev'd. in part on other grounds, 39 F.3d 1011 (9th Cir.1994). Unocal's motion for summary judgment on the basis that plaintiff has already received a full remedy

and its action is moot is therefore denied.[260]

### 3. CERCLA Claims Against The Government Defendants

### a. Release Of A Hazardous Substance

CERCLA defines a "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment...." 42 U.S.C. § 9601(22). Courts have construed this definition broadly. See, e.g., *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 669 (5th Cir.1989) ("the definition of release should be construed broadly"); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1152 (1st Cir.1989) ("The courts have construed CERCLA's definition of 'release' broadly"); *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1045 (2d Cir.1985) (holding that leaking tanks and pipelines, continued leaching and seepage from earlier spills, and leaking drums were all releases); *City of Tulsa v. Tyson Foods, Inc.*, 258 F.Supp.2d 1263, 1287 (N.D.Okla.2003) ("To effect CERCLA's goals of environmental protection and remediation, the definition of 'release' has been broadly construed by courts"); *United States v. Metate Asbestos Corp.*, 584 F.Supp. 1143, 1149 (D.Ariz.1984) (finding

---

**257.** Casparian Prtnshp. Decl., ¶¶ 2, 4–5.

**258.** Resolution No. 97–185 at 3.

**259.** Even were this not the case, the evidence regarding the amount of the rent increase attributable to the response costs is not sufficiently clear to permit the entry of judgment in Unocal's favor on this basis. The rent increase the board approved was designed to ensure that Carson Harbor could maintain a profit level similar to that it had enjoyed prior to the increase in its operating expenses it experienced between 1994 and 1997. There is no evidence in the record regarding the amount of the increase that was attributable

to the response costs Carson Harbor incurred, nor any evidence that would permit approximation of that amount. Accordingly, even if the court were to determine that the rent increase constituted compensation for removal costs under state law, triable issues of fact would preclude the entry of summary judgment in Unocal's favor on the basis that the rent increase fully compensated Carson Harbor for the response costs it incurred.

**260.** The Government Defendants have joined in Unocal's motion on this point. For the reasons stated, their motions for summary judgment on this ground are also denied.

there was a "release" when asbestos fibers were carried by the wind). See also *O'Connor v. Boeing North American, Inc.*, 311 F.3d 1139, 1149 (9th Cir.2002) (noting that § 9601(22) defines release broadly); *Carson Harbor Village, supra*, 270 F.3d at 878 ("[W]e conclude that 'release' is broader than 'disposal,' because the definition of 'release' includes 'disposing' (also, it includes 'passive' terms such as 'leaching' and 'escaping' which are not included in the definition of 'disposal')").[261]

### (1) "Federally Permitted Release" Exception

■ CERCLA provides that the recovery of response costs resulting from "federally permitted releases" shall be "pursuant to existing law in lieu of this section." 42 U.S.C. § 9607(j). See *Westfarm Associates Limited Partnership v. International Fabricare Institute*, Civ. No. HM–92–9, 1993 WL 662329, * 3 (D.Md. July 8, 1993) ("Accordingly, Congress excepted from the strict liability scheme of CERCLA certain releases that are 'federally permitted,' and plaintiffs who seek response costs or damages in connection with such releases must assert their claims under some other provision of law, including common law"), aff'd., 66 F.3d 669 (4th Cir.1995), cert. denied, 517 U.S. 1103, 116 S.Ct. 1318, 134 L.Ed.2d 471 (1996); *Lincoln Properties, Ltd. v. Higgins*, CIV. No. S–91–760DFL/GGH, 1993 WL 217429, * 21 (E.D.Cal. Jan.21, 1993) (" 'Federally permitted releases' . . . are not considered hazardous and are therefore not subject to the provisions of CERCLA").

Federally permitted releases include "discharges in compliance with a permit under section 1342 of Title 33[, the Clean Water Act]." 42 U.S.C. § 9601(10)(A). Under the Clean Water Act, certain pollutant discharges are illegal unless they are in compliance with an NPDES permit. See 33 U.S.C. §§ 1311(a), 1342. An NPDES permit is presently required for stormwater discharges. No permit was required, however, prior to October 1, 1994. See 33 U.S.C. § 1342(p).

There is no dispute that the County of Los Angeles was a permittee, and the cities of Carson and Compton co-permittees, under NPDES permits issued in 1990 and 1996. There is also no dispute that the Government Defendants were in compliance with the permits at all relevant times.[262] The court finds, therefore, as a matter of law, that the Government Defendants' stormwater discharges from and after 1990 do not give rise to CERCLA liability.

### (2) Whether Pre–Permit "Releases" Support Plaintiff's CERCLA Claim

### (i) Constraints Imposed By Law Of The Case

■ Where a defendant establishes that certain releases were "federally permitted," a plaintiff may nonetheless recover if it shows that "non-federally permitted releases contributed to the natural injury." *United States v. Iron Mountain Mines, Inc.*, 812 F.Supp. 1528, 1540 (E.D.Cal.1992) (citing *In re Acushnet River & New Bedford Harbor*, 722 F.Supp. 893, 897

---

**261.** The parties do not dispute that lead is a "hazardous substance" under the statute.

**262.** The court found in its October 11, 2002, order regarding the parties' motions to designate additional experts that the law of the case doctrine dictated a finding that the Government Defendants were in full compliance with their NPDES permits at all relevant

times subsequent to 1990. See *Carson Harbor Village, supra*, 270 F.3d at 870; *Carson Harbor Village, supra*, 990 F.Supp. at 1197. There is, moreover, no evidence that defendants were not in compliance, and Carson Harbor has not attempted to raise a triable issue of fact regarding the Government Defendants' permit compliance in opposition to their motions for summary judgment.

(D.Mass.1989)). Applying this standard, the *Iron Mountain* court concluded that "response costs [could] be recovered for any releases that (1) were not expressly permitted, (2) exceeded the limitations of the permit, or (3) occurred at a time when there was no permit." *Iron Mountain, supra,* 812 F.Supp. at 1541. See also *Idaho v. Bunker Hill,* 635 F.Supp. 665, 673–74 (D.Idaho 1986) ("The court finds that to the extent damage was caused by releases which were not expressly permitted in the various permits, which exceeded the limitations established by the permits or which occurred during a time period when there were no permits, then the State may seek recovery for those damages under the CERCLA statute").

▇▇▇ The Ninth Circuit held that Judge Wardlaw properly granted the Government Defendants' motion for summary judgment on the state law nuisance claim because "[the NPDES] permits authorized the discharge of stormwater containing pollutants, and there is no evidence that there was any lead-contaminated stormwater runoff to the property prior to 1994 or a violation of the permits." *Carson Harbor Village, supra,* 270 F.3d at 888. As this statement clearly indicates, Carson Harbor failed to adduce evidence that the Government Defendants violated the NPDES permits, and also failed to adduce evidence that stormwater runoff brought hazardous materials onto the property prior to the date the first NPDES permit issued. Carson Harbor's opening brief in the circuit court recognized the importance of this dual holding, arguing that summary judgment on the nuisance claim was improper because: (1) "[e]ven finding, as the District Court did, that the Government Entities are in compliance with both Permits, . . . no permit authorizing the

discharge of polluted stormwater existed [prior to 1990]" and (2) "[l]ead has been released onto the Property since at least the late 1940s or early 1950s." [263] Rejecting Carson Harbor's argument, the Ninth Circuit upheld Judge Wardlaw's finding on the issue, holding "there was no evidence" that there was lead in the stormwater prior to 1994. This holding is now the law of the case, and will not be reconsidered by this court. See *Walker, supra,* 158 F.3d at 1185, n. 13 (law of the case applies to factual findings as well as legal conclusions); *Robinson, supra,* 690 F.2d at 872 (same). Accordingly, Carson Harbor has failed to raise a triable issue of fact respecting the Government Defendants' non-permitted release of lead in stormwater runoff prior to issuance of the first NPDES permit in 1990, and defendants are entitled to judgment as a matter of law on Carson Harbor's CERCLA claim as a result.

**(ii) The Record Evidence Supports The Circuit Court's Holding**

Even if the court were independently to consider the evidence on this point, the result would not differ from that dictated by the law of the case. While plaintiff's expert, Dr. Gersberg, opined that there was a 99% probability that lead in stormwater flowed onto the property, he offered no opinion as to when such releases may have occurred. Compton's expert, Dr. Faeder, concluded, based on the relatively low soil sample readings, that stormwater was not the source of the lead in the marsh.[264] The conflict in these opinions creates a triable issue of fact as to whether stormwater discharges are a source of the lead that is present on the property. There is no evidence, however, and thus no triable issue of fact, as to whether the lead

---

263. County of Los Angeles' Supplemental Request for Judicial Notice (LA's Supp. Judicial Notice") (Plaintiff's Opening Brief) at 35.

264. Compton's Facts, ¶ 18; Faeder Decl., ¶ 16.

releases on the property occurred prior to 1990. Neither Gersberg nor any other expert proffered by plaintiff has offered an opinion as to when the lead-contaminated stormwater came onto the property.[265] Carson Harbor has thus failed—as it did previously—to present any evidence raising a triable issue of fact regarding pre-1990 releases of stormwater containing lead.[266] Because it has failed to establish that there were releases that predated issuance of the NPDES permits, such as would support the imposition of CERCLA liability on the Government Defendants, the current state of the record supports granting the Government Defendants' mo-tion for summary judgment on Carson Harbor's CERCLA claim.[267]

### (b) Whether The Release "Caused" Response Costs

■ The Government Defendants also argue that they are not liable under CERCLA for Carson Harbor's response costs because Carson Harbor has not established that the response costs were caused by the Government Defendants' release of lead-contaminated stormwater.

■ A necessary element of establishing liability under CERCLA is proof that a release or threatened release "caused" plaintiff to incur response costs.[268] See

---

**265.** Carson Harbor contends that the fact Gersberg cited pre 1994 studies regarding urban stormwater runoff in his report constitutes evidence that there were lead releases on the property prior to that date. (See June 25, 2003 RT at 44:17–45:14.) The mere fact that Gersberg cited national studies that pre-date 1994 in support of his opinion that lead coming from the stormwater in the County storm drain system flowed onto plaintiff's property is insufficient to demonstrate that stormwater runoff contaminated plaintiff's property prior to 1994. This is particularly true given that Gersberg offers absolutely *no* opinion as to when the runoff occurred. Accordingly, the citation of pre 1994 reports does not raise a triable issue of fact in this regard.

**266.** Carson Harbor relies, in this proceeding, on the same report of Dr. Gersberg that it proffered in connection with the 1997 summary judgment motions heard by Judge Wardlaw. Despite the inclusion of this report in the record, Judge Wardlaw found there was no evidence that there was any lead-contaminated stormwater runoff to the property prior to 1994. The Ninth Circuit, as noted, affirmed that finding.

**267.** This conclusion also warrants denial of plaintiff's cross-motion for summary judgment against the Government Defendants.

**268.** Whether causation must be proved if there has been an actual release, as opposed to a threatened release, is the subject of some debate. See *State of California v. Court Gal-*

*vanizing, Inc.,* 97 F.3d 1461, 1996 WL 5285190, * 3 (9th Cir. Sept. 13, 1996) (Unpub.Disp.) ("The issue is whether Congress intended that the word 'causes' should limit only 'threatened release,' or whether the drafters unintentionally omitted a comma after 'threatened release' such that 'causes' limits both 'threatened release' and 'release.' ... As noted, we have held that to state a claim under § 9607(a), a plaintiff must allege that a release or threatened release of a hazardous substance caused it to incur response costs.... However, because it was unnecessary for their resolution, these cases did not analyze the causation element. Similarly, in the case at bench, we need not decide whether a showing of causation is required where there has been an actual release of hazardous substances because, even assuming such a requirement, the record demonstrates that DTSC met that burden," citing *3550 Stevens Creek Assoc., supra,* 915 F.2d at 1358, and *Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1152–53 (9th Cir.1989)); *Control Data Corp. v. S.C.S.C. Corp.,* 53 F.3d 930, 935, n. 8 (8th Cir.1995) ("The absence of a comma after 'threatened release' in the phrase 'from which there is a release, or a threatened release which causes response costs, of a hazardous substance' makes it at least questionable that there is a causation element at all in cases where there is an actual—as opposed to a threatened—release. We have previously indicated that, even when there is an actual release, a plaintiff must establish a causal nexus between that release and the incur-

*Carson Harbor Village, supra,* 270 F.3d at 870–71; *3550 Stevens Creek, supra,* 915 F.2d at 1358. In evaluating whether this element of a CERCLA claim has been proved, courts do not apply traditional tort notions of causation. See *Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837, 846 (4th Cir.) ("The trigger to liability under § 9607(a)(2) is ownership or operation of a facility at the time of disposal, not culpability or responsibility for the contamination"), cert. denied, 506 U.S. 940, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992); *Court Galvanizing, supra,* 1996 WL 528510 at * 2 ("[C]ourts have held that CERCLA does not import traditional tort notions of causation ..."); *Louisiana–Pacific Corp. v. Beazer Materials & Serv. Inc.,* 811 F.Supp. 1421, 1430 (E.D.Cal.1993) ("*Beazer*") ("Given the statute's broad imposition of liability and limited defenses, it has been repeatedly held that CERCLA does not import traditional tort notions of causation"); *Louisiana–Pacific Corp. v. ASARCO, Inc.,* 735 F.Supp. 358, 362 (W.D.Wash.1990) ("*ASARCO*") (" '[The] structure of CERCLA and its legislative history make it clear that traditional tort notions, such as proximate cause do not apply. Moreover, the practical limits on analytic techniques argue for a weaker causation standard.... Thus, CERCLA requires only a relaxed standard of causation,' " quoting *United States v. Bliss,* 667 F.Supp. 1298, 1309 (E.D.Mo.1987)).

The language of the statute requires that plaintiff establish a causal link between the release for which defendant is responsible, and the response costs in-

curred by plaintiff. See *Court Galvanizing, supra,* 1996 WL 528510 at * 3 ("[T]he relevant causation inquiry is whether there is a nexus between the release and the response cost incurred"); *Control Data Corp., supra,* 53 F.3d at 935, n. 8 ("[E]ven when there is an actual release, a plaintiff must establish a causal nexus between that release and the incurrence of response costs"). The nexus that must be shown, however, is a loose one. In the case of an actual release, the plaintiff need only prove that the defendant's hazardous materials were deposited at the site, that there was a release at the site, and that the release caused it to incur response costs. It need not show that defendant's waste was the source of the release or that defendant's waste caused it to incur response costs. See *Kalamazoo River Study Group v. Menasha Corp.,* 228 F.3d 648, 655 (6th Cir. 2000) ("It is clear from the text, structure, and legislative history of § 107 that the provision does not require a plaintiff to show that a particular defendant caused either the release or the incurrence of response costs in order to prove liability.... Rather, the text requires only that a plaintiff prove 'that the defendant's hazardous substances were deposited at the site from which there was a release and that the release caused the incurrence of response costs' " (citation omitted)); *United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 721 (2d Cir.1993) ("What is *not* required is that the government show that a specific defendant's waste caused the incurrence of clean-up costs.... In *State of New York v. Shore Realty Corp.,* 759

rence of response costs.... We have never addressed, however, the degree of connection necessary in such a case.... [*General Electric Co. v. Litton Industrial Automation Systems, Inc.,* 920 F.2d 1415 (8th Cir.1990),] lends itself to a reading that the required connection may be slight indeed. We find it unnecessary to resolve this problem because the Schloff defendants' release is directly related

to, i.e., directly caused, the incurrence of response costs by Control Data"). For the reasons stated *infra,* the court finds it unnecessary to address this issue in the context of the present motion, since there are triable issues of fact as to whether the actual release of contaminants through the storm drain system caused the response costs Carson Harbor incurred.

F.2d 1032, 1044 (2d Cir.1985), we held that the owner of a facility was liable under CERCLA without a finding of causation of the release because 'including a causation requirement makes superfluous the affirmative defenses provided in section 9607(b)' " (emphasis original)); *Amoco Oil Co. v. Borden Inc.*, 889 F.2d 664, 670, n. 8 (5th Cir.1989) ("[T]he causation requirement has been interpreted in a somewhat relaxed manner due to difficult proof problems inherent in toxic waste cases and CERCLA's broad liability provisions. Accordingly, in cases involving multiple sources of contamination, a plaintiff need not prove a specific causal link between costs incurred and an individual generator's waste"); *Flaherty v. Exide Corp.*, C 01–00730 CRB, 2002 WL 202370, * 2 (N.D.Cal. Jan.22, 2002) ("... to prevail in a cost recovery action a plaintiff must show that defendant is a responsible party (that defendant 'polluted' the site), but plaintiff does not have to show that the response costs were incurred as a result of defendant's specific pollution (or other actions)"); *Elf Atochem North America, Inc. v. United States*, 833 F.Supp. 488, (E.D.Pa. 1993) ("[T]he proper focus of this requirement is the causation of the contaminants at the site, *not* the causation of the response costs.... [T]he plaintiff must only show that the defendant caused contamination at the site, and therefore should pay its fair share of the clean-up costs").

The standard is relatively easy to apply in "single-generator" cases. See *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 266 (3d Cir.1992) ("... in the single generator context, if the response costs were justified, the defendant necessarily caused the incurrence of those costs"). Where the contamination has multiple sources, however, the fact that response costs were justified does not necessarily prove that each generator's waste caused the release and resulting response costs. *Id.*

The Ninth Circuit has recently articulated the causation standard to be applied in multiple generator cases. In *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177 (9th Cir. 2000), the court held that a plaintiff asserting a CERCLA claim against multiple PRPs need not establish a "but for" causal link between each PRP's pollution and the response costs incurred. *Id.* at 1183–85. Rather, the court held, "in the special case of causal overdetermination, i.e., where either polluter's conduct would have caused the same response costs to be incurred in the same amount, and the conduct was of substantially equal blameworthiness, the proper construction of the causation requirement in the statute is that both polluters should be treated as having caused the response cost." *Id.* at 1185.

Other courts have reached similar conclusions.[269] See *Browning–Ferris Industries of Illinois, Inc. v. Ter Maat*, 195 F.3d 953, 958 (7th Cir.1999) ("It is easy to imagine a case in which, had X not polluted a site, no clean-up costs would have been incurred; X's pollution would be a necessary condition to those costs and it would be natural to think that he should pay at least a part of them. But suppose that even if X had not polluted the site, it would have to be cleaned up—and at the same cost—because of the amount of pollution by Y.... [T]hat should not necessarily let X off the hook.... In that case, the conduct of X and the conduct of Y would each be a sufficient but not a necessary condition of the clean up, and it would be entirely arbitrary to let either (or, even worse, both) off the hook on this basis"); *Control*

---

**269.** The Sixth Circuit in *Kalamazoo River, supra*, 228 F.3d 648, held that "consideration of causation is proper only in allocating response costs, not in determining liability." *Id.* at 656.

*Data Corp., supra,* 53 F.3d at 936 ("In order to accept the Schloff defendants' argument, we would have to hold that CERCLA imposes upon a plaintiff the requirement to prove that each type of response cost was separately caused by the defendant's release. CERCLA simply cannot be read this strictly.... [A] plain reading of the statute leads us to the conclusion that once a party is liable, it is liable for its share, as determined by Section 9613(f), of 'any' and all response costs, not just those costs 'caused' by its release").[270]

Law/Crandall's initial environmental assessment detected a "tar-like patch in the ravine." Carson Harbor hired Park Environmental, which collected and examined soil samples, and later hired McLaren Hart to investigate and remediate the property. After visually inspecting the site and collecting samples, McLaren Hart limited its remediation effort to the concentration of tar-like and slag materials on the property. It removed all but a small

portion of these from the site. The Government Defendants contend, as a consequence, that Carson Harbor's response costs were "caused" by the tar-like and slag materials, for which they are in no way responsible.

There appears to be no question, however, that at the time the tar-like and slag materials were removed, there was evidence that lead from a source other than the tar and slag was present on the property. Park Environmental's investigation revealed the presence of lead upstream from the tar and slag, and Dr. Amini testified that, although lead was inherently present in the tar-like and slag materials, the composition of the slag was such that lead coming from the surface (e.g., from stormwater runoff) was able to sink into it as a particulate. Dr. Jenkins' report showed that lead was present in the soil even when samples of the tar-like and slag materials were excluded. Similarly, the McLaren Hart closure report stated that a certain amount of lead remained on the

**270.** The Fifth Circuit has held that "whether a release has caused the incurrence of response costs should rest upon a factual inquiry into the circumstances of a case and the relevant factual inquiry should focus on whether the particular hazard [for which the defendant is responsible] justified the response actions." *Amoco Oil, supra,* 889 F.2d at 670. The Ninth Circuit has rejected this type of fact-specific inquiry, however. See *A & W Smelter, supra,* 146 F.3d 1107, In *A & W Smelter,* the court concluded that the Fifth Circuit's standard constituted an inappropriate attempt to "get[ ] around the lack of a minimum level [of contaminants] requirement" in CERCLA. *Id.* at 1110–11 ("The Fifth Circuit has imposed a minimum level requirement through the back door. It did so by focusing on language in section 9607(a)(4) which defines a liable person as one responsible for a release 'which causes the incurrence of response costs.'... The Fifth Circuit held that the release causes the EPA's response only if it poses a serious enough threat to justify the response; otherwise, the response is caused by the agency's overzealousness....

In our view, this reads much too much into the word 'causes' in section 9607(a)(4). Where a party is responsible for a particular release, that party is a cause of any response to that release, although on occasion EPA overzealousness may be another cause as well. The Fifth Circuit rather explicitly adopted this strained definition of the causation requirement as a way of getting around the lack of a minimum level requirement.... We sympathize, but we believe it is not our function to read into the statute a limitation that Congress did not put there"). Under Ninth Circuit law, therefore, the court need not find that the release of a hazardous substance by any particular defendant rose to a level that independently required remediation. The evidence need only show that its pollution contributed to contamination at the site, and that the response costs incurred were necessary to address that contamination. The issue of the quantum of pollution that a particular defendant contributed to the site is then addressed in allocating liability among PRPs.

property after the excavation was complete.

This evidence is sufficient to raise a triable issue of fact as to whether the lead that allegedly entered the property in stormwater runoff "caused" the response costs incurred. While defendants have proffered evidence demonstrating that lead was inherent in the tar-like material, and that the lead that ·was inherent was alone sufficient to justify the removal effort, this does not preclude a finding that lead that entered the property through the storm drain system might also have provided a basis for remediation. See *Boeing, supra,* 207 F.3d at 1185. The court is mindful of the Ninth Circuit's formulation of the causation standard in *Boeing*—i.e., that there must be a showing that "either polluter's conduct would have caused the same response cost to be incurred in the same amount, and [that] the[ir] conduct was of substantially equal blameworthiness." *Id.* See also *Browning–Ferris Industries, supra,* 195 F.3d at 958 (holding that a portion of plaintiff's response costs should be allocated to a defendant whose "pollution was serious enough ... to require that the site be cleaned up"). Seemingly, other courts have not required a showing that a defendant's waste was sufficient, in and of itself, to require cleanup. See *Control Data Corp., supra,* 53 F.3d at 936. Rather, they have addressed the issue in allocating damages among PRPs under § 9613(f).

Here, there is some evidence that there would have been no remediation if the only contamination at the site was the lead carried in the stormwater. McLaren Hart limited its remediation effort to the tar-like and slag materials, and concluded, once those materials were removed, that no further remediation at the site was necessary. It noted when it was done, however, that "watershed water quality measures" would have to be taken to ad-dress the runoff entering the property. The evidence in the record, moreover, supports an inference that lead from the stormwater runoff interacted in some way with the tar-like and slag materials·on the site. This potential for "synergistic interaction between the different pollutants" (*Browning–Ferris Industries, supra,* 195 F.3d at 958), is not fully developed in the record, and precludes a finding on summary judgment that the pollutants for which the Government Defendants are allegedly responsible did not contribute in any way to the release at the site and the resulting response costs. See *Alcan Aluminum, supra,* 964 F.2d at 270 ("... if [defendant] proves that the [hazardous substance for which it is responsible] did not or could not, *when mixed with other hazardous wastes,* contribute to the release and the resultant response costs, then [defendant] should not be responsible for *any* response costs" (emphasis original)). Accordingly, the court denies the Government Defendants' motion for summary judgment on the issue of causation.

### b. Responsible Parties Under § 9607(a)

The Government Defendants next argue that Carson Harbor has failed to establish that they are PRPs under CERCLA.

### (1) "Arranger" Liability Under § 9607(a)(3)

Under CERCLA, "any person who by contract, agreement, or otherwise *arranged* for disposal or treatment, or *arranged* with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances .... shall be liable...." 42 U.S.C. § 9706(a)(3)

(emphasis added). Under this statute, an entity is liable as a "direct arranger" if it has "direct involvement in arrangements for the disposal of waste." *United States v. Shell Oil Co.*, 294 F.3d 1045, 1055 (9th Cir.2002). Arranger liability may be imposed more broadly, however, on a case-by-case basis. *Id.* ("There is no bright-line test, either in the statute or in the case law, for a broad theory of arranger liability under § 9607(a)(3). Rather, we are required to sort through the fact patterns of the decided cases in order to find similarities and dissimilarities to the fact pattern of our case"). Under this broad theory of liability, "control is a crucial element of the determination of whether a party is an arranger under § 9607(a)(3)." *Id.*

In *Shell Oil,* defendants argued that the "authority to control" the disposal of hazardous materials provided a sufficient basis, standing alone, upon which to impose arranger liability. See *id.* at 1055–59. The Ninth Circuit discussed two Eighth Circuit cases that might be said to stand for that proposition—*United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 743 (8th Cir.1986) ("*NEPACCO*"), in which the court held that "[i]t is the authority to control the handling and disposal of hazardous substances that is critical" to arranger liability, and *United States v. Aceto Agric. Chems. Corp.*, 872 F.2d 1373, 1382 (8th Cir.1989), in which the court stated in dictum that arranger liability was properly imposed on "those who had authority to control the disposal, even without ownership or possession."

The Ninth Circuit concluded that the decisions could not be so broadly read, however, noting that in *NEPACCO* evidence of actual control provided a basis for the imposition of liability. *Shell Oil, supra*, 294 F.3d at 1057 ("In *NEPACCO*, there was actual control exercised by vice-president Lee, who gave permission to the plant supervisor to dispose of the waste at the farm.... In this case, the waste never belonged to the United States, so there was never a United States employee in a position comparable to Lee's. Further, even if we put the problem of ownership of the waste to one side, Lee exercised actual control over the disposal of waste. In this case, no official or employee of the United States ever exercised actual control over any of the waste disposal at issue").

Quoting *Iron Mountain*, the court stated its view of arranger liability as follows:

"'It is true that some cases impose arranger liability on parties who did not literally own or physically possess hazardous waste at the time it was disposed of or released. But in each of those cases the party was either the source of the pollution or managed its disposal by the arranger.... No court has imposed arranger liability on a party who never owned or possessed, and never had any authority to control or duty to dispose of, the hazardous materials at issue.'" *Shell Oil, supra*, 294 F.3d at 1058 (quoting *Iron Mountain Mines, supra*, 881 F.Supp. at 1451 (citations omitted)).

Decisions addressing the liability of municipalities as arrangers are consistent with the standard articulated in *Shell Oil.* In *Transportation Leasing Co. v. State of California*, 861 F.Supp. 931, 942 (C.D.Cal. 1993), municipalities contracted with private companies to transport residential, commercial, and governmental waste to a disposal site. The court found they could be held liable as arrangers despite the fact that the contract did not specifically mention hazardous waste, and despite the fact that the cities did not know the location of the disposal site. In reaching this result, the *Transportation Leasing* court rejected an argument that ability to control, rather than actual control, was all that was required. *Id.* at 950. It concluded, however,

that the cities "constructively possessed" the residential and commercial waste because they "controll[ed] aspects of waste handling and disposal from the point after waste was generated by a resident or business to the point it was hauled away by the transporter." *Id.* at 949. In support of this holding, the court noted that prior cases imposing arranger liability on entities that did not own or possess the hazardous substances in question generally "require[d] that the alleged arranger have some nexus with the actual owner, usually evidenced by having the authority to decide on behalf of the owner where the waste would be deposited." *Id.* at 952. It found the requisite nexus present because the cities "contracted with private disposal companies to haul away waste for which they had responsibility and exercised significant control over those haulers through contract and ordinance." *Id.* at 955.

While the court in *State of New York v. City of Johnstown,* 701 F.Supp. 33 (N.D.N.Y.1988), applied the same "nexus" test with respect to the alleged liability of a governmental defendant as an arranger, it reached the opposite result. See *id.* at 36 ("[T]here has to be some nexus between the allegedly responsible person and the owner of the hazardous substances before a party can be held liable under 42 U.S.C. § 9607(a)(3)"). In *Johnstown,* the state of New York brought suit to remediate problems at two solid waste management facilities. Defendants argued the state was a PRP under § 9607(a) because it had "arranged" for the disposal of the contaminants by permitting or directing waste to be placed in the facilities. The court found there was an insufficient nexus between the state's activities and the owner of the hazardous materials because the state was attempting to remediate the hazardous waste problems at both sites. *Id.*

Similarly, in *United States v. New Castle County,* 727 F.Supp. 854 (D.Del.1989), the court was faced with an argument that the state was an arranger because it had been involved in the selection of a waste disposal site, in planning its design and operation, and in determining the type of waste suitable for disposal there. The court adopted the *Johnstown* nexus test, and concluded there were "no facts or reasonable inferences that indicate[d] the State of Delaware ever owned or possessed, either actually or in a constructive sense, any hazardous wastes that were disposed of at Tybouts Corner." *Id.* at 871–72.

Finally, in *J.S. Lincoln v. Republic Ecology Corp.,* 765 F.Supp. 633 (C.D.Cal.1991), the court found that ordinances dictating the removal of abandoned vehicles from both private and public property did not provide a basis for imposing arranger liability on a municipality. The court stated that CERCLA's legislative history indicated it should be applied to "those who (1) benefit *financially* from transactions involving hazardous substances, or (2) directly cause or contribute to a release." *Id.* at 635 (emphasis original). Applying this test, the court found that the city of Pasadena could not be subjected to arranger liability for "exercis[ing] minimal or involuntary control over the disposition of hazardous substances," particularly given that the city was "engaged in legitimate sovereign, as opposed to proprietary or commercial, functions." *Id.* at 637–38. Cf. *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1199 (2d Cir.1992) ("... appellants cite *Lincoln v. Republic Ecology Corp.* ... apparently for the proposition that liability cannot attach to a municipality that arranges for the disposal or treatment of hazardous substances in its sovereign capacity. We regard *Lincoln* as merely holding that the city's activities in that case, taken in furtherance of its sovereign function to abate public nuisances, were insufficient to give rise to 'arranger' status for purposes of liability under CERCLA").

The import of these holdings was succinctly summarized by the Second Circuit in *B.F. Goodrich* as follows: "We recognize that liability under the arranger subsection requires a sufficient nexus be present between the municipality and the hazardous substances, one that does not exist in cases where the governmental unit is responsible only for promulgating disposal regulations or for permitting disposal facilities.... [A] sufficient nexus is established ... by managing the disposal activities...." *B.F. Goodrich, supra,* 958 F.2d at 1199.

Carson Harbor has presented no evidence that Carson, Compton or the County of Los Angeles were in actual possession of the hazardous lead that was allegedly present in the stormwater entering the property. In fact, Dr. Gersberg's finding that the stormwater flowing onto the property likely contained lead is based on an assumption that the lead was generated by highway runoff or urban residential or commercial uses, not on a belief that it was present in municipally owned waste. Rather, Carson Harbor argues that the municipalities' exercise of control over the disposal of the waste through the storm drain system is sufficient to support a finding of arranger liability.

There is little evidence in the record regarding the municipalities' exercise of control over the waste or its disposal. Compton and the County of Los Angeles admit that certain of the storm drains serving Compton, Los Angeles and Carson join together in the area upstream from the property, and that some of these drains empty onto the property.[271] Carson Harbor proffers evidence that certain storm drains with an outlet to the property were constructed by Caltrans as a part of the Artesia (I–91) Freeway, and that Carson assumed responsibility for the maintenance of the drains and debris traps in 1980.[272] It has also adduced evidence that Carson assumed responsibility for maintenance of drains constructed by Caltrans that are located outside of Caltrans' right of way and within the city limits in 1983.[273] Carson's City Engineer states that Carson held an easement over plaintiff's property from December 1984 to October 1985, which it quitclaimed to LACFCD in October 1985.[274]

Compton proffers evidence that it has had an ordinance for at least twenty-one years that prohibits the disposal of pollutants, including lead, in storm drains, and that it has other procedures in place to prevent pollutants from entering the storm drain system.[275] Defendants also argue that they instituted the "best management practices" required under their NPDES permits during the life of those permits. These include regular street sweeping, providing public trash receptacles, maintaining the storm drain lines and system, and sand bagging around catch basins in the event of a spill.[276]

The evidence indicates that the Government Defendants may have had some obligation to maintain or monitor storm drains

---

271. Compton's Facts, ¶¶ 12–13; LA's Facts, ¶ 4. Plaintiff has also adduced evidence that Compton accepted responsibility for "the entire length of Drain No. MTD 815." (Carden Decl., ¶ 12, Ex. M) ("1978 Compton Letter"). As there is no evidence that this drain is relevant to the current dispute, the court has not taken this fact into consideration.

272. Carden Decl., ¶ 10, Ex. K ("1984 Report to Mayor of Carson").

273. Carden Decl., ¶ 11, Ex. L ("1983 Letter to Carson City Engineer").

274. Supp. Wisz Decl., ¶¶ 17–18, 20.

275. Sotelo Decl., ¶ 8.

276. Compton's Facts, ¶ 50; Sotelo Decl., ¶ 8.

leading onto the property, and that defendants undertook some regulatory efforts to ensure that waste materials were not deposited into the drains. Carson Harbor has presented no evidence, however, that defendants owned the alleged waste, and or that they arranged with another party to dispose of it. Operating a storm drain system pursuant to governmental permit, instituting the best management practices called for by the permits, and enacting regulations and ordinances designed to prevent the entry of waste materials into the system are activities that are distinguishable from the type of conduct the formed the basis for arranger liability in *Transportation Leasing.* There, the municipalities exercised direct control over waste materials by contracting with third parties for their removal. Here, the Government Defendants did not exercise control in the sense that they caused lead to be placed in the storm drain system. They did not decide that the storm drain system was the appropriate place for disposal of lead. They did not contract with others to dispose of lead in the storm drains. Rather, their conduct is more akin to that of the government defendants in *Johnstown, New Castle County,* and *Lin-*

*coln,* in the sense that defendants took steps to prevent the disposition of lead in the stormwater and thus to reduce the possibility of contamination. Stated otherwise, defendants cannot be said to have participated in "managing the disposal" of the lead. At most, they promulgated disposal regulations and acted pursuant to permits issued by the federal government. Accordingly, the court finds that Carson Harbor has failed to establish any basis for imposing "arranger liability" on Carson, Compton, or the County of Los Angeles, and grants the Government Defendants' motions for summary judgment on this alternative ground.[277]

### (2) "Operator" Liability Under § 9607(a)(1)-(2)

■ Section 9607(a) provides that both present and past "owners and operators" of hazardous waste facilities are PRPs under CERCLA. See 42 U.S.C. § 9607(a)(1)-(2). See 42 U.S.C. § 9601(20)(A) (defining an owner and operator as "any person owning or operating such facility ..."); *Long Beach Unified School District, supra,* 32 F.3d at 1367 (*"LBUSD"*) ("a party may be liable either as an owner or as an operator"). In the

277. At least two circuits have held that arranger liability can attach only where the purported arranger intends to dispose of hazardous materials. See *United States v. Cello Foil Products, Inc.,* 100 F.3d 1227, 1231 (6th Cir. 1996) ("CERCLA does not define the phrase 'arrange for.' ... We conclude that the requisite inquiry is whether the party intended to enter into a transaction that included an 'arrangement for' the disposal of hazardous substances. The intent need not be proven by direct evidence, but can be inferred from the totality of the circumstances.

At first blush, discussing state of mind in a CERCLA case appears inappropriate. After all, if the tortured history of CERCLA litigation has taught us one lesson, it is that CERCLA is a strict liability statute.... Notwithstanding the strict liability nature of CERCLA, it would be error for us not to recognize the

indispensable role that state of mind must play in determining whether a party has 'otherwise arranged for disposal ... of hazardous substances' "); *Amcast Industrial Corp. v. Detrex Corp.,* 2 F.3d 746, 751 (7th Cir.1993) ("Detrex hired a transporter, all right, but it did not hire it to spill TCE on Elkhart's premises. Although the statute defines disposal to include spilling, the critical words for present purposes are 'arranged for.' The words imply intentional action"), cert. denied, 510 U.S. 1044, 114 S.Ct. 691, 126 L.Ed.2d 658 (1994). There is no evidence that the Government Defendants operated the storm drain system with the intent that lead or any other hazardous material would be deposited in it. Were this standard to be applied, therefore, it would provide an additional basis for concluding that the Government Defendants are not arrangers under § 9607(a)(3).

event the Government Defendants are not deemed "arrangers," Carson Harbor contends they are "operators," and subject to CERCLA liability as a result.

In *United States v. Bestfoods,* 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), the Supreme Court held that "[a]n operator must manage, direct or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste." *Id.* at 66, 118 S.Ct. 1876. This comports with the well-established rule that "operator" liability "only attaches if the defendant had authority to control the cause of the contamination at the time the hazardous substances were released into the environment." *Kaiser Aluminum & Chemical Corp. v. Catellus Development Corp.,* 976 F.2d 1338, 1341 (9th Cir.1992) (citing *Nurad, supra,* 966 F.2d at 842; *CPC Int'l, Inc. v. Aerojet–General Corp.,* 731 F.Supp. 783, 788 (W.D.Mich.1989)). See also *LBUSD, supra,* 32 F.3d at 1368 ("To be an operator of a hazardous waste facility, a party must do more than stand by and fail to prevent the contamination").

Although Carson Harbor has adduced some evidence that the Government Defendants regulated and maintained the storm drain system leading to the property, it has not established that they did anything more than "stand by and fail to prevent the contamination." *LBUSD, supra,* 32 F.3d at 1368. The regulations that governed defendants' operation and maintenance of the system, which included provisions designed to prevent waste materials from entering the drains, do not transform the storm drain system into an "operation having to do with leakage or disposal." *Bestfoods, supra,* 524 U.S. at 66, 118 S.Ct. 1876. Rather, they demonstrate that the purpose of the storm drain system is specifically designed *not* to contain or dispose of hazardous materials.

The municipalities made efforts to prevent contamination of the water in the storm drains, and Carson Harbor has adduced no evidence that they had any authority to control the disposal of the alleged contamination into the system. See *Kaiser Aluminum & Chemical Corp., supra,* 976 F.2d at 1341. The court thus finds that Carson Harbor has failed to raise a triable issue of fact regarding the Government Defendants' status as "operators" of a facility releasing hazardous waste. Cf. *Fireman's Fund Ins. Co. v. City of Lodi, California,* 302 F.3d 928, 946 (9th Cir.2002) ("While we decline to decide whether Lodi is a PRP on the record before us, we note that it is doubtful whether Lodi may be considered a PRP merely as a result of operating its municipal sewer system"); *Lincoln Properties, Ltd. v. Higgins,* 823 F.Supp. 1528, 1534–35 (E.D.Cal.1992) ("The dry cleaning defendants argue that the County's maintenance and repair work give rise to operator liability. There is some evidence that the County has performed maintenance work on the Lincoln Center sewers, apparently at Lincoln's request.... Since the early 1970's, the County has made fifteen to forty sewer maintenance and repair 'visits' to Lincoln Center.... On this basis the dry cleaning defendants argue that the County is an operator, but cite no authority for so expansive an application of the statute. The maintenance and repair work performed at plaintiff's request did not give the County 'authority to control the operations or decisions involving the disposal of hazardous substances at the site or the contents of the [sewers].' ... If one who builds a treatment system is not an operator, neither is one who repairs a sewer line").

### C. Indemnity Claim Against The

### Partnership Defendants[278]

#### 1. Whether Plaintiff Has Already Recovered Fully For The Alleged Breach

▮▮▮▮▮▮ A plaintiff suing to recover on an indemnity contract must prove, *inter alia*, that it has suffered a loss within the meaning of the parties' indemnification agreement, as well as the amount of the loss sustained. *Four Star Electric, Inc. v. F & H Construction*, 7 Cal.App.4th 1375, 1380, 10 Cal.Rptr.2d 1 (1992). See also *Maryland Casualty Co. v. Bailey & Sons, Inc.*, 35 Cal.App.4th 856, 864, 41 Cal. Rptr.2d 519 (1995) ("Indemnity means 'the obligation resting on one party to make good a loss or damage another party has incurred,' " quoting *Rossmoor Sanitation, Inc. v. Pylon, Inc.*, 13 Cal.3d 622, 628, 119 Cal.Rptr. 449, 532 P.2d 97 (1975)). Where an indemnity contract protects against loss, as opposed to liability, the indemnitee may not recover without payment of the amount of the loss. Where the contract protects against liability, however, the indemnitor's obligation arises when the liability of the indemnitee is established. The indemnitee need not establish that he has made payment. *Gribaldo, Jacobs, Jones & Associates v. Agrippina Versicherunges A.G.*, 3 Cal.3d 434, 446–47, 91 Cal.Rptr. 6, 476 P.2d 406 (1970) (". . . the distinction between an indemnity against liability and an indemnity against loss is that in the former the essence of the contract is that the event shall not happen while in the latter the indemnity is against the consequences of the event if it should happen. Accordingly, the trial court properly invoked the rule of interpretation provided for in subdivision 2 of section 2778, applying to an indemnity against claims, rather than subdivision 1 of that section applying to an indemnity against liability. Subdivision 2 of section 2778 provides that 'Upon an indemnity against claims, or demands . . . or costs . . . the person indemnified is not entitled to recover without payment thereof' "); *Alberts v. American Casualty Co. of Reading, Pa.*, 88 Cal. App.2d 891, 898–99, 200 P.2d 37 (1948) ("'There are two classes of contracts of indemnity. In one class the indemnitor engages to save the indemnitee from loss, meaning actual loss. In the other class the indemnitor engages to save the indemnitee from liability. In the first class the indemnitee must prove loss actually suffered by him. In a case of a loss by the indemnitee of money held as bailee the indemnitor's liability for the loss does not arise until the debt has been paid and the indemnitee has thus suffered a loss").

In *Spurr v. LaSalle Construction Co.*, 385 F.2d 322 (7th Cir.1967) the court invoked this distinction to hold that a company that had indemnified contractors against "liability, payments and expenses of any nature" could not escape its payment obligation by arguing that the indemnitees had not sustained a loss because each had been adequately insured against the liability at issue. *Id.* at 330–31. See also *Fontenot v. Mesa Petroleum Co.*, 791

---

**278.** Carson Harbor objects that the Partnership Defendants' motion is based on new arguments that were not raised in their initial motion for summary judgment in 1997. It asserts the court should refuse to consider these arguments because they should have been raised in the initial motion. The Partnership Defendants' position has changed materially because of the prior proceedings in this case. All but one of the claims against these defendants has now been dismissed.

Accordingly, the court finds that it is appropriate to consider any new arguments raised in the motion. See *F.D.I.C. v. Kooyomjian*, 220 F.3d 10, 16 (1st Cir.2000) (holding that the district court did not abuse its discretion in considering successive motions for summary judgment when "[e]ach of FDIC's motions reflected material changes in the posture of this litigation and was grounded on meritorious contentions").

F.2d 1207, 1220 (5th Cir.1986) ("Bristow first argues that Mesa cannot recover any of the defense costs which were actually borne by Mesa's insurer, National Union Fire Insurance Company (National Union). Since Mesa did not bear those defense costs, there are no costs for Mesa to be reimbursed for, and National Union cannot take advantage of the Mesa–Bristow indemnity provision because the contract does not clearly reflect that intent.... Although the issue never has been addressed by the Texas courts, we feel confident that our Texas brethren would side with the great weight of authority in rejecting Bristow's argument.... To accept Bristow's argument and extend it to its next logical step would mean that an indemnitor could avoid its indemnification responsibility altogether through the fortuity of the indemnitee having obtained a liability insurance policy"); *Tillman v. Wheaton–Haven Recreation Ass'n, Inc.*, 580 F.2d 1222, 1230 (4th Cir.1978) ("We are of the opinion that if called upon, the Maryland courts would decide that if one party is entitled to indemnity from another, the right to indemnity is not defeated by the fact that the loss to be indemnified for was actually paid by an insurance company"); *North Central Airlines, Inc. v. City of Aberdeen, S. D.*, 370 F.2d 129, 134 (8th Cir.1966) ("The fact that Aberdeen had contracted with an insurance carrier to protect itself from the same risk of loss as comprehended by North Central's indemnity obligation should not exonerate North Central from its duty to indemnify according to agreement"); *Lesmark, Inc. v. Pryce*, 334 F.2d 942, 945 & n. 7 (D.C.Cir.1964) (holding that indemnitees could recover their attorneys' fees and costs from an indemnitor despite the fact that the fees and costs had been paid directly by an insurer, and noting that "[t]he indemnitor is not relieved from liability either on the theory that the insurer

is entitled to reimbursement out of the indemnitee's recovery ... or that 'the defendant should not benefit from a contract providently made and paid for by the plaintiff' ").

Here, the parties' agreement provides that the Partnership Defendants will

> "indemnify and hold [Carson Harbor] harmless from and against any claim, demand, debt, lien, loss, damage, cost, expense ..., *liability*, [or] cause of action asserted against or suffered by [Carson Harbor] ... resulting, directly or indirectly, from ... any liability or obligation of [the Partnership Defendants] which [Carson Harbor] is not specifically required to assume ...; [t]he inaccuracy or breach of any of the representations, warranties or covenants made by [the Partnership Defendants]; [or][a]ny other act or omission to act of [the Partnership Defendants], the consequences of which [Carson Harbor] does not expressly assume[ ]." [279]

The Partnership Defendants maintain the Carson Harbor has not actually sustained a loss as a result of its payment of response costs because it was more than fully compensated for those costs through the rent increase it obtained in 1997. Even if Carson Harbor is credited with only half the amount of the increase— given that Carson Harbor's increased expenses were not attributable solely to its remediation efforts—the Partnership Defendants contend that the additional profits generated fully compensated Carson Harbor for any damages it might otherwise be entitled to recover on its contractual indemnity claim.

Under the cases cited above, however, the Partnership Defendants may not avoid their indemnity obligation by pointing to the fact that the increased rent paid by the

---

**279.** First Amended Complaint, Ex. C, ¶ 4 (Purchase Sale Agreement) (emphasis added).

mobile home park tenants allowed Carson Harbor to recoup some or all of the response costs it paid. This is because the Partnership Defendants undertook to indemnify against liability as well as loss. It is also because the Ninth Circuit has determined that California follows the general rule that an indemnitee who recovers some or all of its loss from a third party can nonetheless recover the amount of that loss from the indemnitor. See *Bank of the West v. Valley National Bank*, 41 F.3d 471, 480 (9th Cir.1994) ("This falls within the general principle that indemnitors must pay all the legal expenses of its indemnitee, even if the indemnitee's insurer already paid for the expenses," citing *Long v. Keller*, 104 Cal.App.3d 312, 318, 163 Cal.Rptr. 532 (1980)).[280]

The court notes, moreover, that a related body of California case law, which concerns the right of an insurer to recover in subrogation from a contractual indemnitor, would, if applied in this context, support the same result. There is a split of authority among California courts that have considered whether an insurer has a right of subrogation against a contractual indemnitor who indemnified the same loss. See *Truck Ins. Exchange v. County of Los Angeles*, 95 Cal.App.4th 13, 25–26, 115 Cal. Rptr.2d 179 (2002). Some courts hold that an insurer may be subrogated only if the indemnitor caused the loss the carrier paid. See, e.g., *California Food Service Corp. v. Great American Ins. Co.*, 130 Cal.App.3d 892, 899–900, 182 Cal.Rptr. 67 (1982); *Patent Scaffolding Co. v. William Simpson Constr. Co.*, 256 Cal.App.2d 506, 512, 514, 64 Cal.Rptr. 187 (1967). Others review the circumstances and terms of the

indemnity agreement, and weigh the equities to determine whether the indemnitor should bear the entire loss. *Fireman's Fund Ins. Co. v. Wilshire Film Ventures, Inc.*, 52 Cal.App.4th 553, 557–59, 60 Cal. Rptr.2d 591 (1997); *Meyer Koulish Co. v. Cannon*, 213 Cal.App.2d 419, 428–29, 28 Cal.Rptr. 757 (1963). At bottom, each of these approaches evaluates the respective involvement of the parties who have or will pay the indemnitee's loss, and imposes liability as equity dictates. See *Reliance National Indem. Co. v. General Star Indem. Co.*, 72 Cal.App.4th 1063, 1081, 85 Cal. Rptr.2d 627 (1999) ("... there is a division of decisional authority on whether an insurer is entitled to subrogation against a party who by a separate contract has agreed to assume responsibility for the same loss and is not responsible for causing the loss. The test as to whether the party has the right to maintain the action for subrogation 'involves a consideration of, and must necessarily depend upon the respective equities of the parties.' ... [I]t is a matter of applying the equities of the parties to the facts of the case to determine the superior and inferior positions of the parties," quoting *Meyers v. Bank of America Nat. Trust & Savings Ass'n.*, 11 Cal.2d 92, 102, 77 P.2d 1084 (1938)); *Fireman's Fund Ins. Co., supra*, 52 Cal. App.4th at 558, 60 Cal.Rptr.2d 591 ("... it becomes apparent that the result (if not the reasoning) in *Patent Scaffolding* and the result in *Meyer Koulish* are consistent with the rule announced by our Supreme Court in *Meyers v. Bank of America* ... that the right to maintain an action for subrogation 'involves a consideration of,

---

**280.** In their brief, the Partnership Defendants cited several California and federal cases holding that the collateral source rule does not apply in breach of contract cases. They argued, as a consequence, that they were entitled to have the amount of any judgment for breach of the indemnity contract reduced by the amount of the "collateral" payments Carson Harbor received through the rent increase. None of the cases cited by the Partnership Defendants involved express indemnity contracts, and, as the cases cited in text reveal, the rule is different where the contract at issue is of that nature.

and must necessarily depend upon the respective equities of the parties' ").

Application of this test in the instant case requires comparison of the equities of the Partnership Defendants, on the one hand, and Carson Harbor's tenants, on the other. While there is no evidence that the Partnership Defendants "caused" the contamination, in the sense that they deposited or discharged toxic substances on the property, as a legal matter, it is clearly more appropriate to impose liability on them than it is on the tenants, whose only connection to the contamination is the fact that it was discovered on property they rent from Carson Harbor. The Partnership Defendants contracted to indemnify Carson Harbor from liabilities such as the response costs at issue in this case.[281] The tenants, by contrast, did not affirmatively assume any responsibility for the liability, yet have purportedly had some or all of it passed on to them as part of a completely separate and independent contract to pay rent. That theirs is the stronger equitable position is evident from the fact that the Rental Board resolution effectively granted them a subrogation right with respect to any recovery from the Partnership Defendants. Specifically, the Rental Board required that the amount of any recovery by Carson Harbor in this suit must be included as income in its next rent increase application, such that it will effectively reduce any future rent increase Carson Harbor is granted.[282] Accordingly, the court concludes that the Partnership Defendants are not entitled to avoid liability under the indemnity contract on the basis that Carson Harbor has recouped its response costs through the rent increase authorized by the Rental Board.

■ Even were this not the case, the evidence regarding the amount of the rent increase attributable to the response costs is not sufficiently clear to permit the entry of judgment in the Partnership Defendants' favor on this basis. Like Unocal and the Government Defendants, the Partnership Defendants argue that Carson Harbor received $1.7 million in increased rent as a result of the Rental Board's resolution, and that this more than fully compensates for the response costs it incurred. Acknowledging that the increase took into account operating expenses other than the response costs, the Partnership Defendants argue that even if only half the amount of the increase is considered, the additional profits generated constitute full compensation for the response costs Carson Harbor paid.

The Rental Board granted Carson Harbor a rent increase after reviewing its income, expenses, profit and loss. The increase was designed to ensure that Carson Harbor could maintain a profit level similar to that it had enjoyed prior to the increase in its operating expenses between 1994 and 1997.[283] There is no evidence in the record regarding the amount of the increase that was attributable to the response costs Carson Harbor had incurred. Nor is there any evidence in the record regarding the methodology utilized by the Rental Board in calculating the increase, such that the court could even approximate the amount of the increase attributable to payment of the response costs. Carson Harbor argues, in fact, that such a calculation is impossible, since the rent increase depended on a number of factors, and since the ultimate goal of the Rental Board was to ensure a fair and reasonable return

---

**281.** The court assumes for purposes of this motion that the response costs fall within the scope of the indemnity provision in the parties' contract.

**282.** Resolution No. 97–185 at 3.

**283.** Resolution No. 97–185 at 5.

on the property rather than reimbursement of specific items of expense. See *Carson Harbor v. Rental Review Board, supra,* 70 Cal.App.4th at 288, 82 Cal. Rptr.2d 569 ("The Ordinance directs the Board to review all relevant factors in making a rent increase application determination. However, no one factor is determinative so long as the Board's decision permits a just, fair and reasonable return on the property"). Carson Harbor also argues that certain response costs were not included as operating expenses in the board's calculation, and that the rent increase did not compensate in any way for these amounts.[284] Accordingly, even if the law supported the Partnership Defendants' view on this question, triable issues of fact would preclude the entry of summary judgment in their favor on the basis that the rent increase fully compensated Carson Harbor for the response costs it incurred.[285]

### 2. Whether Plaintiff May Recover Damages Based On The Higher Rate Of Interest It Paid To Refinance The Property

 "In a contractual indemnity action, the indemnitee must prove that liability is covered by the contract, that liability existed, and the extent thereof." *Peter Culley & Associates v. Superior Court,* 10 Cal.App.4th 1484, 1498, 13 Cal.Rptr.2d 624 (1992). To prevail on an indemnity claim, the plaintiff need not show that the indem-

nitor was at fault. Rather, "courts will enforce indemnity agreements even for losses caused by acts over which the indemnitor had no control." *Continental Heller Corp. v. Amtech Mechanical Services, Inc.,* 53 Cal.App.4th 500, 505, 61 Cal.Rptr.2d 668 (1997) (citing *Vinnell Co. v. Pacific Elec. Ry. Co.,* 52 Cal.2d 411, 416, 340 P.2d 604 (1959)).

The Partnership Defendants contend that Carson Harbor may not seek indemnification for the difference between the interest rate it paid to refinance the property through Bank of America and the lower interest rate it would have paid had G.E. Capital refinanced the property in 1994. They assert that Carson Harbor is solely to blame for the fact that the G.E. Capital loan transaction did not close, and that it has not raised triable issues of fact as to whether G.E. Capital declined the loan because of contamination on the property.

 California courts define a cause in fact as "something that is a substantial factor in bringing about the injury." See *Rutherford v. Owens–Illinois, Inc.,* 16 Cal.4th 953, 968–69, 67 Cal.Rptr.2d 16, 941 P.2d 1203 (1997). This standard "has been embraced as a clearer rule of causation— one which subsumes the 'but for' test while reaching beyond it to satisfactorily address other situations, such as those involving independent or concurrent causes in fact." *Id.* at 969, 67 Cal.Rptr.2d 16, 941 P.2d 1203. "[A] force which plays only an 'in-

---

**284.** See Pl.'s Ptrnshp. Issues, ¶ 3.

**285.** The Partnership Defendants argue that the need to allocate among expenses does not give rise to triable issues of fact, citing the statement in the California Court of Appeal's decision that "[t]he increase in operating expenses was primarily related to costly remediation of contaminated wetlands located on [Carson Harbor's] property." *Carson Harbor v. Rental Review Board, supra,* 70 Cal.App.4th at 285, 82 Cal.Rptr.2d 569. See also Lipsman Decl., Ex. C at 57 (Carson Harbor's

Petition for Writ of Mandate, stating that a "large increase in operating expenses in 1995" was due "principally" to the costs incurred in responding to the environmental contamination found on the property). While these statements quantify the amount of increased cost attributable to the contamination in some way, "primarily" and "principally" afford no basis for allocating the rent increase that was approved among the response costs, the property taxes and the other operating expenses Carson Harbor paid.

finitesimal' or 'theoretical' part in bringing about injury, damage, or loss is not a substantial factor." *Id.* (citing *People v. Caldwell,* 36 Cal.3d 210, 220, 203 Cal.Rptr. 433, 681 P.2d 274 (1984)).

 Even where a tortfeasor's conduct is a substantial contributing factor to injury or loss, it will not be held liable if "an independent event intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible." The intervening event then becomes the "superseding cause." *Soule v. General Motors Corp.,* 8 Cal.4th 548, 573, n. 9, 34 Cal.Rptr.2d 607, 882 P.2d 298 (1994) (citations omitted). See also *Hardison v. Bushnell,* 18 Cal.App.4th 22, 26, 22 Cal. Rptr.2d 106 (1993) ("[W]here there is an independent intervening act which is not reasonably foreseeable, the defendant's conduct is not deemed the 'legal' or proximate cause").

The undisputed evidence demonstrates that the tar-like and slag material on the property was initially discovered in 1993 as a result of an environmental investigation (the Phase I investigation) conducted by potential lender G.E. Capital. G.E. Capital requested that Carson Harbor implement certain recommendations contained in a "Phase I Report," and indicated that it was not prepared to go forward with a loan until a "Phase II Report" was prepared. G.E. Capital's representative, Brian Mills, testified that the drilling necessary for the Phase II investigation would have cost Carson Harbor $12,000.[286] Mark Hansen, Carson Harbor's primary contact with G.E., testified that loan discussions with G.E. continued through September and November 1993, and terminated when Carson Harbor declined G.E.'s request that it conduct a groundwater test at the site.

 The Partnership Defendants contend that Carson Harbor's refusal to conduct groundwater testing is the "but for" cause of its failure to obtain the G.E. Capital loan. Issues of causation are generally questions of fact for the jury. *Lombardo v. Huysentruyt,* 91 Cal.App.4th 656, 666, 110 Cal.Rptr.2d 691 (2001) ("Causation is generally a question of fact for the jury, unless reasonable minds could not dispute the absence of causation"). Similarly, the reasonable foreseeability of an intervening event is a question for the trier of fact. *Id.* (citing *Cline v. Watkins,* 66 Cal.App.3d 174, 178, 135 Cal.Rptr. 838 (1977)).

There is a clear factual link between the contamination at the property, G.E.'s request that groundwater testing be performed, and Carson Harbor's refusal to perform that testing. Specifically, the evidence supports an inference that G.E. would not have required additional Phase II testing had contamination not been discovered during the Phase I investigation. Bank of America, for example, whose environmental review took place after the property had been remediated, did not require a Phase II investigation.

Mills testified, moreover, that more than one loan on which he had worked had failed to close because the lender imposed Phase II environmental testing requirements.[287] This raises a triable issue of fact as to whether it was foreseeable to the Partnership Defendants that Carson Harbor would balk at performing such testing. Given the factual connection between the contamination and the Phase II testing,

---

**286.** Mills Depo. at 126:14–21. Phase II would have involved testing around three oil wells, drilling a sump pit, and soil testing in the wetlands area. (*Id.* at 116:2–9.)

**287.** *Id.* at 209:1–11.

and the potential foreseeability of Carson Harbor's response to the request for such testing, the court cannot say as a matter of law that Carson Harbor's refusal to proceed with groundwater testing constituted a superseding cause of its interest rate damages. Compare *Gibraltar Savings v. Commonwealth Land Title Ins. Co.*, 907 F.2d 844, 848 (8th Cir.1990) ("The district court identified two superseding causes: Waterfront's default on the loan and the Lenders' loss of the motion to lift the stay by their withholding evidence justifying the grant of that motion. Commonwealth does not dispute that each of these acts occurred after Worden rendered the opinion letters and that neither act bears any connection to the opinion letters. Commonwealth likewise does not dispute that but for these acts, the Lenders would not have been able to claim that the bankruptcy court's refusal to lift the automatic stay constituted a loss under the title insurance policy. Furthermore, while Commonwealth contends that a suit based upon the bankruptcy clause was foreseeable to Popham, Commonwealth does not contend that either of the two intervening acts was foreseeable to Popham. The undisputed facts therefore support the district court's conclusion that Waterfront's default and the Lenders' intentional loss of the motion to lift the stay constituted superseding causes as a matter of law").

Stated otherwise, triable issues of fact remain as to whether the contamination on the property was a substantial factor in G.E.'s decision not to proceed with the refinancing transaction or whether Goldstein's refusal to conduct ground water testing was an independent, superseding cause. There is no evidence that G.E. Capital would have made the loan had Goldstein agreed to undergo groundwater testing. Rather, the evidence indicates that the company's willingness to proceed

would have been contingent on the outcome of the tests, i.e., on the quantity and quality of contamination at the site.[288] Accordingly, the Partnership Defendants' motion for summary judgment as to this species of damage is denied.

### 3. Whether Plaintiff May Recover Damages For Decreased Property Value

#### a. Damages For Tortious Injury To Property

▮▮▮▮ The measure of damages in California for tortious injury to property is "the amount which will compensate for all the detriment proximately caused thereby ...." CAL.CIV.CODE § 3333; *Serian Brothers, Inc. v. Agri–Sun Nursery*, 25 Cal. App.4th 306, 325, 30 Cal.Rptr.2d 382 (1994) (quoting *Baker v. Ramirez*, 190 Cal.App.3d 1123, 1137, 235 Cal.Rptr. 857 (1987)). "There is no fixed, inflexible rule for determining the measure of damages for injury to, or destruction of, property; whatever formula is most appropriate to compensate the injured party for the loss sustained in the particular case will be adopted." *Heninger v. Dunn*, 101 Cal.App.3d 858, 862, 162 Cal.Rptr. 104 (1980). See also *Serian Brothers, supra*, 25 Cal.App.4th at 325, 30 Cal.Rptr.2d 382 (same).

The measure generally applied in ordinary cases involving tortious injury to real property is "diminution in value" or "cost of repair," whichever is less. *Housley v. City of Poway*, 20 Cal.App.4th 801, 810, 24 Cal.Rptr.2d 554 (1993) (citing *Mozzetti v. City of Brisbane*, 67 Cal.App.3d 565, 576, 136 Cal.Rptr. 751 (1977)); *Ferraro v. William Lyles Const. Co.*, 102 Cal.App.3d 33, 49–50, 162 Cal.Rptr. 238 (1980) (same). Cf. *Heninger, supra*, 101 Cal.App.3d at 863, 162 Cal.Rptr. 104 ("Restoration costs may be awarded even though they exceed

---

**288.** Hansen Depo. at 155:17–25.

the decrease in market value if 'there is a reason personal to the owner for restoring the original condition', or 'where there is reason to believe that the plaintiff will, in fact, make the repairs' " (citations omitted)).

The Partnership Defendants note that, according to Carson Harbor, remediation costs totaled $231,797. They speculate that Carson Harbor's claim for diminution in value damages will exceed this amount, and seek an order declaring that Carson Harbor cannot recover the reduction in the value of its property as a result. It is premature on the present record to make such a finding, as there is no evidence regarding the diminution in value damages Carson Harbor seeks, or whether they exceed the cost of remediation.

### b. "Stigma Damages" For Permanent Nuisance

■ Defendants also contend that it is proper to enter an order that precludes Carson Harbor from recovering a combination of remediation *and* diminution in value damages under state nuisance law. A nuisance is "[a]nything which is injurious to health, . . . is indecent or offensive to the senses, or [is] an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property. . . ." CAL.CIV.CODE § 3479.

■ Nuisances are classified as "permanent" or "continuing," depending on the type of harm suffered. *Baker v. Burbank–Glendale–Pasadena Airport Authority,* 39 Cal.3d 862, 869, 218 Cal.Rptr. 293, 705 P.2d 866 (1985), cert. denied, 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986). Permanent nuisances arise where "by one act a permanent injury is done, [and] damages are assessed once for all." *Baker, supra,* 39 Cal.3d at 868, 218 Cal. Rptr. 293, 705 P.2d 866. A nuisance is "continuing," by contrast, if it can be discontinued or abated. See *Mangini v. Ae-*

*rojet–General Corp.,* 12 Cal.4th 1087, 1097, 51 Cal.Rptr.2d 272, 912 P.2d 1220 (1996). "A nuisance is also generally considered continuing if it is 'an ongoing or repeated disturbance,' such as a disturbance 'caused by noise, vibration or foul odor,' that 'may vary over time.'" *Bartleson v. United States,* 96 F.3d 1270, 1275 (9th Cir.1996) (citing *Baker, supra,* 39 Cal.3d at 869, 218 Cal.Rptr. 293, 705 P.2d 866, and *Spar v. Pacific Bell,* 235 Cal.App.3d 1480, 1485, 1 Cal.Rptr.2d 480 (1991)).

■ Where a party alleges the creation of a permanent nuisance, it may seek damages for many types of injury, including diminution in property value. See *F.D.I.C. v. Jackson–Shaw Partners No. 46, Ltd.,* 850 F.Supp. 839, 842 (N.D.Cal.1994) (citing *City of San Jose v. Superior Court,* 12 Cal.3d 447, 464, 115 Cal.Rptr. 797, 525 P.2d 701 (1974)). Because they can be abated, however, parties alleging the existence of a continuing nuisance may not recover diminution in value damages. See *Santa Fe Partnership v. ARCO Products Co.,* 46 Cal.App.4th 967, 978, 54 Cal. Rptr.2d 214 (1996) ("[W]e are bound to follow and apply the decisions of our highest court, which expressly disallow prospective damages in cases of continuing nuisance. Accordingly, we reject appellants' request to create new law to permit recovery of diminution in value damages in a continuing nuisance case," citing *Spaulding v. Cameron,* 38 Cal.2d 265, 239 P.2d 625 (1952), and *Auto Equity Sales, Inc. v. Superior Court,* 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937 (1962)); *Mangini v. Aerojet–General Corp.,* 230 Cal. App.3d 1125, 1145, 281 Cal.Rptr. 827 (1991) (*"Mangini I "*) ("[D]efendant notes that plaintiffs seek to recover all diminution in the market value of their property . . . This *form of relief* is incompatible with a claim based on injuries caused by continuing nuisance" (emphasis original)); *id.* at 1147, 281 Cal.Rptr. 827 (finding that "proposed averments" regarding a con-

tinuing nuisance "are necessarily at odds with the *relief* requested by plaintiffs"). Cf. *Santa Fe Partnership, supra,* 46 Cal. App.4th at 983–84, 54 Cal.Rptr.2d 214 ("However, claims for stigma damages are beginning to arise in cases throughout the nation in toxic contamination cases. Decisions from courts which have entertained such claims appear to suggest stigma damages could be a proper element of damages in cases presenting substantial evidence the property suffers permanent physical injury despite remediation efforts.... On the other hand, courts have uniformly rejected claims of stigma damages absent evidence the plaintiff's own property suffered physical injury from the contamination").

Carson Harbor contends that, despite its remediation efforts, lead remains present at the site, and thus injury to the property is permanent. In any event, it asserts, "[w]hether contamination is a permanent or continuing nuisance is generally a question of fact" (*Shamsian v. Atlantic Richfield Co.,* 107 Cal.App.4th 967, 980, 132 Cal.Rptr.2d 635 (2003)), and the evidence it has adduced raises a triable issue as to whether a permanent nuisance exists.

The evidence in the record does not substantiate Carson Harbor's claim. The RWQCB issued a clean closure report on October 18, 1995, which stated that all appropriate remedial measures had been taken.[289] Carson Harbor has not present-

289. Certain evidence indicates that lead remained on the property after remediation, including: (1) a March 1995 letter from McLaren Hart to the RWQCB in which McLaren Hart stated that while the remediation would remove the tar-like and slag materials, other "water quality measures" would have to be taken to improve the quality of the surface run-off (Ross Depo., Ex. 26); (2) statements in the remedial action plan that soil containing some percentage of lead beneath and upgradient from the tar and slag would not be removed during remediation (RAP at 132–133); and (3) McLaren Hart's Clean Closure Report, which stated that four verification samples revealed a lead concentration below 50 ppm and soluble lead concentrations marginally exceeding 5 ppm (McLaren/Hart Clean Closure Report at 152). The Partnership Defendants objected at argument to consideration of this evidence, as it was not submitted in opposition to their motion and was not argued by Carson Harbor in opposition to their motion. Rather, the evidence was submitted in connection with separate motions filed by other defendants, motions in which the Partnership Defendants did not join. Accordingly, the court will not consider the above evidence in connection with the Partnership Defendants' motion. See Ca CD L.R. 56–3 ("In determining any motion for summary judgment, the Court will assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except

to the extent that such material facts are (a) included in the 'Statement of Genuine Issues' and (b) controverted by declaration or other written evidence filed in opposition to the motion"). Cf. *Fair Housing Council of Riverside County, Inc. v. Riverside Two,* 249 F.3d 1132, 1136–37 (9th Cir.2001) (holding that the court must consider evidence submitted in support of a *cross*-motion for summary judgment to determine whether it raises triable issues of fact defeating the opponent's motion). Moreover, the only evidence that directly indicates that lead remained on the property in 1995—the McLaren Hart Clean Closure Report—was considered by the RWQCB before it issued its own closure report stating that no further remedial action needed to be taken. To date, no environmental agency has ordered further remediation. Accordingly, even were the court to consider it, this evidence that lead remained on the property in the mid 1990's does not raise a triable issue of fact respecting the existence of a permanent nuisance. See *In re Burbank Environmental Litigation,* 42 F.Supp.2d 976, 984–85 (C.D.Cal.1998) (stating, with respect to a nuisance claim based, *inter alia,* on "minor contamination in the soil," that "[t]he contamination in the soil already meets EPA abatement levels," and thus that "[s]tigma damages [were] not recoverable, and granting defendant's motion to dismiss the stigma damages claim as a result"); *Santa Fe Partnership, supra,* 46 Cal.App.4th at 983–84, 54

ed admissible evidence that a sufficient degree of contamination presently remains at the site that it constitutes a permanent nuisance, or that the remediation did not completely halt any diminution in value the property might otherwise have suffered.[290] Given this absence of evidence, the court cannot find that Carson Harbor has raised a triable issue of fact regarding the existence of a continuing nuisance on the property. Accordingly, the court grants the Partnership Defendants' motion for partial summary judgment on Carson Harbor's claim for diminution in value damages under a permanent nuisance theory.[291]

## III. CONCLUSION

For the reasons stated, the court grants the motions of Unocal Corporation, the City of Carson, the City of Compton, and the County of Los Angeles for summary judgment on plaintiff's CERCLA claims (Docket Nos. 462, 484, 488, and 493). The motion of defendants Carson Harbor Village Mobile Home Park, Richard G. Braley and Walker Smith, Jr. (Docket No. 456) are granted in part and denied in part; plaintiff may not seek damages for diminution in the value of its property on a

permanent nuisance theory. The cross-motion of plaintiff Carson Harbor Village, Ltd. is denied (Docket No. 509). The City of Carson's motion to strike (Docket No. 483) is granted in part and denied in part. Its second motion to strike (Docket No. 523) is also granted in part and denied in part.

Cal.Rptr.2d 214 ("Decisions from courts which have entertained ... claims [for stigma damages in toxic contamination cases] appear to suggest stigma damages could be a proper element of damages in cases presenting *substantial* evidence the property suffers permanent physical injury despite remediation efforts.... [C]ourts have uniformly rejected claims of stigma damages absent evidence the plaintiff's own property suffered physical injury from the contamination" (emphasis added)).

**290.** The court notes, in this regard, that once remediation occurred, Carson Harbor was able to secure a loan from Bank of America without completing a Phase II environmental study. Compare *Santa Fe Partnership, supra,* 46 Cal.App.4th at 977, 54 Cal.Rptr.2d 214 (noting, before rejecting, plaintiffs' argument that "remediation may take as long as 20 years[ ] or more in some cases," and that, in

those circumstances, "it is difficult, if not impossible, to sell or secure a loan against the land due to the stigma which attaches to previously contaminated property"). Goldstein's unsupported, conclusory assertion that a buyer would seek a 20–25% reduction in purchase price, moreover, does not demonstrate ongoing diminution in value, particularly given that Goldstein has made no attempt to sell the property, and his opinion must be deemed entirely speculative as a result.

**291.** The Partnership Defendants contend they are not responsible for attorneys' fees under the indemnity contract because plaintiff has not demonstrated that it is entitled to recover any damages, and is therefore not the prevailing party in this suit. As the court has found that triable issues of fact remain regarding liability and damages, it denies this aspect of defendants' motion.